U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

NOV 1 8 2016

CLERK, U.S. DISTRICT COURT
By _____
        Deputy

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

SALVADOR ORTIZ AND THOMAS SCOTT, §
ON BEHALF OF THEMSELVES AND ALL §
OTHERS SIMILARLY SITUATED,       §
                                 §
          Plaintiffs,            §
                                 §
VS.                              §   NO. 4:16-CV-151-A
                                 §
AMERICAN AIRLINES, INC., ET AL., §
                                 §
          Defendants.            §

MEMORANDUM OPINION
and
ORDER

Before the court for consideration is the relief sought by

plaintiffs in a document they filed in the above-captioned action

on July 18, 2016, titled "Unopposed Motion for Order

Preliminarily Approving (I) Conditional Certification of the

Settlement Classes; (II) Appointment of Lead and Class Counsel;

(III) Preliminary Approval of Settlement; and (IV) Approval of

Form and Manner of Notice."  By this memorandum opinion and

order, the court is providing reasons why it is not in a position

at this time to grant any of the relief sought by that motion.

However, the court is not denying the requested relief, but is

informing plaintiffs of additional information the court wishes

to receive and consider before proceeding further.

I.

## Plaintiffs' Complaint

This action was initiated on February 10, 2016, by Salvadora Ortiz ("Ortiz") and Thomas Scott ("Scott") ("plaintiffs"), on behalf of themselves and others similarly situated, by the filing of a "Class Action Complaint (ERISA)" naming as defendants American Airlines, Inc. ("American"), The American Airlines Pension Asset Administration Committee ("Committee"), and American Airlines Federal Credit Union ("Credit Union").

An abbreviated summary form of plaintiffs allegations is as follows:

The action is brought on behalf of a 401(k) retirement plan for employees of participating AMR Corporation subsidiaries (the "Plan") under §§ 502(a)(2) and 502(a)(3) of the Employee Retirement Income Security Act of 1974, as amended, ("ERISA") (29 U.S.C. §§ 1132(a)(2) and 1132(a)(3)). Each defendant is a fiduciary as to the Plan and its participants, and each violated fiduciary duties owed to the Plan and its participants. Each named plaintiff has been a participant in the Plan, as defined in ERISA § 3(7) (29 U.S.C. § 1002(7)), and has owned, directly or indirectly, an interest in the Plan's investment option that is referred to in the complaint as the American Airlines Credit Union Demand Deposit Fund ("AA Credit Union Fund").

2

In addition to asserting actions on behalf of the Plan, plaintiffs seek certification of the action as a class action on behalf of all participants and beneficiaries of the Plan who invested directly on indirectly in the AA Credit Union Fund at any time from February 12, 2010, through the date of the judgment in this action (excluding certain categories of persons). The class of participants and beneficiaries plaintiffs requested the court to certify was defined as follows:

> All participants and beneficiaries of the $uper $aver, a 401(k) Capital Accumulation Plan for Employees of Participating AMR Corporation Subsidiaries, who invested directly in the AA Credit Union Fund or who indirectly invested in the AA Credit Union Fund by virtue of their investment in the Moderate Pre-Mixed Portfolio or the Conservative Pre-Mixed Portfolio at any time from February 12, 2010 through the date of judgment, excluding the (i) Directors and elected officers of Defendant American Airlines; (ii) the members of the PAAC; the members of any other committee exercising fiduciary responsibility or authority with respect to the Plan, including the Benefits Strategy Committee and the Pension Benefits Administration Committee; and the Directors and elected officers of Defendant AA Credit Union.

Doc. 1 at 9, ¶ 33.[1]

The Plan is an employee pension benefit plan within the meaning of ERISA § 3(2)(A) (29 U.S.C. § 1002(2)(A)). It is an eligible individual account plan, which provides an individual retirement account for each participant, as contemplated by ERISA § 3(34) (29 U.S.C. § 1002(34)), the benefits of which are based solely on the amount contributed to the participant's account,

---

[1]The "Doc. ___" references are to the numbers assigned to the referenced items on the docket in this Case No. 4:16-CV-151-A.

with adjustments for income, gains, losses, and expenses.  Such a
plan is commonly referred to as a "defined contribution plan."
The participants select the investments to be made to their
accounts from investment options provided for the participants by
one or more Plan fiduciaries.  The Plan is intended to comply
with ERISA § 404(c) (29 U.S.C. § 1104(c)) and related
regulations.

By ERISA regulation, one of the investment options that must
be provided to the participants of such a plan is an income-
producing, low-risk, liquid fund.  The only option provided by
defendants to the Plan participants for an investment in that
category was the AA Credit Union Fund, which is a fund sponsored
and managed by Credit Union.

Defendants violated their fiduciary duties by having the AA
Credit Union Fund as the only Plan investment option that would
qualify as an income-producing, low-risk, liquid fund.  The AA
Credit Union Fund produced extremely poor investment returns.  As
of November 5, 2015, the twelve-month return on an investment in
that fund was 0.22%; and, as of January 3, 2016, the twelve-month
return was 0.24%.  The return on the AA Credit Union Fund was at
all material times less than a poorly managed checking account.
At the same time that the AA Credit Union Fund was providing the
Plan participants who invested in it the meager returns described

4

above, checking accounts offered by Credit Union to its
depositors paid better returns than those earned by the Plan
participants who elected to invest in the AA Credit Union Fund.
One such account paid interest at the rate of 2.27%.  Stable
value funds, commonly used by large plans similar to the Plan,
typically offered a greater return on a participant's investment
than does the AA Credit Union Fund.

If defendants had properly performed their fiduciary
obligations to the Plan and its participants, the income-
producing, low-risk, liquid fund option would have been, or
included, a stable value fund.  According to a 2015 Stable Value
Study, 80% of sponsors of similar plans offered a stable value
fund option.  That same study disclosed that returns on stable
value funds were more than double the returns on money market
funds from 1988 to 2015, and that almost 90% of financial
advisors of defined contribution plans were in agreement that the
stable value funds outperformed the returns of money market funds
over the last twenty-five years.

If the Plan funds invested in the AA Credit Union Fund had
instead been invested in a stable value fund returning average
benchmark returns during the proposed class period, plaintiffs
and the other Plan participants would not have lost tens of
millions of dollars in their retirement savings, and would not

continue to suffer additional losses as a result of the existence of the AA Credit Union Fund option in the Plan.

American Airlines and Committee are liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from their breach of fiduciary duties related to the failure to provide a stable value fund as an investment option.

At all relevant times, Credit Union held $1 billion in Plan assets in the AA Credit Union Fund, which is a demand deposit account, for which it had a fiduciary obligation to pay a reasonable rate of interest.  Rather than to pay a reasonable rate of interest to the Plan participants who elected to invest in the AA Credit Union Fund, Credit Union used the $1 billion in Plan assets it held as investments by Plan participants to provide loans to members of Credit Union and to make other investments for which it earned substantial income, which, in turn, permitted Credit Union to offer substantially higher interest rates on similar demand deposit accounts to customers other than the Plan participants who invested in the AA Credit Union Fund.  Credit Union should have paid to plaintiffs in the proposed class at least the same rate of interest it was offering to its other customers.

Consequently, Credit Union is liable under 28 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting

6

from Credit Union's breach of fiduciary duty in failing to pay to the Plan participants a reasonable rate of return on investments they made in the AA Credit Union Fund option.   American shares with Credit Union, as American's co-fiduciary, liability under 29 U.S.C. § 1105(a) for those losses by reason of having participated in Credit Union's breach of fiduciary duty knowing that Credit Union's conduct was such a breach and by failing to take reasonable efforts under the circumstances to remedy the breach.

American and Committee share liability for the loss resulting from Credit Union's breach of fiduciary duties to the Plan and its participants by reason of ERISA § 406(a) (29 U.S.C. § 1106(a)), which prohibits transactions between the Plan and a party-in-interest.

II.

## Defensive Positions of
## American, Committee, and Credit Union

While none of the defendants filed an answer to the complaint, each made known its defensive positions by means of a motion to dismiss.   American and Committee (collectively "Am/Com") jointly filed a motion to dismiss, with a supporting memorandum and appendix, on May 10, 2016.   On the same date,

Credit Union filed its motion to dismiss and supporting
memorandum.

A.   The Substance of the Motion Filed by American and Committee

Am/Com sought dismissal of all claims asserted by plaintiffs
against them on the ground that plaintiffs failed to allege any
claims against either of them upon which relief might be granted.
They interpreted plaintiffs' contention to be that only a stable
value fund is an acceptable principal preservation option for
401(k) plans.  Am/Com urged that Count I be dismissed in its
entirety because plaintiffs have failed to "allege facts that, if
accepted as true, would show that a prudent fiduciary under like
circumstances would not and could not have made the same
investment decision."  Doc. 26 at 6.  Am/Com noted that nothing
in ERISA or its accompanying regulations precluded Plan
investment in Credit Union demand deposit vehicles or required
the inclusion of a stable value fund as an investment option.
They mention that ERISA § 408(b)(4) (29 U.S.C. § 1108(b)(4))
expressly contemplates that all or a part of Plan assets may be
invested in deposits with a bank or similar financial
institution, such as credit unions.

As substantiation for the wisdom of the provision for the
Plan participants of the AA Credit Union Fund option rather than
a stable value fund option, Am/Com pointed to a study they

8

included in the appendix to their motion that indicates that 18%
of defined contribution plans do not include a stable value fund
option, and that 45% of the defined contribution plans that
provide a stable value fund option also provide an alternative
capital preservation option.  Another argument advanced is that
an investment in a stable value fund would have a greater risk of
investment loss than would an investment in the AA Credit Union
Fund.

　　　According to Am/Com, plaintiffs' comparison between stable
value funds and credit union demand deposit vehicles "is all the
more flawed because it ignores the role of the Credit Union
Option in the Plan's broadly diversified lineup," and that "[t]he
Credit Union is just one option among many made available to Plan
participants, all across the risk/return spectrum, from which
participants can construct their individual investment portfolios
according to their individual investment needs and preferences."
Doc. 26 at 10.  The investment options the Plan participants had
during the years 2010-14 are disclosed in Form 5500 excerpts
found in the appendix to the motion.  Doc. 27 at AA-APP 090, 105,
121, 136, and 151.  Those items suggest that the only income-
producing, low-risk, liquid fund option provided to the Plan

participants in each of those years was the AA Credit Union Fund option, and that

(1) of the $7,124,859,000 invested by the Plan participants as of December 31, 2010, $1,255,308,000 was invested in the AA Credit Union Fund demand deposit,

(2) of the $6,439,645,000 invested by the Plan participants as of December 31, 2011, $1,695,160,000 was invested in the AA Credit Union Fund demand deposit,

(3) of the $6,877,523,000 invested by the Plan participants as of December 31, 2012, $1,259,896,000 was invested in the AA Credit Union Fund demand deposit,

(4) of the $8,435,430,000 invested by the Plan participants as of December 31, 2013, $1,145,443,000 was invested in the AA Credit Union Fund demand deposit, and

(5) of the $9,093,254,000 invested by the Plan participants as of December 31, 2014, $1,059,795,000 was invested in the AA Credit Union Fund demand deposit.

Am/Com maintained that the comparison between the returns on the AA Credit Union Fund investment and the 2.27% paid by Credit Union to its checking account depositors is a false comparison because the 2.27% checking account rate applied only to balances up to $5,000, and was subject to reduction for fees, and that any balances above $5,000 "receive a return of 0.05%, . . . , again

10

subject to fees--a fraction of what the Complaint itself reports that the Credit Union Option returns to investors." Doc. 26 at 11.

American contended that the complaint does not allege facts that would support a claim of co-fiduciary liability for alleged fiduciary breaches by Credit Union.  It asserted that, to establish co-fiduciary liability against it, plaintiffs must first establish that Credit Union had fiduciary duties under ERISA, and violated them, and that, for the reasons set forth in Credit Union's separately filed motion to dismiss, the complaint fails to allege facts establishing violation of Credit Union of any fiduciary duty owed to plaintiffs or the Plan. Alternatively, American contended that the complaint does not allege facts that would state a co-fiduciary liability against it even if one were to assume a plausible claim of breach of fiduciary duty against Credit Union because none of the three circumstances prescribed by ERISA § 405(a) (29 U.S.C. § 1105(a)) that authorize co-fiduciary liability against a defendant fiduciary have been alleged by plaintiffs.

Moreover, Am/Com asserted, plaintiffs' allegations that the Plan's investment in the AA Credit Union Fund is a prohibited transaction under ERISA § 406(a) is in error because the

11

investment comes within an exemption provided by ERISA § 408(b)(4) (29 U.S.C. § 1108(b)(4)).[2]

B. The Substance of Credit Union's Motion

Credit Union urged by its motion that all claims asserted by plaintiffs against it should be dismissed because plaintiffs have failed to state a plausible right to relief.

Credit Union interpreted plaintiffs' claim against it to be that it used Plan assets to benefit itself and its other customers in violation of ERISA § 406(b)(1) (29 U.S.C. § 1106(b)(1)), resulting in significant losses for the Plan and its participants. First, Credit Union contended that plaintiff has failed to allege factual bases for its conclusion that Credit Union is a Plan fiduciary. Second, Credit Union maintained that plaintiffs do not allege facts sufficient to establish that

---

[2]Am/Com recognizes that for the ERISA § 408(b)(4) exemption to apply, the deposits in a bank or similar institution must bear a reasonable interest rate. In explaining how the "reasonable interest rate" hurdle is overcome by Am/Com, they state in their motion that:

> By the statute's plain design, ERISA § 408(b)(4)'s purpose is to permit 401(k) plans to invest in bank and similar deposits; the function of this exemption would be frustrated (if not defeated altogether) if the reasonableness of such deposit returns were judged in relation to the returns of a different investment vehicle altogether. See also H.R. Rep. No. 93-1280 (1974), reprinted in 1974 U.S.C.C.A.N. 5038, 5093 ("[T]he prohibited transaction rules of the substitute do not prevent a bank or similar institution ... which is a plan fiduciary from investing all or part of the plan's assets in deposits with the bank ....").

Doc. 26 at 15. Am/Com omitted from the language it quoted from H.R. Rep. No. 93-1280 the ending words "etc., if the deposits bear a reasonable interest rate." H.R. Rep. No. 93-1280 (1974), reprinted in 1974 U.S.C.C.A.N. 5038, 5093. Am/Com seemed to justify that omission by an argument that comparing the rate of return on the AA Credit Union Fund demand deposit with the returns on stable value funds is inappropriate because it is an investment vehicle that has features and terms different from stable value funds.

Credit Union used any of the Plan's assets for its own interest
or for its own account, as they must under the plain terms of
29 U.S.C. § 1106(b)(1).  In support of the latter contention,
Credit Union maintained that plaintiffs never allege a
transaction that benefitted Credit Union, much less a transaction
that would be prohibited.

Alternatively, Credit Union maintained that, even if
plaintiffs had sufficiently pleaded a claim against Credit Union
for a violation of 29 U.S.C. § 1106(b)(1), the alleged prohibited
transactions are exempt under 29 U.S.C. § 1108(b)(4).  In support
of that position, Credit Union maintained that "[p]laintiffs'
sole complaint, . . . , appears to be that the Credit Union
failed to pay the same rate of interest to Plan participants as
it did to its other customers." Doc. 20 at 8.  From there,
Credit Union proceeded to argue that the comparison between the
interest rate earned by the Plan participants on the AA Credit
Union Fund demand deposits and the 2.27% Credit Union paid on the
depositors in one of its checking accounts is inappropriate
because of limitations placed on the checking account to which
plaintiffs refer.  Credit Union maintains that a more appropriate
comparison would be between the interest paid on the AA Credit
Union Fund investments and interest paid by Credit Union on its
other demand deposit accounts.

III.

## Pertinent Allegations In, and Information Provided by, Plaintiffs' Motion and Its Supporting Memorandum and Appendix

The court has not been made aware of the positions plaintiffs would take in response to the grounds of defendants' motions to dismiss.  Rather than to respond to those motions, plaintiffs sought and obtained two extensions of time for the filing of responses before their filing on July 18, 2016, of the motion the court now has under consideration.

The instant motion and its supporting memorandum and appendix contain allegations and information that raise concerns as to whether an order of the kind sought by plaintiffs should be issued.

A.  ## Information Plaintiffs Say Caused Them to Conclude That They Had Valid Claims Against Defendants

On the fifth page of plaintiffs' supporting memorandum, the following statements are made:

> Before filing the Complaint, Class Counsel undertook extensive investigation to support the allegations and claims in the Complaint. Nestico Decl. ¶¶4 - 6 (APP61-63). Among other things, Class Counsel, working with industry experts and ERISA consultants, examined and evaluated Department of Labor filings from the Plan and peers; Department of Labor filings from parties in interest to the Plan; the investment structure of the Plan in comparison with other types of retirement plans; plan studies and surveys addressing various types of fixed-income investment alternatives available to plan sponsors, including historic risk and return characteristics of those alternatives; industry

14

surveys and studies addressing the performance of
stable value funds over time, including periods of high
market volatility; professional publications discussing
various types of stable value products such as
insurance company guaranteed investment contracts,
insurance company pooled separate accounts, and
separately managed synthetic guaranteed investment
contracts; as well as the prevalence of stable value
funds in ERISA qualified retirement plans; rules of the
Financial Accounting Standards Board governing the
requirements of and accounting for stable value funds;
and other research regarding the use of demand deposits
for long-term investing in qualified retirement plans.
Id. at ¶4 (APP61). Class Counsel, working with
consultants, constructed estimated damages models for
the Plan extrapolating from the publicly available, but
necessarily non-plenary information. Id. at ¶5 (APP63).
Later, Class Counsel, working with experts and
consultants, incorporated information shared by
Defendants in mediation into these models. Id. at ¶6
(APP63).

Doc. 52 at 5.[3] And, plaintiffs add that:

The Complaint in the Action was the product of
hundreds of hours of extensive and careful research and
analysis. Plaintiffs' Counsel worked closely with
consultants to investigate the claims, with numerous
analyses of complex financial and investment data, in
addition to reviewing Plan documents, financial
statements, prospectuses, studies, surveys, and other
information and data to prepare the Complaint.

Id. at 22.

---

[3]The "APP" references in the quoted language are to statements made in the declaration of
Nestico that is found in plaintiffs' supporting appendix. Doc. 53 at APP 60-66.

B.   The Process That Plaintiffs Say Led to the Proposed
     Settlement

Plaintiffs described the process that led to their decision

to advocate the proposed settlement agreement now under

consideration by saying in their memorandum:

> A private mediation was arranged with the Honorable
> Faith Hochberg of Hochberg ADR. Id. at ¶7 (APP63).
> Judge Hochberg has extensive experience in mediating
> complex class actions, including class actions
> involving claims of ERISA violations. The parties
> exchanged mediation briefs and other supporting
> documents in advance of the June 6, 2016 mediation.
> Nestico Decl. ¶7 (APP63). At the day-long mediation,
> the parties were able to reach tentative agreement on
> some, but not all, key terms. Id. at ¶7 (APP63).
>
>      Subsequent to the mediation, on or about June 7,
> 2016, Judge Hochberg made a mediator's proposal to the
> parties, i.e., a proposal offered on a take-it-or-
> leave-it basis. Id. at ¶7 (APP63). The parties accepted
> Judge Hochberg's proposed terms on June 14,2016. Id. at
> ¶7 (APP63).

Id. at 5-6.[4]  Plaintiffs explained that:

> Prior to mediating with Judge Hochberg, the parties
> exchanged confidential information so that the parties
> could more accurately value the claims. The parties
> prepared detailed, substantive mediation briefs before
> mediation. The parties' respective positions and
> arguments were also subjected to vigorous questioning
> and analysis by the mediator.

Id. at 22-23.  And, at page 22 of the memorandum:

>      The Settlement here was achieved through
> extensive, arm's-length negotiations under the guidance
> of Judge Faith Hochberg. Judge Hochberg has extensive

---

[4]The "APP" references are again to the Nestico declaration contained in the Appendix.

> experience mediating complex class actions.  In
> addition to the in-person mediation session, Judge
> Hochberg communicated with the parties by phone and
> email to achieve Settlement. With her assistance, the
> parties ultimately reached agreement and executed a
> memorandum of understanding summarizing the key terms
> on June 14, 2016.

Id. at 22 (footnote omitted).

Plaintiffs informed the court in their memorandum that they have undertaken discovery to confirm the accuracy and truthfulness of the facts they relied upon in connection with the proposed settlement, which, when the discovery has been completed, will have entailed a review of years of records of the Plan's relevant fiduciary committees and interviews of key individuals.  Id. at 23.  John J. Nestico, one of the attorneys for plaintiffs, in his declaration, elaborated on plaintiffs' ongoing efforts to acquire information relative to the merit of the proposed settlement by saying:

> Plaintiffs' counsel also reviewed additional
> documents provided by Defendants to confirm assumptions
> on which the settlement is premised, including two
> years of records for the American Airlines Pension
> Asset Administration Committee, and will review several
> more years of records as provided by Defendants.
> Plaintiffs' Counsel also plan to conduct interviews
> with American Airlines executives aud employees
> responsible for selecting and managing the Plan's
> investment choices within the next few weeks.

Doc. 53 at APP65, ¶ 9.

C.    The Proposed Settlement Agreement

The motion documents disclose that the proposed settlement
agreement contemplates certification for settlement purposes of
two non opt-out (Doc. 53 at APP15, ¶ 2.13) classes, one
designated the "Monetary Relief Class," defined as follows:

> The "Monetary Relief Class" will consist of all
> current and former participants in the Plan who
> maintained a balance of any amount in the Plan at any
> point during the period from February 10, 2010 to the
> date of the Preliminary Approval Order, and who
> invested directly or indirectly in any of the following
> capital preservation options at any time from
> February 10, 2010 to the date of entry of the
> Preliminary Approval Order:
>
> (i)     The American Airlines Federal Credit Union
>         Option;
> (ii)    The Fidelity Institutional Money Market -
>         Money Market Portfolio; or
> (iii)   The Fidelity Managed Income Portfolio II
>         (collectively the "Fixed Income Options").

Doc. 52 at 11, and, the other designated the "Structural Relief
Class," defined as follows:

> The "Structural Relief Class" will consist of all
> participants in the Plan on or after the date of entry
> of the Preliminary Approval Order.

Id.

Plaintiffs disclosed in their memorandum that the only
monetary payment defendants[5] will make as part of the settlement

---

[5]The proposed settlement agreement itself discloses that the monetary payment will be made by
"[d]efendants or their insurers." Doc. 53 at APP16, ¶ 4.1(a).

is $8,800,000.[6]  Out of that, there is to be deducted attorneys'

fees to be received by plaintiffs' counsel, not to exceed one-

third of the remaining balance of the $8,800,000 payment[7] after

certain described deductions have been made.[8] Whatever is left is

to be allocated to Monetary Relief Class Members on a pro rata

basis according to a formula described in an exhibit to the

proposed settlement agreement.[9]

The benefits to be received by the members of the Structural

Relief Class, as well as members of the Monetary Relief Class,

are described in plaintiffs' memorandum as follows:

> Defendants will implement the following changes to the
> Plan (the "Structural Relief"), unless otherwise noted:

---

[6]The proposed settlement agreement language discloses that the $8,800,000 monetary payment is to be made in two segments, the first a $500,000 payment to be deposited to an Escrow Account within thirty days after the entry of the preliminary approval, and the $8,300,000 balance to be deposited into the Escrow Account within thirty days following what is referred to in the settlement agreement as the "Effective Date." Doc. 53 at APP16-17, ¶ 4.1(a). The proposed settlement agreement has rather complex provisions concerning the handling of the Escrow Account, including a provision that, if approved by the court, would cause the court to have an ongoing obligation to monitor the handling of the funds in the Escrow Account, saying that "[a]ll funds held in the Escrow Account shall be deemed to be in the custody of the Court and shall remain subject to the jurisdiction of the Court until the funds are distributed in accordance with [the settlement agreement]." Id. at APP17, ¶ 4.1(e); APP16-19, ¶¶ 4.1(a-j).

[7]The proposed settlement agreement itself provides that the award of attorneys' fees and expenses to class counsel is "not to exceed in any event fifty percent of the value of the Monetary Relief . . . ." Doc. 53 at APP26, ¶ 8.2.

[8]According to plaintiffs' motion, the deductions before allocation to the Monetary Relief Class members are to be incentive awards to plaintiffs, attorneys' fees and expenses, independent fiduciary fees, settlement administration costs, and taxes and tax-related costs.

[9]The proposed settlement agreement's scheme for distribution of settlement funds to the Monetary Relief Class members is set forth in its paragraph 4.2, which, in turn, refers to its Exhibit C for the Plan of Allocation. Doc. 53 at APP19-22, ¶¶ 4.2-4.6; APP57-58 (Ex. C).

> the Plan shall retain the services of an unaffiliated
> investment consultant to assist the American Airlines
> Pension Asset Administration Committee (the
> "Committee") or its successor in selection of an
> appropriate "stable value fund" which, for this
> purpose, shall be defined as a designated investment
> alternative in the Plan that will provide capital
> preservation, liquidity, and steady, positive returns
> that are expected to exceed the returns of money market
> investments over time. The ultimate selection of the
> fund will be within the discretionary authority of the
> Committee, but shall be derived from the competitive
> selection process employed by, and based on the
> recommendations of, the investment consultant. The fund
> may be in the form of any of the stable value products
> available in the marketplace, which may include the
> stable value product added to the Plan at the end of
> 2015, provided the above conditions are met.

Doc. 52 at 6-7.[10]

Plaintiffs, through their counsel, estimate that the future
monetary value to Plan participants of the "Structural Relief"
described above "is between $30,000,000 to $48,000,000 for the
three-year [period] following the implementation of the
Structural Relief, based on certain assumptions." Id. at 7.   A
detailed explanation of how that estimated future monetary value

---

[10]The description by plaintiffs in their memorandum of the Structural Relief is basically consistent with the language of the proposed settlement agreement, except that plaintiffs' description omits a section that is problematic. Paragraph 3.4 provides that:

> Notwithstanding anything in this Section III to the contrary, Defendants shall not be required to comply with any provision of this Section III should any change in applicable law, based on advice of counsel, render such compliance unlawful or unreasonably burdensome or prohibitively expensive.

Doc. 53 at APP16, ¶ 3.4.  The court notes that there is no provision for resolution of the dispute that would arise if Plan participants were to disagree with the advice of defendants' counsel that compliance with the Structural Relief provision would be unlawful or unreasonably burdensome or prohibitively expensive, other than, perhaps, the dispute resolution provision. Id. at APP30, ¶ 11.2.

was determined is found in the declaration of Nestico, in which

he explains:

> Plaintiffs' Counsel, with the assistance of qualified
> financial experts, have estimated the value of the
> Structural Relief to be between thirty million and
> forty-eight million dollars ($30,000,000-$48,000,000)
> for a three-year period following implementation of the
> Structural Relief, depending on the value of
> participant accounts transferred from the American
> Airlines Credit Union Demand Deposit Option into the
> new stable value option provided for in the Structural
> Relief. Records for the Plan indicate that the average
> investment return for the American Airlines Credit
> Union Demand Deposit Option for the ten-year period
> preceding the filing of the Complaint was 0.57% (57
> basis points), with a one-year rate of return of 0.24%
> (24 basis points). By contrast, a well-performing
> stable value fund, such as the Bank of America Stable
> Value Fund, has provided an investment return of 2.97%
> over the preceding five-year period, and guaranteed-
> interest products offered by insurance companies, such
> as the Mass Mutual Guaranteed Interest Account have
> provided a stable return of 3.03% over that same five-
> year period. Hueler Analytics, one of the premier
> stable value analysts, reports <u>average</u> investment
> returns of 2.25% for the preceding five years.
> Accordingly, for purposes of estimating the value of
> the Structural Relief, Plaintiffs' Counsel have
> calculated that a competitive selection process could
> result in the selection of a stable value fund that
> could produce returns that somewhat higher than the
> Hueler average but not as high as the Bank of America
> Stable Fund or the Mass Mutual Guaranteed Interest
> Account, resulting in investment returns that are 2%
> higher than the return on the Plan's current stable
> value fund option. Based on that assumption, if
> participants move half of the approximately one billion
> dollars of their accounts currently invested in the
> American Airlines Credit Union Demand Deposit Option
> into the new stable value fund option, participants
> would earn an additional $10,000,000 per year in
> investment return, and if participants move eighty
> percent of their accounts invested in the American

21

Airlines Credit Union Demand Deposit Option, the
increased investment return would equal $16,000,000 per
year, resulting in a range of value for the Structural
Relief Of $30,000,000-$48,000,000 for the three-year
period following implementation of the Structural
Relief..

Doc. 53 at APP64-65, ¶ 8.

Plaintiffs' memorandum explains that the proposed settlement

contemplates that all members of the settlement classes will

release defendants and other parties, as described in the

settlement agreement, of any claims arising out of or relating in

any way to the subject matter of the instant action, and covenant

not to sue any of the released parties on any such claims.

According to the memorandum,

> [t]he release will include direct and derivative
> claims, claims on behalf of any class, claims under
> ERISA, common law and any other statute, in each with
> respect to the claims covered by the Complaint, and
> shall extend to all Defendants, including each of their
> present, past, and future predecessors, successors,
> parents, subsidiaries, affiliates, divisions, assigns,
> officers, directors, committees, employees,
> fiduciaries, administrators, actuaries, agents,
> insurers, representatives, attorneys, retained experts
> and trustees.

Doc. 52 at 9.[11]

The proposed settlement agreement has language that has the

potential to cause the agreement to be terminated if the court

---

[11]The definition of the claims that are to be released and the subjects of the covenant not to sue are extremely broad. Doc. 53 at APP5-6, ¶ 1.12; APP9, ¶ 1.34; APP10-11, ¶ 1.46; APP23, ¶¶ 6.1 & 6.2.

does not use the proposed preliminary approval order, the
proposed notice to members of the classes, or the proposed final
order and judgment, "including, but not limited to any judicial
findings included therein."   Doc. 53 at APP27, ¶¶ 9.1 & 9.2.   The
provisions in the proposed settlement agreement the court has
located that, in effect, provide that, if the court were to
approve the settlement, the court would be obligated to use the
proposed court documents attached thereto as exhibits are found
at Doc. 53 at APP7, ¶ 1.20; APP7-8, ¶ 1.25; APP9, ¶ 1.33; APP11,
¶ 2.2; APP12, ¶ 2.6; APP14, ¶ 2.9; APP27, ¶¶ 9.1 & 9.2; and
APP28, ¶ 9.4.

IV.

## Concerns of the Court

The court recognizes that at this preliminary approval
stage, the court is limited to determinations as to whether the
court is satisfied that the proposed settlement appears to be the
product of serious, informed, non-collusive negotiations, has no
obvious deficiencies, and does not improperly grant preferential
treatment to class representatives or segments of the class, and
that there is good cause to order issuance of notice to the
proposed settlement classes of the proposed settlement, and to
proceed with a hearing to determine whether the proposed
settlement should be approved as being fair, reasonable, and

adequate to the members of the proposed classes as Rule 23(e)(2) of the Federal Rules of Civil Procedure contemplates. See In re Shell Oil Refinery, 155 F.R.D. 552, 555 (E.D. La. 1993). The court has not been persuaded by the information it has received thus far that there is good cause for entry of such an order or to proceed with such a hearing.

A.   Information Received by the Court Suggests That the Monetary Payment Is Inadequate

Plaintiffs have provided the court information that causes the court to be persuaded that if this case were to go to trial, a fact finder probably would find that American and Committee, as Plan fiduciaries, should have provided the Plan participants an opportunity to invest in a stable value fund as an income-producing, low-risk, liquid fund option instead of, or in addition to, the AA Credit Union Fund option.

All parties to this action seem to take as a given that money market funds, though perhaps riskier, generally generate higher returns on a participant's investment than a demand deposit fund such as the AA Credit Union Fund. At least one authority has recognized that "Stable Value Funds simply outperform money market funds." Paul J. Donahue, Plan Sponsor Fiduciary Duty for the Selection of Options in Participant-Directed Defined Contribution Plans and the Choice Between Stable

Value and Money Market, 39 Akron L. Rev. 9, 24 (2006). According
to that author, "Stable Value Funds are one of the more popular
investment options among [defined contribution] Plan
Participants." Id. at 20.  The author included the following in
the article's Conclusion:

> Plan Sponsor choice of Plan options in Section
> 404(c) participant-directed plans is a fiduciary
> responsibility of the Plan Sponsor. Section 404(c) does
> not relieve Plan Sponsors of liability for failing to
> uphold ERISA's "prudent expert" fiduciary duty standard
> in choosing plan options. Further, a Plan Sponsor must
> provide adequate disclosure of the risks and returns of
> each option offered, as well as having selected the
> option prudently, in order to shift the liability for
> their option selections to Plan Participants.
>
> Stable Value Fund or Money Market Fund is a
> universal example of Plan Sponsor exercise of option
> selection, because of the requirement of a liquid, low
> volatility fund. In the context of a [defined
> contribution] Plan, Stable Value has an absolute
> superiority to Money Market, as any reasonable due
> diligence investigation would make clear. The choice of
> a Money Market Fund instead of a Stable Value Fund
> meaningfully decreases Participant wealth and is a
> clear violation of a Plan Sponsor's duty to select
> options as a prudent expert. Participants who were
> offered only Money Market Funds have a right to recover
> the difference in lost income from Plan Sponsors as
> damages due to a breach of fiduciary duty.

Id. at 33.  Also pertinent is the study mentioned by plaintiffs
in their complaint, supra at 5, a copy of which is in the

appendix American and Committee filed with their motion to dismiss, Doc. 27 at AA-APP 153-179.[12]

According to plaintiffs and their experts, if defendants were to provide a stable value fund option to the Plan participants for the next three years, the participants would earn an additional $10 million to $16 million per year, for a total increase in earnings of $30 million to $48 million for the three-year period. Using those same per-year numbers, if a stable value fund option had been included as an income-producing, low-risk, liquid fund option, from February 2010 through this date, the income the Plan participants have lost by reason of the absence of a stable value fund option would appear to have been between $55 million and $88 million. Based on the information provided to the court, if this action were to be pursued through litigation rather than by settlement, such an outcome would appear likely.[13] That being so, the court does not

---

[12]The study says in its Introduction that:
Stable value is the most widely used safe option by asset volume. Stable value offers significantly higher returns than alternatives in the capital preservation space, with less risk. It is this combination that makes stable value options popular among plan participants.
Doc. 27 at AA-APP 157.

[13]Factors the Fifth Circuit has recognized as proper to be considered in evaluating adequacy of a class-action settlement include the strength of the case for the plaintiffs, balanced against the amount offered in settlement, and a comparison of the settlement terms with likely rewards the class would have received following a successful trial. In re Corrugated Container Antitrust Litig., 643 F.2d 195, 212 (5th Cir. 1981).

now have information that would allow it conclude that there is a realistic chance that after a hearing the court would determine that the proposed settlement, which contemplates a payment by defendants of only $8.8 million to certain of the putative class members, should be approved as being fair, reasonable, and adequate to the members of the proposed classes.

B.    The Court Is Concerned with the Broad Releases, and Covenants Not to Sue, to Which the Class Members Would Be Subjected If the Settlement Were to Be Approved

The court would not be inclined to approve a settlement agreement that is binding on all the settlement class members that contains broad release and covenant-not-to-sue language of the kind contemplated by the proposed settlement agreement.  The court would not expect release or covenant-not-to-sue language in a settlement of claims of the kind that have been made by the plaintiffs in this action to be broader than the scope of the claims that are being settled.

Another concern is the effect on the Structural Relief Class of the proposed releases and covenants not to sue. Even though the members of the Structural Relief Class are not being permitted to participate in the monetary relief aspect of the proposed settlement, they would be denied by the broad release and covenant-not-to-sue language from bringing a future action against any of the defendants (or other released parties) for

27

whatever losses they might have suffered in the past from the failure of the Plan fiduciaries to give them an opportunity to invest in a stable value fund as an income-producing, low-risk, liquid fund option, rather than in the AA Credit Union Fund option.   The court is not satisfied that none of the members of the Structural Relief Class who chose not to invest in the AA Credit Union Fund (or one of the other funds listed in the Monetary Relief Class definition) suffered damages by reason of not having an option to invest in a stable value fund in years past.

C.   Members of Both Settlement Classes Should Receive Notice by First-Class Mail

A related concern is the language in the proposed settlement agreement that contemplates that the Structural Relief Class members would not receive by first-class mail the Class Notice, thus causing them to be less likely than the Monetary Relief Class members to have notice of a final approval hearing.   Doc. 53 at APP14, ¶ 2.9.

D.   The Court Is Satisfied That it Would Not Approve Certain Provisions in the Proposed Court Documents

The proposed documents contemplate that the court, after approving the settlement agreement, and entering a final judgment, would, nevertheless, have ongoing involvement in this action, perhaps for years, in matters related to the settlement.

28

See Doc. 53 at APP6, ¶ 1.15; APP17, ¶ 4.1(c), (d), & (e); APP19-20, ¶ 4.2(b); APP21, ¶ 4.5; APP22, ¶ 5.2; APP32, ¶ 11.8; APP33, ¶ 11.12.   The proposed Judgment Approving Settlement of Class Action contains injunctive-type language, such as the wording in its paragraph 6 that "[t]he Parties are directed to implement, perform, and consummate the Settlement in accordance with the terms and provisions of the Agreement."   Doc. 53 at APP42, ¶ 6. The court would not be inclined to put that language in a judgment.[14]   The court would expect the parties to include in their settlement agreement whatever language needs to be in it for there to be a complete settlement between the parties, without the court being involved in an ongoing basis through wording of the settlement agreement or a judgment.

The court anticipates that if the court were to preliminarily approve a settlement agreement, conditionally certify the settlement classes, and appoint for settlement purposes leading class counsel, the court would prepare its own order granting that relief and providing the court's explanations as to why it was doing so.   Therefore, the court does not anticipate that it would use an order on those subjects provided by the parties for the court's signature.   The same is true as to

---

[14]Nor would the court put in a judgment much, if any, of the language proposed in paragraphs 2-4 and 8-15 of the proposed Judgment Approving Settlement of Class Action. Doc. 53 at APP41, 43-46.

notice to the class members and any final approval order and final judgment, if the matter were to go that far.

The court adds that it would not, if the matter were to go that far, approve the wording of the proposed notice to the settlement class members that is identified as Exhibit B to the proposed settlement agreement.   Id. at APP48-55.  The court anticipates that, if the matter were to reach that point, the court would prepare a notice acceptable to the court, using as much of the proposed notice as would be consistent with the court's view of what a proper notice should say, and then present the notice to the parties for comment before making a final decision as to the wording to be used.

The court is calling the matters discussed under this subheading to the attention of the parties because of the wording in some of the documents presented by plaintiffs to the court for review indicating that the proposed settlement will not go forward, or will be subject to termination, if the court does not choose to use as court documents ones worded consistent with the ones drawn by the parties.

V.

Possible Future Courses of Action for Plaintiffs to Take

If, after considering the foregoing contents of this memorandum opinion and order, and after consultation with counsel

30

for defendants, plaintiffs wish to proceed further with the
motion they filed on July 18, 2016, the court suggests that
plaintiffs give thought to the following courses of action:

(a)   Presumably the concerns the court expressed in the B,
C, and D parts of section IV could be resolved by a redrafting of
the proposed settlement agreement and a rethinking of their
wishes as to the contents of the proposed court documents.   If
the parties do not wish to tackle those projects, all plaintiffs
need to do is to inform the court of that fact.   Upon being so
informed, the court will deny plaintiffs' July 18, 2016 motion,
and go forward with steps to dispose of the litigation in the
usual manner, starting with fixing a deadline for plaintiffs'
responses to defendants' motions to dismiss.

If redrafting is to be accomplished and rethinking is to be
done, plaintiffs should promptly inform the court of that fact,
and give the court an indication as to when the court might be
expected to receive further filings by plaintiffs.   As the court
has indicated, the court plans for the most part to do its own
wording of any preliminary approval order, notice to the class
members, and final order and final judgment.   In preparing those
documents, the court would take into account the terms of any
revised proposed settlement agreement that the court has found
acceptable.

(b)   If plaintiffs wish to address the concerns the court
expressed in part A of section IV, the court will be receptive to
the receipt of further information from plaintiffs bearing on
that subject.   The documents filed by plaintiffs suggest that
they have an abundance of information that might give the court
further insight on the subject.

The court would benefit from the results of the "extensive
investigation to support the allegations and claims in the
Complaint" to which plaintiffs refer in their memorandum.   See
supra at 14.   According to plaintiffs, that investigation
involved plaintiffs' counsel working with industry experts and
ERISA consultants, examining and evaluating Department of Labor
filings from the Plan and peers, Department of Labor filings from
parties-in-interest to the Plan, the investment structure of the
Plan, etc.   Supra at 15.   Plaintiffs assert that their counsel,
working with consultants, "constructed estimated damages models
for the Plan extrapolating from the publicly available, but
necessarily non-plenary information," id., and that later counsel
for plaintiffs, "working with experts and consultants,
incorporated information shared by defendants in mediation into
these models," id.   The court would benefit from copies of the
results and products of all of the activities described in the
quoted language in section III. A. above.

32

Equally informative would be the writings that are mentioned in section III. B. above, particularly (1) all documentation provided to Judge Hochberg for her consideration, (2) the mediation briefs and other supporting documents that were prepared or exchanged in advance of the June 6, 2016 mediation, (3) Judge Hochberg's mediator's proposal, and (4) any other documentation that had a role in the mediation conducted by Judge Hochberg, including all information exchanged by the parties in preparation for or in the process of the mediation.

If a record was made of any of the "vigorous questioning and analysis by the mediator" (supra at 16), a transcript of the record could prove helpful.  Plaintiffs indicate in their memorandum that there were extensive exchanges between Judge Hochberg and one or both of the parties.  Whatever record was made of any of those exchanges would be helpful.  The court probably would benefit from seeing the memorandum of understanding summarizing the key terms that was executed on June 14, 2016.

VI.

Order

Consistent with the foregoing, the court is withholding a final ruling on the motion filed by plaintiffs on July 18, 2016.

33

The court ORDERS that if plaintiffs wish to take steps to resolve the concerns of the court expressed in section IV above, they advise the court of that fact by a document filed by December 8, 2016, providing in that document a detailed description of what plaintiffs propose to do to resolve those concerns and when the court can expect them to do whatever that is.

SIGNED November 18, 2016.

JOHN McBRYDE
United States District Judge