## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| SALVADORA ORTIZ and THOMAS SCOTT, on behalf of themselves and all others similarly situated, | § § § § | |
| Plaintiffs, | § § | Case No. 4:16-cv-00151-A |
| v. | § § | |
| AMERICAN AIRLINES INC., THE AMERICAN AIRLINES PENSION ASSET ADMINISTRATION COMMITTEE, and AMERICAN AIRLINES FEDERAL CREDIT UNION, | § § § § § § | |
| Defendants. | § | |

## DEFENDANTS AMERICAN AIRLINES, INC.'S AND THE AMERICAN AIRLINES PENSION ASSET ADMINISTRATION COMMITTEE'S (REDACTED) MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT THEREOF

Dee J. Kelly, Jr. (S.B. # 11217250)
Lars L. Berg (S.B. # 00787072)
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Tel.: (817) 332-2500
Fax: (817) 878-9280
dee.kelly.2@kellyhart.com
lars.berg@kellyhart.com

Brian D. Boyle (*admitted pro hac vice*)
(D.C. Bar # 419773)
Shannon M. Barrett (*admitted pro hac vice*)
(D.C. Bar # 476866)
Meaghan VerGow (*admitted pro hac vice*)
(D.C. Bar # 977165)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Tel.: (202) 383-5300
Fax: (202) 383-5300
bboyle@omm.com
sbarrett@omm.com

*Cont'd on Next Page*

Jeffrey I. Kohn (*admitted pro hac vice*)
(N.Y. Bar # 1980838)
O'Melveny & Myers LLP
7 Times Square
New York, New York 10036
Tel.: (212) 326-2000
Fax: (212) 326-2061
jkohn@omm.com

*Attorneys for Defendants American Airlines, Inc. and*
*the American Airlines Pension Asset Administration Committee*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF FACTS ...................................................................... 3

    A.    Factual Background ................................................................. 3

        1.    *American Airlines' 401(k) Plan* ........................................ 3

        2.    *Plaintiffs—and Other American Airlines Employees— Preferred the Credit Union Option* ................................ 7

ARGUMENT ..................................................................................... 9

    I.    UNDISPUTED FACTS FORECLOSE PLAINTIFFS' CLAIM THAT DEFENDANTS IMPROPERLY SELECTED OR RETAINED THE CREDIT UNION OPTION (COUNT I) ..................................... 9

        A.    Plaintiffs Lack Article III Standing to Bring Their Imprudence Claim Because They Have Failed to Establish That They Suffered An Injury In Fact ......................................................... 11

        B.    Plaintiffs' Challenge To The Initial Selection Of The Credit Union Option Is Time-Barred ................................................ 15

        C.    Undisputed Facts Preclude Plaintiffs From Establishing That the Credit Union Option Was An Unreasonable Retirement Investment Vehicle, And Thus That the Fiduciaries Improperly Retained It ......... 16

            1.    *Plaintiffs have failed to provide a meaningful benchmark to support their imprudence claim.* ................................... 18

                (a)    Greater Risk ............................................. 19

                (b)    Less Liquidity .......................................... 23

            2.    *Plaintiffs' Criticism of Options Like the Credit Union Option Is Out-Of-Step With Fiduciary Practice, And Recent Cases Have Rejected Similar Categorical Challenges to Capital Preservation Options With Lower Returns.* .......... 24

            3.    *Plaintiffs' Argument Ignores the Role of the Credit Union Option Within the Plan's Broader Investment Menu.* .......... 27

    II.    UNDISPUTED FACTS SHOW THAT PLAINTIFFS' CLAIM FOR CO-FIDUCIARY LIABILITY AGAINST AMERICAN AIRLINES FAILS (COUNTS I AND II) ....................................................... 28

    III.    UNDISPUTED FACTS ESTABLISH THAT THE PLAN'S CREDIT UNION OPTION FALLS WITHIN AN ERISA PROHIBITED TRANSACTION EXEMPTION, THUS PRECLUDING PLAINTIFFS' PROHIBITED TRANSACTION CLAIM (COUNT III) .................. 30

CONCLUSION ................................................................................. 32

**TABLE OF AUTHORITIES**

Page(s)

## Cases

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..........................................................................................9

*Bell v. Pension Comm. of ATH Holding Co.*,
2017 WL 1091248 (S.D. Ind. Mar. 23, 2017).........................................26

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)..........................................................................................9

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)..........................................................................................4

*Cunningham v. Cornell Univ.*,
2019 WL 4735876 (S.D.N.Y. Sept. 2019)..............................................18

*Davis v. Wash. Univ. in St. Louis*,
960 F.3d 478 (8th Cir. 2020) ...............................................17, 18, 19

*DeBruyne v. Equitable Life Assurance Soc'y*,
920 F.2d 457 (7th Cir. 1990) ...............................................16, 22

*Donovan v. Cunningham*,
716 F.2d 1455 (5th Cir. 1983) ........................................................29

*Dorman v. Charles Schwab Corp.*,
2019 WL 580785 (N.D. Cal. Feb. 8, 2019) ............................................26

*Dupree v. Prudential Ins. Co. of Am.*,
2007 WL 2263892 (S.D. Fla. Aug. 10, 2007)........................................32

*Ferguson v. Ruane Cunniff & Goldfarb Inc.*,
2019 WL 4466714 (S.D.N.Y. Sept. 18, 2019)........................................26

*Fifth Third Bancorp v. Dudenhoeffer*,
573 U.S. 409 (2014)........................................................................18

*Glennie v. Abitibi-Price Corp.*,
912 F. Supp. 993 (W.D. Mich. 1996) ..................................................22

*Hecker v. Deere & Co.*,
556 F.3d 575 (7th Cir. 2009) .............................................................17

*Horvath v. Keystone Health Plan E., Inc.*,
333 F.3d 450 (3d Cir. 2003).............................................................15

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF FACTS ................................................................................................... 3

    A.    Factual Background ...................................................................................... 3

           1.    *American Airlines' 401(k) Plan* ..................................................... 3

           2.    *Plaintiffs—and Other American Airlines Employees— Preferred the Credit Union Option* ............................................... 7

ARGUMENT .................................................................................................................... 9

    I.    UNDISPUTED FACTS FORECLOSE PLAINTIFFS' CLAIM THAT DEFENDANTS IMPROPERLY SELECTED OR RETAINED THE CREDIT UNION OPTION (COUNT I)................................................................. 9

        A.    Plaintiffs Lack Article III Standing to Bring Their Imprudence Claim Because They Have Failed to Establish That They Suffered An Injury In Fact................................................................................. 11

        B.    Plaintiffs' Challenge To The Initial Selection Of The Credit Union Option Is Time-Barred. ............................................................... 15

        C.    Undisputed Facts Preclude Plaintiffs From Establishing That the Credit Union Option Was An Unreasonable Retirement Investment Vehicle, And Thus That the Fiduciaries Improperly Retained It............ 16

           1.    *Plaintiffs have failed to provide a meaningful benchmark to support their imprudence claim.* .................................................. 18

                (a)    Greater Risk ................................................................. 19

                (b)    Less Liquidity .............................................................. 23

           2.    *Plaintiffs' Criticism of Options Like the Credit Union Option Is Out-Of-Step With Fiduciary Practice, And Recent Cases Have Rejected Similar Categorical Challenges to Capital Preservation Options With Lower Returns.* ................... 24

           3.    *Plaintiffs' Argument Ignores the Role of the Credit Union Option Within the Plan's Broader Investment Menu.* ................. 27

    II.    UNDISPUTED FACTS SHOW THAT PLAINTIFFS' CLAIM FOR CO-FIDUCIARY LIABILITY AGAINST AMERICAN AIRLINES FAILS (COUNTS I AND II). .......................................................................... 28

    III.    UNDISPUTED FACTS ESTABLISH THAT THE PLAN'S CREDIT UNION OPTION FALLS WITHIN AN ERISA PROHIBITED TRANSACTION EXEMPTION, THUS PRECLUDING PLAINTIFFS' PROHIBITED TRANSACTION CLAIM (COUNT III). ................................... 30

CONCLUSION................................................................................................................ 32

**TABLE OF AUTHORITIES**

**Page(s)**

## Cases

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)...................................................................................... 9

*Bell v. Pension Comm. of ATH Holding Co.*,
    2017 WL 1091248 (S.D. Ind. Mar. 23, 2017)........................................ 26

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)...................................................................................... 9

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013)...................................................................................... 4

*Cunningham v. Cornell Univ.*,
    2019 WL 4735876 (S.D.N.Y. Sept. 2019)........................................... 18

*Davis v. Wash. Univ. in St. Louis*,
    960 F.3d 478 (8th Cir. 2020) .............................................. 17, 18, 19

*DeBruyne v. Equitable Life Assurance Soc'y*,
    920 F.2d 457 (7th Cir. 1990) ..................................................... 16, 22

*Donovan v. Cunningham*,
    716 F.2d 1455 (5th Cir. 1983) ........................................................... 29

*Dorman v. Charles Schwab Corp.*,
    2019 WL 580785 (N.D. Cal. Feb. 8, 2019) ..................................... 26

*Dupree v. Prudential Ins. Co. of Am.*,
    2007 WL 2263892 (S.D. Fla. Aug. 10, 2007)................................. 32

*Ferguson v. Ruane Cunniff & Goldfarb Inc.*,
    2019 WL 4466714 (S.D.N.Y. Sept. 18, 2019).............................. 26

*Fifth Third Bancorp v. Dudenhoeffer*,
    573 U.S. 409 (2014).................................................................................. 18

*Glennie v. Abitibi-Price Corp.*,
    912 F. Supp. 993 (W.D. Mich. 1996) ............................................... 22

*Hecker v. Deere & Co.*,
    556 F.3d 575 (7th Cir. 2009) .............................................................. 17

*Horvath v. Keystone Health Plan E., Inc.*,
    333 F.3d 450 (3d Cir. 2003)............................................................... 15

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*In re Ark-La-Tex Timber Co., Inc.*,
    482 F.3d 319 (5th Cir. 2007) ................................................. 9

*In re Dell, Inc. ERISA Litig.*,
    563 F. Supp. 2d 681 (W.D. Tex. 2008).................................... 28

*In re J.P. Morgan Fund Stable Value ERISA Litig.*,
    2019 WL 4734396 (S.D.N.Y. Sept. 23 2019)......................... 21

*In re J.P. Morgan Fund Stable Value ERISA Litig.*,
    No. 12-cv-022548-VSB, ECF No. 182 ................................... 21

*In re Unisys Sav. Plan Litig.*,
    74 F.3d 420 (3d Cir. 1996)..................................................... 21

*Larson v. Allina Health Sys.*,
    350 F. Supp. 3d 780 (D. Minn. 2018) .................................... 26

*Lee v. Verizon Commc'ns, Inc.*,
    837 F.3d 523 (5th Cir. 2016) ................................................. 11

*Little v. KPMG LLP*,
    575 F.3d 533 (5th Cir. 2009) ................................................. 13

*Loomis v. Exelon Corp.*,
    658 F.3d 667 (7th Cir. 2011) ................................................. 27

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992).......................................................... 12, 15

*McDonald v. Provident Indem. Life Ins. Co.*,
    60 F.3d 234 (5th Cir. 1995) ................................................... 16

*Meiners v. Wells Fargo & Co.*,
    898 F.3d 820 (8th Cir. 2018) ............................................ 18, 23

*Merritt-Campbell, Inc. v. RxP Prods., Inc.*,
    164 F.3d 957 (5th Cir. 1999) ................................................... 9

*Moitoso v. FMR LLC*,
    --F. Supp. 2d--, 2020 WL 1495938 (D. Mass. Mar. 27, 2020)............ 26

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*,
    712 F.3d 705 (2d Cir. 2013)............................................... 16, 18

*Pledger v. Reliance Trust Co.*,
    240 F. Supp. 3d 1314 (N.D. Ga. 2017) .............................. 23, 26

iii

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Radford v. Gen. Dynamics Corp.*,
  151 F.3d 396 (5th Cir. 1998) ........................................................................ 15, 16

*Renfro v. Unisys Corp.*,
  671 F.3d 314 (3d Cir. 2011)........................................................................... 27

*Roth v. Sawyer-Cleator Lumber Co.*,
  16 F.3d 915 (8th Cir. 1994) ........................................................................... 16

*Singh v. RadioShack Corp.*,
  882 F.3d 137 (5th Cir. 2018) ................................................................ 16, 18, 20

*Taveras v. UBS AG*,
  612 F. App'x 27 (2d Cir. 2015) ...................................................................... 12

*Thole v. U.S. Bank N.A.*,
  140 S. Ct. 1615 (2020)................................................................................... 12

*Tibble v. Edison Int'l*,
  729 F.3d 1110 (9th Cir. 2013), *vacated on other grounds*, 135 S. Ct. 1823
  (2015).......................................................................................................... 32

*White v. Chevron Corp.*,
  2017 WL 2352137 (N.D. Cal. May 31, 2017), *aff'd*, 752 F. App'x 453 (9th
  Cir. 2018) ................................................................................................. 22, 26

*Whitley v. BP, P.L.C.*,
  838 F.3d (5th Cir. 2016) ................................................................................ 18

*Wildman v. Am. Century Servs., LLC*,
  362 F. Supp. 3d 685 (W.D. Mo. 2019) ........................................................... 26

**Statutes**

29 U.S.C. § 1104(a)(1)(B) ...............................................................................16

29 U.S.C. § 1105(a) ........................................................................................29

29 U.S.C. § 1106(a) ........................................................................................31

29 U.S.C. § 1106(b) ........................................................................................31

29 U.S.C. § 1108(b)(3) ....................................................................................30

29 U.S.C. § 1108(b)(4) ................................................................................17, 30

29 U.S.C. § 1113.............................................................................................15

iv

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

29 U.S.C. § 1113(1)(A)..................................................................................................16

**Rules**

Fed. R. Civ. P. 56(a) ......................................................................................................9

**Regulations**

12 C.F.R. § 204.2(b) .................................................................................................6, 23

29 C.F.R. § 2550.408b-4.............................................................................................31

29 C.F.R. § 2550.408b-4(a) ........................................................................................31

29 C.F.R. § 2550.408b-4(b)(3) ...................................................................................31

29 C.F.R. § 2550.408b-4(c)(1)...............................................................................17, 30

29 C.F.R. § 404c-1(b)(1)(ii) ................................................................................2, 4, 19

29 C.F.R. § 404c-1(b)(2).......................................................................................2, 4, 19

29 C.F.R. § 404c-1(b)(3).......................................................................................2, 4, 19

72 Fed. Reg. 60,452 (Oct. 24, 2007).................................................................19, 20, 25

**Other Authorities**

Federal Reserve Bank of New York, *Actions Related to AIG*,
    https://www.newyorkfed.org/aboutthefed/aig (last visited July 2, 2020)...............................22

FINRA, Evaluating Investment Performance,
    http://www.finra.org/investors/evaluating-investment-performance (last
    visited July 2, 2020)......................................................................................32

FINRA, Tracking Performance of Your Investments,
    https://www.finra.org/investors/learn-to-invest/key-investing-
    concepts/tracking-your-investments ...............................................................32

H.R. Rep. No. 93-1280 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5038 ..................................29, 32

NCUA, Share Insurance Fund Overview, https://www.ncua.gov/support-
    services/share-insurance-fund (last visited July 2, 2020) .........................................6

Paul J. Donahue, *Plan Sponsor Fiduciary Duty for the Selection of Options in
    Participant-Directed Defined Contribution Plans and the Choice Between
    Stable Value and Money Market*, 39 Akron L. Rev. 9 (2006).................................23

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

Retirement Plan Products and Services, Office of the Comptroller of the
    Currency, Comptroller's Handbook AM-RPPS 34 (February 2014),
    https://www.occ.treas.gov/publications/publications-by-type/comptrollers-
    handbook/retirement-plan-products-services/pub-ch-retirement-plan.pdf .............................20

Defendants American Airlines, Inc. ("American Airlines") and the American Airlines

Pension Asset Administration Committee (the "PAAC," and together with American Airlines

"American" or "Defendants") file this Motion for Summary Judgment and Brief in Support

thereof and respectfully submit the following:

## PRELIMINARY STATEMENT

For more than four years, Plaintiffs have pressed claims that American violated ERISA,

but they have only recently settled on a theory for why that is so.  After this Court ordered

Plaintiffs to "resolve uncertainties concerning [their] positions," Plaintiffs committed to the

following theory of liability: "American Airlines breached its fiduciary duty by imprudently and

disloyally ***selecting and retaining***" the American Airlines Credit Union Option ("Credit Union

Option") as an investment option in its 401(k) Plan ("Plan").  *See* ECF No. 168, Order of June

15, 2020, at 4 (emphasis added); *see also,* ECF No. 153, Order of September 30, 2019.  In

Plaintiffs' view, this Court must prohibit American from offering this longstanding—and widely

popular—Credit Union Option, forcing thousands of American Airlines employees to transfer

their retirement funds into a riskier and less liquid investment option.  Plaintiffs' latest—and

most extreme—position is at odds with actual fiduciary practice and case law rejecting similar

arguments.  This Court should grant summary judgment on Plaintiffs' fiduciary breach claim for

three reasons.

First, and as a threshold matter, Plaintiffs lack constitutional standing to press their

fiduciary breach claim.  As this Court recognized in its June 15, 2020 Order, Plaintiffs must

prove an injury that is "actual or imminent, fairly traceable to defendant's challenged behavior;

and likely to be redressed by a favorable ruling."  ECF No. 168 at 16 (quotations omitted).

Plaintiffs cannot muster that proof because they cannot show that, without the Credit Union

Option in the menu, either of them would have allocated their accounts in a way that would have

1

generated more retirement wealth.  Nor, for that matter, can they make such a showing on behalf of other participants.  Plaintiffs' alleged injuries from the inclusion of the Credit Union Option are based on nothing more than speculation.

Second, any claim that the fiduciaries acted imprudently when initially selecting the Credit Union Option is barred by ERISA's six-year statute of repose.  The Credit Union Option was selected as an investment option in 1985—35 years ago—and the time to challenge that decision has long since expired.

Third, undisputed facts establish that neither the selection nor retention of the Credit Union Option can be challenged as unreasonable, and thus imprudent, retirement investment. ERISA regulations encourage 401(k) plan fiduciaries to offer plan participants a "safe" investment option—*i.e.*, an "income producing, low risk, liquid fund."  29 C.F.R. § 404c-1(b)(1)(ii), (b)(2), (b)(3).  The Credit Union Option is just that.  It is income producing: it has consistently provided participants a fixed return that greatly exceeds the returns on comparable investment products.  It is low risk: each participant's principal investment and any posted returns are guaranteed by the federal government up to $250,000.  And it is liquid, allowing participants to withdraw their investments on demand, without restriction.  Not surprisingly, the vast majority of American Airlines employees seeking a "safe" investment option have chosen the Credit Union Option, even after participants gained access to other capital preservation options in connection with a plan merger following American Airline's 2015 merger with US Airways Group Inc. ("US Airways").

Plaintiffs nonetheless contend that the Credit Union Option was imprudent because (on Plaintiffs' theory) a fundamentally different investment vehicle—a stable value fund—could have served as the Plan's exclusive capital preservation option, and might have produced greater

2

returns.  But even if stable value funds have sometimes generated higher returns, they come with

significant costs, namely a greater risk and less liquidity (i.e., the ability to move into and out of

the fund).  Stable value funds, for instance, do not offer participants the security of a guarantee of

principal and accrued interest by the federal government, and they typically impose significant

restrictions on withdrawals.  Those differences are undisputed.  During the period this case has

been pending, at least eight courts have thus rejected the same legal theory Plaintiffs advance in

this case based on their apples-to-oranges comparison, and this Court should do similarly now.

       This Court can make quick work of Plaintiffs' remaining causes of action.  Plaintiffs have

offered conclusory allegations that Defendant American Airlines is liable as a "co-fiduciary" for

any breaches by the American Airlines Federal Credit Union ("AAFCU").  To the extent

Plaintiffs are still pursuing that claim, they have not shown any underlying breach by the

AAFCU or that American Airlines actually knew of any such breach.  Both shortcomings are

fatal to their claim.  Nor have Plaintiffs shown that Defendants violated ERISA § 406(a) by

engaging in a prohibited transaction, as Count III alleges.  On the contrary, Defendants'

unrebutted evidence shows that the transactions were exempt under ERISA § 408(b).

       For the foregoing reasons and as detailed below, Defendants are entitled to summary

judgment on all claims.

## **STATEMENT OF FACTS**

### A.    **Factual Background**

####    *1.    American Airlines' 401(k) Plan*

American Airlines sponsors the American Airlines, Inc. 401(k) Plan (the "Plan"), a

participant-directed 401(k) plan that enables eligible American Airlines employees to save for

retirement by investing a portion of their pre-tax compensation.  ECF No. 1, Complaint

("Compl.) ¶ 7.  At all relevant times,[1] the PAAC[2] was the fiduciary body responsible for the selection of Plan investment options.  Compl. ¶¶ 8, 39.  Plan participants are (subject to IRS limits) responsible for deciding whether to invest, how much to invest, and in which options to invest based on their individualized risk and reward preferences.  Pulford Decl.[3], Ex. B ("2009 Plan SPD"), at App. 46.[4]

Like other employer-sponsored retirement plans, the Plan is governed by ERISA. Compl. ¶¶ 11-12.  Under existing regulations, fiduciaries of ERISA-governed plans are strongly encouraged to make at least three investment options available to participants, including at least one "safe" option—*i.e.*, an "income producing, low risk, liquid fund."  29 C.F.R. § 404c-1(b)(1)(ii), (b)(2), (b)(3).  At all relevant times, American has thus offered a broad range of investment options, including a self-directed brokerage account through which participants can invest in thousands of other options.  Declaration of Francis Longstaff, Ex. 1 ("Longstaff Report") ¶¶ 23-24, at App. 397-98.  These options range from higher-risk/higher-return equity-focused vehicles (such as an "International Equity Option") to lower-risk/lower-return bond-focused vehicles (such as a "Short Term Bond" option).  *See, e.g.*, Declaration of Meaghan

---

[1] The relevant period here stems from February 12, 2010 (Compl. ¶ 33) to, at the latest, October 2016.  By that time, this lawsuit was pending and both Plaintiffs had either withdrawn or reallocated their funds away from the Credit Union Option.  *See infra*, at 8-9.  To the extent either Plaintiff has returned or will return funds to the Credit Union Option since filing suit (despite the consistent availability of a stable value option in the Plan since 2015), they cannot allege any injury on that basis.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (holding Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves").

[2] In 2014, the PAAC was replaced by the Employee Benefits Committee ("EBC"). Declaration of David Pulford ("Pulford Decl."), Ex. A ("2016 Plan SPD"), at App. 13.

[3] The Longstaff Report and Pulford Declaration were submitted previously in opposition to class certification, but remain applicable to this motion.  Citations herein to the Longstaff Report and Pulford Declaration are limited to those sections of the Report and Declaration that support Defendants' Motion for Summary Judgment.

[4] "App." refers to the Appendix to Defendants' Motion for Summary Judgment filed herewith.

VerGow ("VerGow Decl."), Exs. A-E ("2010-14 Plan Form 5500s"), at App. 773, 776-77, 788, 791-92, 804, 807-08, 820, 822, 834, 837.

The dispute in this case revolves around the Plan's "safe" options, sometimes known as "capital preservation vehicles."  Longstaff Report ¶ 25, at App. 398.  A capital preservation vehicle prioritizes protecting the existing monetary value of an investment rather than earning returns on those investments.  *Id*.  Although the return rates on capital preservation vehicles thus can sometimes be lower than the inflation rate, these options can provide valuable protection to participants when stock prices decline (as they did, for example, during the 2008 financial crisis).  *Id*. ¶¶ 25-27, at App. 398-99 (noting 401(k) participants with more than $200,000 in savings lost an average of 25% of their retirement funds during the crisis).

Since 1985, the Plan has offered the Credit Union Option as a capital preservation vehicle.  Pulford Decl., Ex. G., at App. 121.  The Credit Union Option is a demand deposit fund, i.e., a fund held in a demand deposit account—such as a checking account—at a credit union, bank, or other financial institution.  Longstaff Report ¶ 31, at App. 401.  In this case, the Credit Union Option funds were held at Defendant AAFCU, an independent federal credit union, which is supervised by the National Credit Union Administration ("NCUA").  Compl. ¶ 9.  The AAFCU is fully independent from American Airlines and maintains separate decision-making capabilities.  Declaration of Lewis Cohen ("Cohen Decl.") ¶ 2.[5]

Demand deposit vehicles such as the Credit Union Option are unique relative to other low-risk investment options in that assets invested therein are both payable on demand without transfer restrictions, and guaranteed (up to $250,000) by the full faith and credit of the United

---

[5] The Declaration of Lewis Cohen is being filed in support of Defendant AAFCU's motion for summary judgment.

States government.  *See* 12 C.F.R. § 204.2(b) (defining "demand deposit"); Longstaff Report ¶ 33, at App. 402.  Because of that federal guarantee, the NCUA reports that "[c]redit union members **have never lost even a penny** of insured savings at a federally insured credit union."[6]  Indeed, even one of the representative Plaintiffs (Mr. Scott) explained that he invested in the Credit Union Option because it was the "next best thing" to "gold" when he needed somewhere "to hide" from market turmoil.  Scott Dep. Tr. 77:10-11, 78:19-21, at App. 869-70.

In late 2015, American Airlines' parent corporation merged with US Airways, and in connection with the merger of the two companies' 401(k) plans, the Plan's investment lineup was revised to include two new funds relevant here.  Pulford Decl. ¶ 6, at App. 2.  First, a stable value fund was added to the Plan.[7]  As noted, the stable value fund, like the Credit Union Option, is a capital preservation option.  But stable value funds expose investors to greater risk than demand deposit accounts.  Longstaff Report ¶ 44, at App. 409.  As explained in more detail below, stable value funds offer only a limited "guarantee" that investors will be able to withdraw their principal plus any accumulated interest.  *Id.* ¶¶ 35-37, at 403-04; *see infra*, at 30-31.  That guarantee, unlike the federal guarantee for credit union deposits, generally comes with several contractual limitations that increase the risk that an investor will suffer losses.  *Id.* ¶ 35, at App. 403.  The guarantee may also disappear if the private companies insuring them default.  *Id.* ¶¶ 41-42, at App. 406-07.   The investment disclosure documents for American's stable value funds thus acknowledge that participants could receive less than the book value of their investment

---

[6] NCUA, Share Insurance Fund Overview, https://www.ncua.gov/support-services/share-insurance-fund (last visited July 2, 2020) (emphasis added).

[7] This fund was originally called the Fidelity Managed Income Portfolio II ("MIP II") option. Pulford Decl. ¶ 6, at App. 2.  In 2017, American replaced the MIP II option with a different stable value fund, the American Airlines Stable Value Fund ("AA Stable Value Fund"), in June 2017.  *Id.* ¶ 8, at App. 3.

balance when withdrawing their funds.  Pulford Decl., at App. 88, 122.  In addition, stable value funds in general (again, like those offered in the Plan) contain liquidity restrictions, including provisions prohibiting investors from moving any money directly from the fund into certain other low-risk "competing" options.  *Id*. ¶ 44, at App. 409.

Second, American also introduced a money market fund (the Fidelity Institutional Money Market) into its investment lineup.  Pulford Decl. ¶ 6, at App. 2.  A money market mutual fund is a type of fixed income mutual fund that is required by federal regulations to invest in debt securities that have very short maturity and high credit quality.  Longstaff Report ¶ 30, at App. 401.  Unlike the Credit Union Option, the returns of a money market fund are not guaranteed, though they have historically been positive because they are lower risk options.  *Id.*  In September 2016, that fund was removed from the Plan lineup.  Pulford Decl. ¶ 7, at App. 2-3.

> 2.  *Plaintiffs—and Other American Airlines Employees—Preferred the Credit Union Option*

The Credit Union Option has been overwhelmingly popular among all American Airlines employees, even when compared to other capital preservation options.  Between 2010 and 2013, it was the most widely held of the Plan's investment options in terms of assets invested, accounting for between $1.1 billion and $1.7 billion in Plan assets (which was between 14.0% and 27.4% of Plan assets).  Longstaff Report ¶ 48, at App. 411.  The Credit Union Option remained popular with Plan participants even after American added the money market or stable value funds, as more than 75% of plan participants who invested in capital preservation options chose the Credit Union Option from 2015 to 2018.  *Id*. ¶ 51, at App. 412.  Overall, between 6.6% and 11.3% of Plan assets during the same period were invested in the Credit Union Option compared to approximately 2% in the stable value fund and less than 1% in the money market fund before its removal.  *Id*. ¶ 49, at App. 411.

Plaintiffs' own investment choices mirror these Plan-wide patterns.  Although Plaintiffs claim that selecting and retaining the Credit Union Option was imprudent, the Plaintiffs themselves invested in the Credit Union Option even when given the choice of a stable value fund—which Plaintiffs have consistently touted as the capital preservation investment of choice. At the beginning of 2010, ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████, *id*., Ex. K, at App. 224.  ***At no time did she invest in the Plan's stable value options.***  *Id*. ¶ 11 & Exs. I-K, at App. 159-224.

Likewise, Mr. Scott held ████████ in the Credit Union Option at the beginning of 2010, ████████████████████████████████████████████████████████

████████████.  *Id*., Ex. L, at App. 226.  ████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████.  *Id*. at App. 293.  In September 2016—just months after filing this lawsuit—████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████.  Scott Dep. Tr. 33:9-18, 39:3-40:9, at App. 866-68.  ██████████████████████████████████, Mr. Scott ***at no***

8

*time invested in the Plan's stable value options*, Pulford Decl.¶ 12 & Exs. L-N, at App. 297–364; Scott Dep. Tr. 81:15-20, at App. 871, even though he knew American offered such a fund. Scott Dep. Tr. 85:14-18, at App. 872.

## ARGUMENT

A party is entitled to summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catlett*, 477 U.S. 317, 323–25 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Merritt-Campbell, Inc. v. Rapp Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999). The movant can discharge its burden under Rule 56(a) by pointing out the absence of evidence supporting one or more essential elements of the nonmoving party's claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. Once the movant has carried its burden, "the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *In re Ark-La-Tax Timber Co., Inc.*, 482 F.3d 319, 329 (5th Cir. 2007).

I. **UNDISPUTED FACTS FORECLOSE PLAINTIFFS' CLAIM THAT DEFENDANTS IMPROPERLY SELECTED OR RETAINED THE CREDIT UNION OPTION (COUNT I).**

Plaintiffs' theory of Count I has been a moving target since they first filed suit in 2016. Plaintiffs originally sought relief on behalf of a class of Plan participants, maintaining that Defendants should have replaced the Credit Union Option with their preferred investment vehicle: a stable value fund. Compl. ¶ 41. Defendants explained why Plaintiffs' "stable-value-at-all-costs theory" was wrong: Plaintiffs had focused "on investment returns to the exclusion of

every other relevant consideration," including risk and liquidity.  *See* ECF No. 20, Defs. Mot. to Dismiss, at 2.  While this Court denied the motion to dismiss, it explained that it did so because American's arguments went "to the merits of the claims and ***would more properly be presented by motions for summary judgment***."  ECF No. 84, Order of November 27, 2017, at 2 (emphasis added).

As the cases rejecting this original theory multiplied (as many as eight courts have rejected claims that plan fiduciaries were required to select stable value funds as capital preservation vehicles since this case was filed, *see infra* at 26 & n.20, Plaintiffs shifted to arguing that American Airlines should have included a "prudent capital preservation option"— i.e., a stable value fund—"in place of ***or in addition to*** the [Credit Union Option]."  *See e.g.*, ECF No. 52, Settlement Class Cert. Motion, at 3 (emphasis added); ECF No. 81, Opposition to Mot. to Dismiss, at 7-8 (challenging American's "failure to include in [the Plan] a properly-performing capital preservation option.").[8]  Defendants have already explained why the two individual Plaintiffs cannot travel on this theory: American ***has*** offered Plaintiffs' preferred investment option—a stable value fund—since 2015 and yet neither of the Plaintiffs have invested a single dollar in that account.  ECF No. 101 at 1.  Their own behavior thus belies their lawyers' arguments.

So now Plaintiffs have course-corrected again.  In response to this Court's Order that Plaintiffs "resolve uncertainties concerning [their] positions," *see* ECF No. 153, Plaintiffs entirely abandoned their argument that American Airlines should have offered a stable value

---

[8] Indeed, the mediation memo Plaintiffs submitted to this Court left no doubt that they believed that the stable value fund "could have been offered ***together with*** the Credit Union Demand Deposit accounts."  ECF No. 74, at App. 17 (emphasis added).

fund *in addition to* the Credit Union Option.  Instead, Plaintiffs committed to the following theory:

> Plaintiffs claim that American Airlines breached its fiduciary duty by imprudently and disloyally *selecting and retaining* a capital preservation option [the Credit Union Option] that had dramatically lower investment returns than other readily available capital preservation investments, including stable value funds.

*See* ECF No. 154 at 3 (emphasis added).  Put another way, Plaintiffs believe that the Credit Union Option is so inherently "imprudent" as an investment option that it "should never have been included in the Plan," ECF No. 122, Mot. to Exclude Longstaff, at 5, seemingly irrespective of the remaining capital preservation constituents of the investment lineup.  It therefore asks the Court to eliminate the Credit Union Option completely.

Plaintiffs' new position fares no better than their previous ones.  First, they lack standing to pursue relief given their own investing behavior.  Second, undisputed facts and sound principles of law preclude Plaintiffs' extreme theory.

### A.      Plaintiffs Lack Article III Standing to Bring Their Imprudence Claim Because They Have Failed to Establish That They Suffered An Injury In Fact.

Plaintiffs' claim fails on a threshold matter: both lack standing to pursue relief under the legal theory their lawyers have landed on.  As this Court recognized in its June 15, 2020 Order, "a representative bringing an action on behalf of a class must each establish that he/she has constitutional standing in order to avoid dismissal."  ECF No. 168 at 14.  To satisfy the "irreducible constitutional minimum" of Article III standing, it is not enough for Plaintiffs to serve as "representatives" of the Plan and allege that *some other* participants suffered an injury. *Id.* (internal quotation marks omitted)*; see also Lee v. Verizon Commc'ns, Inc.,* 837 F.3d 523, 530 (5th Cir. 2016).  Rather, the Supreme Court recently made clear that the Plaintiffs "*themselves* still must have suffered an injury in fact, thus giving them a sufficiently concrete

interest in the outcome of the issue in dispute." *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1620 (2020) (emphasis added; internal quotation marks omitted).[9]   Or, as this Court has put it, Plaintiffs have the burden to show that they suffered an "injury that is concrete, particularized, and actual or imminent; fairly traceable to defendant's challenged behavior; and likely to be redressed by a favorable ruling."  ECF No. 168 at 16 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

Plaintiffs have not done so.  Plaintiffs do not argue that they ***lost*** any of their principal investments by investing in the Credit Union Option.  Nor could they, as the Credit Union's average annual rate of return (0.56%) has been positive throughout the period in which Plaintiffs held funds in that account.  Longstaff Report ¶ 53, at App. 412.  Instead, Plaintiffs' theory is that they could have earned ***better*** returns had American replaced the Credit Union Option with alternative capital preservation vehicles.  Their injury, the theory goes, "is the difference between" the money they "would have [earned] by [investing in] ***the prudent choice*** and the much lower [returns] earned on the alleged imprudent choice."  ECF No. 168 at 4 (emphasis added).

First, as this Court has recognized, Plaintiffs' theory necessarily requires them to identify "the prudent choice" that American should have offered instead of a Credit Union Option.  *Cf. id.*  American explains below why Plaintiffs cannot make that showing simply by comparing

---

[9] While *Thole* involved a defined benefit plan instead of a defined contribution plan, this Court correctly recognized in its June 15, 2020 Order that the difference was irrelevant.  As this Court explained, *Thole*'s holding that "each representative . . . bringing the action have constitutional standing is as applicable to the instant case as it was in *Thole*."  ECF No. 168 at 14; *see also Taveras v. UBS AG*, 612 F. App'x 27, 29 (2d Cir. 2015) (holding outside the defined benefit context that "[a]n ERISA plan participant lacks standing to sue for ERISA violations that cause injury to a plan but not individualized injury to the plan participant").

rates of return between *different* investment vehicles, as other factors (such as risk and liquidity) necessarily inform the prudence of an investment option.  *See infra*, at 19-24.

Second, and in any event, Plaintiffs' alleged injuries are far "too speculative to confer Article III standing."  *Little v. KPMG LLP*, 575 F.3d 533, 541 (5th Cir. 2009).  Plaintiffs have posited that a stable value fund would be a more "prudent option" than the Credit Union Option because stable value funds earned higher returns during the relevant period than other common capital preservation vehicles.[10]  But even accepting that assertion, Plaintiffs must establish that if the Credit Union Option did not exist, they would have *necessarily* allocated their accounts across the Plan's options in a way that would have generated greater retirement wealth (for instance, by allocating their Credit Union Option balances—and only their Credit Union Option balances—to the stable value option instead).  Without evidence indicating that they would have made that choice, they cannot claim that they lost the allegedly superior returns a stable value fund would have provided.

Not only have Plaintiffs submitted no evidence to this effect, all of the available evidence suggests the contrary.  In fact, the Plan *has* offered a stable value option for much of the relevant period.  *See supra*, at 6-7.  Yet neither named Plaintiff made use of it.  *Id.* at 8.  Even after filing this suit, both Plaintiffs continued to invest their Plan accounts in both the Credit Union Option and other investment accounts.  *Id.*  Plaintiff Ortiz admitted that she never took even basic steps to evaluate the stable value fund as an investment option.  Ortiz Dep. Tr. 106:22-107:6, at App.

---

[10] Although Plaintiffs have previously suggested that the Credit Union's checking account might bear higher returns, Defendants explain below why that is wrong.  *See infra* at 19, n.15.  And while Plaintiffs previously tried to frame those comparisons as mere examples (ECF No. 81 at 2, 9), they are the only "examples" that Plaintiffs have ever identified after more than four years of litigation.

876-77.  Plaintiff Scott, meanwhile, knew there was a stable value option—he simply chose not to invest in it.  Scott Dep. Tr. 85:14-18, at App. 872.

It makes no difference that American continued to offer the Credit Union Option during the relevant time period.  Even if American had eliminated that option, it is still speculative to assume that Plaintiffs (or, indeed, any other present or former Plan participant) would have reallocated their ████████████████████ exclusively into the stable value option instead. While Mr. Scott ███████████████████████████████████████████████████

███████████████████.  *See supra*, at 8-9.  ██████████████████████████

████████████████████████████████████████████

██████████████████████  *See supra*, at 8-9.  Around the same time, ████████████

████████████████████████████████████████████

██████████████████  Scott Dep. Tr. 33:9-18, 39:3-40:9, at App. 866-68.  ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████  Longstaff Report ¶ 60, at App. 415-16.  Mr. Scott's demonstrated behavior thus undercuts his lawyer's speculation about where he would channel his █████████████

███████████  absent a Credit Union Option.

Indeed, Mr. Scott's investment strategy underscores yet another reason why Plaintiffs' injuries are speculative: even if Plaintiffs could suggest (contrary to their actual behavior) that they would have in fact allocated a portion of their accounts to a stable value option had the Credit Union Option disappeared, they might have actually *lost* money by doing so depending on where they pulled the money from.  When American added a stable value option in 2015, some Plan participants reallocated money to that option from *non-capital preservation options* that

had historically generated higher rates of return than stable value funds.  Longstaff Report ¶¶ 53-54, at App. 412-13. ████████████████████████████████

████████████████████████████████████████

All told, Plaintiffs' theory of standing layers one shaky inference upon the next.  They ask this Court to assume that, without the Credit Union Option, they would have reallocated their Credit Union balances to a stable value option; but their own investment behavior when offered a stable value choice belies that assumption.  Accordingly, they cannot establish that they (or any other Plan participant) suffered a concrete—rather than "conjectural"— injury from the retention of the Credit Union Option.  *See Lujan*, 504 U.S. at 560; *Horvath v. Keystone Health Plan E., Inc.*, 333 F.3d 450, 457 (3d Cir. 2003) (holding plan participant lacked standing under ERISA where injury was "too speculative to serve as the basis for a claim of individual loss").  This Court should therefore hold that Plaintiffs lack standing to proceed with Count I and award summary judgment on that basis alone.[11]

### B. Plaintiffs' Challenge To The Initial Selection Of The Credit Union Option Is Time-Barred.

Turning to the merits, this Court should reject as time-barred any challenge to American's "inclusion" of the Credit Union Option in the Plan.  *Cf.* ECF No. 142 at 7.  ERISA § 413(2) sets a six-year limitations period for claims alleging violations of fiduciary duty.  *See* 29 U.S.C. § 1113.  This provision, effectively a statute of repose, *see Radford v. Gen. Dynamics*

---

[11]At minimum, Plaintiffs cannot establish where other Plan participants would have allocated their accounts in the absence of the Credit Union Option as one of a range of capital preservation options and thus cannot pursue relief on behalf of the Plan for supposed injuries to those other participants' accounts.  Plan participants (like the Plaintiffs themselves) have different investment preferences, and the Court's inquiry into whether each such participant's account was injured by the alleged breach would thus depend on each investor's individualized tolerance for risk and desire for return, among other factors.  Longstaff Report ¶¶ 20, 53-54, at App. 396-97, 413-15.

*Corp.*, 151 F.3d 396, 400 (5th Cir. 1998), precludes a plaintiff from filing claims more than six

years after "the date of the last action which constituted a part of the breach or violation."  29

U.S.C. § 1113(1)(A).  Because American first introduced the Credit Union Option in 1985 (more

than 35 years ago), *see supra*, at 5, the time to challenge the selection of that option has long

since expired.   The Court should therefore dismiss any such challenge on that basis.

> ### C.    Undisputed Facts Preclude Plaintiffs From Establishing That The Credit Union Option Was An Unreasonable Retirement Investment Vehicle, And Thus That The Fiduciaries Improperly Retained It.

Plaintiffs also maintain that Defendants acted imprudently by ***retaining*** the Credit Union

Option as one of several conservative options in the Plan's investment lineup.   ERISA requires

"fiduciaries to manage plan assets 'with the care, skill, prudence, and diligence . . . that

a prudent man acting in a like capacity and familiar with such matters' would use under the

circumstances."  *Singh v. RadioShack Corp.*, 882 F.3d 137, 144 (5th Cir. 2018) (quoting 29

U.S.C. § 1104(a)(1)(B)).  This standard is an "objective" one, which assesses the fiduciary's

actions "under the circumstances then prevailing . . . not from the vantage point of hindsight."

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir.

2013) (internal quotation marks omitted).

To sustain an imprudence claim, ***it is the plaintiff's burden*** to "prove a breach of a

fiduciary duty and a ***prima facie*** case of loss to the plan."  *McDonald v. Provident Indem. Life

Ins. Co.*, 60 F.3d 234, 237 (5th Cir. 1995) (emphasis added).[12]   Plaintiffs offer one theory in

support of that claim: that it was ***inherently*** imprudent for American to retain the Credit Union

Option in the Plan's investment lineup because there are higher yielding capital preservation

---

[12] *See also Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 917 (8th Cir. 1994) ("ERISA plaintiffs bear the burden of proving a breach of fiduciary duty and a prima facie case of loss to the plan."); *DeBruyne v. Equitable Life Assurance Soc'y*, 920 F.2d 457, 465 (7th Cir. 1990) (granting summary judgment where plaintiffs failed to produce evidence showing imprudence).

vehicles such as stable value funds.  In other words, they contend—that no prudent fiduciary would include such an option in a 401(k) plan as a capital preservation vehicle.  *See supra*, at 11. That theory of breach is insupportable.

To begin, nothing in ERISA or its accompanying regulations precludes plans from including credit union demand deposit vehicles as an investment option.  *See Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009) ("We see nothing in the statute that requires plan fiduciaries to include any particular mix of investment vehicles in their plan.").  To the contrary, the Department of Labor has recognized that a variety of options designed to preserve invested capital—even options with modest returns on that invested capital, such as money market funds—may be valuable components of a retirement portfolio.  *See infra* at 25-26.  Moreover, demand deposit vehicles offered by banks and other financial institutions are not unfamiliar in retirement plans.  In fact, ERISA § 408(b)(4) expressly contemplates that "all or part of a plan's assets" may be invested in "deposits" with a "bank or similar financial institution," 29 U.S.C. § 1108(b)(4), which are defined to include credit unions, 29 C.F.R. § 2550.408b-4(c)(1).

Despite these authorities, Plaintiffs claim that prudent fiduciaries would systematically avoid the Credit Union Option because (they claim) there are types of capital preservation vehicles that would likely have provided a greater return.  But it is not enough for Plaintiffs to show that the fund underperformed options with different characteristics, or that another type of fund was in some respect superior.  *See Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 484 (8th Cir. 2020) (Plaintiffs cannot rely on general "allegation[s] that costs are too high, or returns are too low.").[13]  Instead, Plaintiffs must establish that a prudent fiduciary under like circumstances

---

[13] *See also Pension Benefit Guar. Corp.*, 712 F.3d at 718 ("Nor is it necessarily sufficient to show that better investment opportunities were available at the time of the relevant decisions."); *Hecker*, 556 F.3d at 586 ("[N]othing in ERISA requires every fiduciary to scour the market to

would not and could not have made the same investment decision.  *See Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 410-11 (2014) (instructing that to determine whether fiduciaries failed to discontinue investment, courts must consider "whether . . . a prudent fiduciary in the defendant's position could not have concluded that stopping purchases . . . would do more harm than good"); *Pension Benefit Guar. Corp.*, 712 F.3d at 720 (absent direct allegations of fiduciaries' decision-making, ERISA requires plaintiffs to show "that a prudent fiduciary in like circumstances would have acted differently.").

 In light of the undisputed facts in the record, Plaintiffs cannot carry that burden.

> *1.*     *Plaintiffs have failed to provide a meaningful benchmark to support their imprudence claim.*

First, Plaintiffs' imprudence claim fails because they have not identified any *comparable* fund that outperformed the Credit Union Option.  Where, as here, a plaintiff challenges the retention of a fund as imprudent, the plaintiff "must provide ***a sound basis for comparison***—a meaningful benchmark."  *Davis*, 960 F.3d at 484 (emphasis added; quoting *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018)); *see also Cunningham v. Cornell Univ.*, 2019 WL 4735876, at *13 (S.D.N.Y. Sept. 2019) (a "party alleging imprudence based on retaining a specific fund must demonstrate that a comparator is an ***equivalent investment vehicle***" (emphasis added; internal quotations omitted)).[14]  Without a proper comparator, Plaintiffs' cries (ECF No. 81 at 8) that the Credit Union Option's returns were "woeful" or that the fund

---

find and offer the cheapest possible fund (which might, of course, be plagued by other problems.").

[14] *Cf. Whitley v. BP, P.L.C.*, 838 F.3d at 529, 529 (5th Cir. 2016) (explaining in employer stock context, "the plaintiff bears the significant burden of proposing an alternative course of action so clearly beneficial that a prudent fiduciary ***could not conclude*** that it would be more likely to harm the fund than to help it."); *Singh*, 882 F.3d at 158 (similar).

"underperform[ed]" are meaningless.  *See Davis*, 960 F.3d at 485 ("Comparing apples and oranges is not a way to show that one is better or worse than the other.").

To date, Plaintiffs have principally staked their case on a false comparison to stable value funds, which they claim had "dramatically" higher investment returns during the relevant period. *See* ECF No. 168 at 4.[15]  But that comparison ignores that stable value funds score lower than the Credit Union Option on other metrics emphasized by the DOL, including risk and liquidity.  *Cf.* 29 C.F.R. § 404c-1(b)(1)(ii), (b)(2), (b)(3) (emphasizing liquidity and risk as key considerations for "safe" investment options).   Those differences are not in dispute.   Indeed, Plaintiffs' own cited authority acknowledges that numerous plan sponsors opt not to offer a stable value fund option because of "[c]oncerns about liquidity" and the "potential for negative returns."  Vergow Decl., Ex. F (MetLife 2015 Stable Value Study), at App. 846.  But lest there be any doubt, American has produced ample record evidence explaining the pitfalls of stable value funds relative to the Credit Union Option.

(a)   Greater Risk

For starters, Plaintiffs cannot dispute that stable value funds are riskier than demand deposit options like the Credit Union Option.  That proposition follows from basic "[e]conomic theory," which holds that "financial instruments with ***similar risk characteristics will provide similar returns*.***"  72 Fed. Reg. 60,452 at 60,463, 60,473 n.35 (Oct. 24, 2007) (emphasis added);

---

[15] At times, Plaintiffs have also compared the Credit Union Option's returns to the promotional rate for one of the AAFCU's checking accounts.  It is a false comparison.  That account's 2.25% rate applies only to balances up to $5,000, subject to fees and a host of additional requirements.  Cohen Decl. ¶ 12.  Otherwise, the rate for that account was 0.05%, meaning its effective rate for funds held therein typically fell ***below*** that offered by the Credit Union Option.  Longstaff Report 26 n.66 & Ex. 12, at App. 413, 450.  More fundamentally, Plaintiffs offer no allegations—much less evidence—that the Credit Union or any other institution would have actually offered the teaser rate to the Plan on balances of $1 billion or more while also allowing the Plan to withdraw the balances entirely on short notice.  Thus any attempt to establish this account was a "readily available" alternative to the Credit Union Option falls flat.  *Cf.* ECF No. 168 at 4.

*Singh*, 882 F.3d at 145 ("In an efficient market, market price accounts for risk.").  Recognizing

as much, the Department of Labor—the federal agency chiefly responsible for enforcing

ERISA—rejected any notion that stable value funds were "superior" to other capital preservation

options simply because stable value funds had earned "higher rates of return" in the past.  72

Fed. Reg. at 60,462-63.  Even where returns were higher, the Department explained that "stable

value products may expose investors to the credit risk of the fund vendor in ways that [other

capital preservation funds] do not."  *Id.* at 60,473 n.35

 In fact, those risks are baked into the very structure of a stable value fund.  A stable value

fund channels participant money into a portfolio of fixed income investments, which faces

inherent market risks.  Longstaff Report ¶ 35, at App. 403.  In an attempt to minimize those

risks, the managers of a stable value fund often enter into a so-called "wrap" contract with a

third-party (like an insurance company or other financial institution) which carries a "limited

guarantee" that the investor will be able to withdraw the "book value" of his or her investments,

i.e., the principal plus interest earned to date.  Longstaff Report ¶¶ 35-37, at App. 403-04.  But

unlike the Credit Union Option's federal guarantee, *see supra*, at 5-6, this "wrap" contract

"***generally comes with contractual limitations*** that increase the risk that an investor will suffer

losses."  Longstaff Report ¶ 39, at App. 404 (emphasis added).  The U.S. Department of the

Treasury, for instance, has recognized "instances when participants do not get book value from a

stable value fund," including where withdrawals are prompted by the sponsoring company's

"early retirement program, layoff[s], or bankruptcy."[16]

---

[16] Retirement Plan Products and Services, Office of the Comptroller of the Currency,
Comptroller's Handbook AM-RPPS 34 (February 2014),
https://www.occ.treas.gov/publications/publications-by-type/comptrollers-handbook/retirement-plan-products-services/pub-ch-retirement-plan.pdf.

These risks are not just theoretical.  Longstaff Report ¶ 40, at App. 405.  During the 2008 financial crisis, for example, participants investing in the stable value fund offered in the Chrysler LLC retirement plan received ***only $0.89 on the dollar*** after Chrysler declared bankruptcy.  *Id*.  Similarly, the stable value fund offered in the Lehman Brothers Holdings plan took a write down of 1.7% in December 2008, as insurers sold securities to meet the redemption requests of terminated employees.  *Id*.  The crisis-era losses experienced by stable value funds spawned a decade's worth of litigation: Just one year ago, in fact, JPMorgan paid $75 million to settle a suit from plan participants who alleged that its stable value funds suffered "catastrophic" losses during the crisis.  *See In re J.P. Morgan Fund Stable Value ERISA Litig.*, 2019 WL 4734396, at *1 (S.D.N.Y. Sept. 23 2019) (describing settlement); *In re J.P. Morgan Fund Stable Value ERISA Litig.,* No. 12-cv-022548-VSB, ECF No. 182 ¶ 15 (S.D.N.Y. Dec. 16, 2014). Consistent with this history of stable value performance, Plan participants were warned that investors in the Plan's own stable value funds might receive less than the book value of their investment balance.[17]

There are other ways stable value funds can lose money.  Whereas credit union funds are backed by the full faith and credit of the United States, *see supra*, at 5-6, a stable value fund's "guarantee" that principal and accrued interest can be withdrawn is only as good as the creditworthiness of the private company issuing it.  Longstaff Report ¶ 41, at App. 406.  And private companies that provide such guarantees can and do fail.  *Id*.; *see also, e.g.*, *In re Unisys Sav. Plan Litig.*, 74 F.3d 420 (3d Cir. 1996) (litigation involving failure of Executive Life

---

[17] Pulford Decl. at App. 88-89, 122 (warning that "withdrawals prompted by certain events (e.g., layoffs, early retirement windows, spinoffs, sale of a division, facility closing, plan terminations, partial plan terminations, changes in laws or regulations) may be paid at the market value of the fund's securities, which may be less than your book value balance.").

Insurance Company of California); *Glennie v. Abitibi-Price Corp.*, 912 F. Supp. 993, 995 (W.D. Mich. 1996) (same, involving Mutual Benefit Life Insurance Company). Indeed, during the financial crisis, one of the most widely-used wrap providers, AIG, was one federal bailout away from collapse.[18] And if those institutions fail, a stable value investor will be left with only the market value of the investments—which may be less than the investor's "book value" or contractual balance.[19] Longstaff Report ¶ 42, at App. 407.

While those risks have not yet materialized with the Plan's stable value choices, that is irrelevant to the reasonableness of offering an investment option that avoided the gamble. *White v. Chevron Corp.*, 2017 WL 2352137, *10 (N.D. Cal. May 31, 2017) ("No fiduciary selecting a plan's 'safe' option can foresee whether the associated risks with stable value investment will come to fruition, and a fiduciary may reasonably choose to avert those risks in favor of a safer alternative."), *aff'd*, 752 F. App'x 453 (9th Cir. 2018). The fiduciary duty of care, after all, "requires prudence, not prescience." *DeBruyne*, 920 F.3d at 465. And had the greater risks associated with stable value funds come home to roost in recent years (such as through a fresh credit crisis or an interest rate spike), the performance of such funds would have been much less rosy. This Court should thus reject any comparison based on realized returns as "an improper

---

[18] *See* Federal Reserve Bank of New York, *Actions Related to AIG*, https://www.newyorkfed.org/aboutthefed/aig (last visited July 2, 2020) (explaining that in September 2008 AIG was the issuer of "approximately $38 billion of stable-value wrap contracts" and if it had been allowed to fail "[w]orkers whose 401(k) plans had purchased guarantees in the form of [those] contracts from AIG could have lost that insurance").

[19] Not surprisingly, the market bears out that a federal guarantee has more value than a corporate guarantee. Investors in even "investment-grade corporate bonds"—i.e. the corporate bonds with the lowest risk of default—have "demanded higher interest rates than treasury bonds of similar duration and credit quality." Longstaff Report ¶ 34, at App. 402-03. "The fact that investors receive higher interest rates for investment-grade bonds shows that investors perceive [those bonds as] carrying greater risk than treasury bonds and that they receive some value from the protection offered by the federal guarantee." *Id.*

hindsight-based challenge." *Pledger v. Reliance Trust Co.,* 240 F. Supp. 3d 1314, 1333-34 (N.D. Ga. 2017) (quotation omitted); *see also Meiners*, 898 F.3d at 822 ("The fact that one fund with a different investment strategy ultimately performed better does not establish anything about whether [Credit Union Option was] an imprudent choice at the outset.").

(b)    Less Liquidity

Risk is not the only downside of a stable value fund: these funds are also generally less liquid than the Credit Union Option.  The Credit Union Option—a type of demand deposit account—is liquid by its very nature. *See* 12 C.F.R. § 204.2(b); *see supra*, at 5-6.  Participants can move in and out of the Credit Union Option on a daily basis.  Stable value funds, by contrast, are able to "guarantee" the book value of an investment only by placing severe restrictions on when a participant or plan can withdraw those funds.

For one thing, most stable value funds limit the ability of individual investor*s* to reallocate their funds to similar or safer investment options.  Stable value funds often include a so-called "equity-wash" provision, Longstaff Report ¶ 44, at App. 409, which requires "funds withdrawn from a Stable Value Fund [] to remain in an equity fund, subjecting them to the risk of market loss, before those funds can be reinvested in a" competing capital preservation plan. Paul J. Donahue, *Plan Sponsor Fiduciary Duty for the Selection of Options in Participant-Directed Defined Contribution Plans and the Choice Between Stable Value and Money Market*, 39 Akron L. Rev. 9, 21-22 & n.65 (2006).  The AA Stable Value fund, for example, specifies that before a participant can move assets to the Credit Union Option or to the Plan's brokerage account option, the participant must first invest those assets in one of the Plan's other—generally riskier—investment options ***for at least 90 days.***  Longstaff Report ¶ 44, at App. 409.

Moreover, stable value funds often limit the ability of a plan fiduciary to remove the fund from the investment lineup, even if that fiduciary believes that doing so is in the best interest of

all plan participants.  Typically, stable value funds will require *at least 12 months' notice* before a fiduciary can move a plan's funds to another investment option.  *Id*. ¶ 45, at App. 409-10. Thus if the market value of a stable fund ever drops below its "book value," a plan manager faces a Hobson's choice: he "must choose between taking all of its funds at [the lower] market value or waiting up to 12 months after serving notice."  *Id*.  During those twelve months, the rate of return on the investment will fall—perhaps drastically—so that the "market value and book value converge" at the lower number.  *Id*.

All told, a prudent investor could well prefer an option that provided participants with far more security and control over their retirement savings.  Plaintiffs' comparison based on this inapposite fund thus does nothing to advance their claim.

> 2.      *Plaintiffs' Criticism of Options Like the Credit Union Option Is Out-Of-Step With Fiduciary Practice, And Recent Cases Have Rejected Similar Categorical Challenges to Capital Preservation Options With Lower Returns.*

Plaintiffs' claim that the Credit Union Option is inherently imprudent also fails for an additional reason:  Their theory depends on showing that no prudent investor could or would invest in a Credit Union Option.  But given all the downsides of stable value funds just described (*see supra*, at 18-24), reasonable plan officials can and regularly do include other capital preservation options in their investment lineup, including options that perform worse than the Credit Union Option.

In particular, fiduciaries across the country routinely include money market funds as core options instead of or in addition to stable value funds.  Plaintiffs, for example, cite a report by MetLife ("MetLife 2015 Stable Value Study")—a stable value fund provider—indicating that "over 80%" of defined contribution plans offer stable value fund options.  Compl. ¶ 16.  But the same survey also indicated that *62%* of surveyed plans included a money market fund in their

investment lineups, either instead of or in addition to a stable value fund.  MetLife 2015 Stable

Value Study, at App. 844.  Likewise, a survey of Vanguard-record kept plans with over 5,000

participants found that money market options were more common than stable value funds.

Longstaff Report ¶ 67 & Ex. 3, at App. 421-22, 435 (noting that between 57% and 65% of such

plans offered a stable value option between 2011 to 2016, while 66% and 77% of such plans

offered a money market option during the same period).

Under Plaintiffs' theory, each of these plans would have needed to eliminate their money

market options, as those funds performed worse during the survey period than did the Credit

Union Option that Plaintiffs deem inherently imprudent.  During the relevant time period, the

Credit Union Option returns averaged 0.56% on an annualized basis (with a high of 1.01% in

2010, and a low of 0.24% in 2013, 2014, and 2017).  Longstaff Report ¶ 53, at App. 412-13.

Those annual returns vastly exceeded the rate of returns during that period of almost every

money market fund available, despite holding similar risk and liquidity profiles.  *See id.*  From

2010 to 2017, for example, the annual returns of the Credit Union option exceeded the returns of

more than 88% to 99% of bank money market accounts and more than 85% to 99% of money

market mutual fund accounts.  *Id*. ¶ 53(d),(e), at App. 413.  Hence were this Court to hold that no

prudent plan fiduciary could select a Credit Union Option, it would necessarily follow that no

prudent plan fiduciary could offer a money market option either.

That position is untenable.  Not only would it question the judgment of the majority of

401(k) plan fiduciaries across the country, *see supra*, at 19, it is also expressly at odds with the

Department of Labor's guidance, which instructs that money market funds "can, and in many

instances will, play an important role as a component of a diversified portfolio that constitutes a

qualified default investment alternative" 72 Fed. Reg. at 60,463; *see also id.* at 60,452

("[I]nvestments in money market funds, stable value products and other capital preservation

investment vehicles may be prudent for some participants or beneficiaries….").

District courts have thus regularly rejected claims challenging the inclusion of a money

market fund as a matter of law, even where those money market options produced

"[m]icroscopically [l]ow" rates of return." *Pledger,* 240 F. Supp. 3d at 1333-34.  Indeed, since

this case has been pending, at least eight different courts have rejected allegations that a plan

should have included a stable value fund in addition to or instead of a money market fund.[20]

These courts recognize exactly what Defendants have explained: that while the "return of money

market funds may at certain time periods be lower than the return of stable value funds, [] that

does not change the fact that stable value funds take greater risks than money market funds."

*White*, 2017 WL 2352137at *11; *see supra* at 20.  Hence the mere "fact that stable value funds

may provide a higher return" does not "raise an inference of imprudence by selecting [a] money

market fund." *Ferguson*, 2019 WL 4466714, at *10.  This Court should reject Plaintiffs'

challenge on the same basis.

---

[20] *See, e.g.*, *Moitoso v. FMR LLC*, --F. Supp. 2d--, 2020 WL 1495938, at *13 (D. Mass. Mar. 27, 2020) (joining the "[n]umerous courts" that "have ruled that plans are under no duty to offer alternatives to mutual funds"—including stable value funds—"even when the plaintiffs argue [those alternatives] are markedly superior"); *Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 704 (W.D. Mo. 2019) (no imprudence where plan that offered numerous funds along the risk/reward spectrum failed to offer passive options such as an index fund or stable value fund); *Dorman v. Charles Schwab Corp.*, 2019 WL 580785, at *4 (N.D. Cal. Feb. 8, 2019) (similar); *Ferguson v. Ruane Cunniff & Goldfarb Inc.*, 2019 WL 4466714, at *10 (S.D.N.Y. Sept. 18, 2019) ("Plaintiffs' argument that the Plan should have included a stable value fund rather than a money market fund fails"); *Larson v. Allina Health Sys.*, 350 F. Supp. 3d 780, 803 (D. Minn. 2018) (dismissing claims because "the inclusion of money market funds . . . as compared to stable value funds, without more, does not state a claim upon which relief can be granted"); *Pledger*, 240 F. Supp. 3d. at 1333-34; *White*, 2017 WL 2352137, at *10 ("Without more, the mere act of offering Plan participants a money market fund over a stable value fund as an option providing 'a high degree of safety and capital preservation' is not a fiduciary breach"); *Bell v. Pension Comm. of ATH Holding Co.*, 2017 WL 1091248, at *5 (S.D. Ind. Mar. 23, 2017) (defendants have no duty to offer a stable value fund instead of a money market fund).

3.   _Plaintiffs' Argument Ignores the Role of the Credit Union Option Within the_
     _Plan's Broader Investment Menu._

Finally, Plaintiffs' attack on the Credit Union Option is flawed because it ignores the role

of the Credit Union Option in the Plan's broadly diversified lineup.  *See Renfro v. Unisys Corp.*,

671 F.3d 314, 327–28 (3d Cir. 2011) (holding "the range of investment options and the

characteristics of those included options—including the risk profiles, investment strategies, and

associated fees—are highly relevant" in assessing challenges to a plan's mix of investments).

The Credit Union is just one of many options—all across the risk/return spectrum—from

which Plan participants can construct their individual investment portfolios according to their

investment needs and preferences.  During the relevant period, the Plan has offered participants a

range of conservative investment options, which have included not only the Credit Union Option

but also a money market fund, a short-term bond fund, an intermediate-term bond fund, and—as

of 2015—a stable value fund.  *See* 2010-14 Plan Form 5500s, at App. 776-77, 791-92, 807-08,

822, 837.  Thus, participants have always had a choice between the federal guarantee of the

Credit Union Option and the potentially higher returns—and commensurately higher risks—of

alternative capital preservation options.  And for investors who prefer the ironclad federal

guarantee, the Credit Union Option has outperformed other potential investment options with

that feature.  From 2010 to 2017, for instance, it outperformed 84% to 99% of credit union

savings accounts and 83% to 99% of bank savings accounts.  Longstaff Report ¶ 53, at App. 413.

Plaintiffs nonetheless press a more "paternalistic approach," *Loomis v. Exelon Corp.*, 658

F.3d 667, 673-74 (7th Cir. 2011), requiring this Court to eliminate entirely the Credit Union

Option instead of allowing it to offer that option alongside or instead of a stable value fund.  If

the Court did so, it would force thousands of American Airlines employees to leave their

preferred retirement plan option, while leaving those employees with no investment option that

held a similar risk and liquidity profile.  ERISA does not require this result.  On the contrary, the statute "encourages sponsors to allow more choice to participants in defined-contribution plans." *Id.*  In this case, American "has left [the] choice" of how much risk to bear "to the people who have the most interest in the outcome, and it cannot be faulted for doing [so]."  *Id.*  Plaintiffs' allegations in Count I thus fail as a matter of law.

## II.     UNDISPUTED FACTS SHOW THAT PLAINTIFFS' CLAIM FOR CO-FIDUCIARY LIABILITY AGAINST AMERICAN AIRLINES FAILS (COUNTS I AND II).

Plaintiffs have also asserted that American Airlines should be subject to co-fiduciary liability for alleged fiduciary breaches by the AAFCU (presumably those alleged in Count II of their Complaint).  *See* Compl. ¶ 43.  It is not clear whether Plaintiffs continue to press this claim against American Airlines, as their Statement in response to this Court's September 19, 2020 Order stated only that the AAFCU was liable on this basis.  *See* ECF No. 154 at 3.  But to the extent Plaintiffs continue to claim American Airlines is liable as a co-fiduciary, this theory, too, cannot be supported.

To establish co-fiduciary liability against American Airlines, Plaintiffs must first establish that the AAFCU had fiduciary duties under ERISA in determining the interest rates to credit on its demand deposits and violated them.  *See, e.g.*, *In re Dell, Inc. ERISA Litig.,* 563 F. Supp. 2d 681, 695 (W.D. Tex. 2008).  For the reasons set forth in the AAFCU's separately-filed motion, Plaintiffs fail to do so.  Plaintiffs' claim for co-fiduciary liability fails for that reason alone.

But even if the Plaintiffs could make such a showing, Plaintiffs still would not have stated a co-fiduciary liability claim against American Airlines.  ERISA § 405(a) authorizes co-fiduciary liability against a defendant fiduciary in three circumstances:

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105(a).

By the terms of the statute, American Airlines must have violated its *own* ERISA fiduciary duties to be subject to co-fiduciary liability under ERISA § 405(a)(2). For the reasons discussed above, American Airlines has not breached any fiduciary duties. Any claim against American Airlines under ERISA § 405(a)(2) must therefore fail.

Plaintiffs fare no better under ERISA §§ 405(a)(1) and (3), which explicitly condition co-fiduciary liability on the defendant having knowledge of another fiduciary's breach. As the Fifth Circuit has recognized, those provisions require not only that the defendant knew of the facts giving rise to a breach but that the defendant also knew that those facts constituted a breach. *Donovan v. Cunningham*, 716 F.2d 1455, 1475 (5th Cir. 1983); H.R. Rep. No. 93-1280 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5038, 5080 ("Under this rule, the fiduciary must know the other person is a fiduciary with respect to the plan, must know that he participated in the act that constituted a breach, and must know that it was a breach."). Count II alleges that the AAFCU breached various fiduciary duties in setting the interest rate for the Credit Union Option. Even assuming that the Credit Union breached any duties in that way, Plaintiffs have produced no evidence to support an inference that American Airlines **knew** that such conduct constituted a

breach.  Indeed, Plaintiffs have produced no evidence to support their co-fiduciary claim at all.

Accordingly, the Court should grant summary judgment on any co-fiduciary claim.

III.    **UNDISPUTED FACTS ESTABLISH THAT THE PLAN'S CREDIT UNION OPTION FALLS WITHIN AN ERISA PROHIBITED TRANSACTION EXEMPTION, THUS PRECLUDING PLAINTIFFS' PROHIBITED TRANSACTION CLAIM (COUNT III).**

Finally, Count III alleges that the Plan's investment in the Credit Union Option is a prohibited transaction under ERISA § 406(a) because the Credit Union, allegedly a party-in-interest to the Plan, furnishes services to the Plan.  Compl. ¶¶ 53-55.  But there are several exemptions to ERISA's prohibited transaction rules, including ERISA § 408(b)(4), which exempts a plan's investment, where, *inter alia*, (1) the deposits are in "a bank or similar financial institution supervised by the United States;" (2) "the bank is . . . a fiduciary of such plan"; (3) such "investment is expressly authorized . . .by a fiduciary (other than such bank or institution or affiliate thereof) who is expressly empowered by the plan to so instruct the trustee with respect to such investment"; and (4) the deposits by "reasonable rates."  29 U.S.C. § 1108(b)(3)-(4).

The undisputed facts in this case establish that the exemption's conditions are met.  First, the AAFCU is indisputably a "bank" that is supervised by the United States":  the DOL regulation implementing § 408(b)(4) explains that credit unions qualify as a "bank or similar financial institution," for purposes of the exemption,  29 C.F.R. § 2550.408b-4(c)(1), and Plaintiffs agree that the Credit Union is a "federally charted credit union."  Compl. ¶ 9.

Second, Plaintiffs themselves allege that the AAFCU is fiduciary of the Plan.  *Id*.  Even were it otherwise, the Credit Union's alleged status as a Plan service provider—and therefore a "party in interest" with respect to the Plan under ERISA § 3(14)(B)—is sufficient for the Plan to qualify for the § 408(b)(4) exemption.  *See* 29 C.F.R. § 2550.408b-4(a) (explaining the

applicability of the exemption where the bank is a "fiduciary *or other party in interest* with respect to the plan" (emphasis added)).[21]

Third, American Airlines and PAAC—the fiduciaries responsible for selecting the Plan's investment options—are entirely independent of the Credit Union and authorized Plan investments in the Credit Union Option.  *See supra*, at 5; Declaration of Kenneth Menezes, Ex. A at § 12.2, at App. 552-53; *id.*, Ex. B at § 12.4, at App. 656-67; *see also* 29 C.F.R. § 2550.408b-4(b)(3).[22]

That leaves the fourth condition: whether the fund bore a "reasonable interest rate."  ECF No. 81 at 15.  While Plaintiffs have questioned the reasonableness of the Credit Union's rate, they base that challenge on the same inapposite comparisons underlying their prudence challenge—the returns on stable value funds and the return supposedly offered on one of the Credit Union's checking account products.  The Court can reject that argument for the reasons discussed above: the Complaint's comparison of the Credit Union Option to the Credit Union's checking account products is misleading, and the comparison to the alleged returns of a stable value fund is irrelevant.  *See supra*, at 19 n.15.  Indeed, the purpose behind ERISA § 408(b)(4) is to permit 401(k) plans to invest in bank and similar deposits; the function of this exemption would be frustrated (if not defeated altogether) if the reasonableness of such deposit returns were

---

[21] If the AAFCU were not a "party in interest" with respect to the Plan, Plaintiffs' claim would fail for a more basic reason: ERISA § 406(a) would be entirely inapplicable, as it covers only transactions between the Plan and "a party in interest."  29 U.S.C. § 1106(a).

[22] Plaintiffs have previously questioned whether Defendants had an "interest in the transaction[s]" with the AAFCU that "may affect the authorizing fiduciary's best judgment.  ECF No. 81 at 15 (citing 29 C.F.R. § 2550.408b-4).  The regulation on which they rely, however, refers only to fiduciary self-dealing—i.e., it prohibits the same fiduciary representing both sides of a plan transaction, or a fiduciary receiving consideration from a counterparty to a plan in connection with a plan transaction.  29 C.F.R. § 2550.408-4 (citing 29 U.S.C. § 1106(b)).  Plaintiffs do not allege that American engaged in "self-dealing" or otherwise violated § 406(b), so this objection goes nowhere.

judged in relation to the returns of entirely different investment vehicles. *See also* H.R. Rep. No. 93-1280 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5038, 5093 ("[T]he prohibited transaction rules of the substitute do not prevent a bank or similar institution … which is a plan fiduciary from investing all or part of the plan's assets in deposits with the bank ….").

The ***appropriate*** measure of an investment's performance is how that performance compares to the market of investment vehicles with similar features and terms. *See supra*, at 18-23.[23] And by that measure, the Credit Union Option's returns were unquestionably reasonable, as its rates exceeded those offered on most demand deposit and bank money market accounts during the relevant period. *See* Longstaff Report ¶ 53 & Exs. 10A, 10B, at App. 412-13, 447-48; *see supra*, at 25.

Accordingly, the Plan's investment in the Credit Union Option is squarely exempted by ERISA § 408(b)(4), and this Court should grant summary judgment as to Count III.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that this Court grant their Motion for Summary Judgment.

---

[23] *See also, e.g.*, *Dupree v. Prudential Ins. Co. of Am.*, 2007 WL 2263892, at *12, *37 (S.D. Fla. Aug. 10, 2007) (finding plan fiduciaries "diligently carried out their responsibilities to monitor and review plan … performance" where they "compared Plan investments to performance records of other investments following the same investment style"); FINRA, Tracking Performance of Your Investments, https://www.finra.org/investors/learn-to-invest/key-investing-concepts/tracking-your-investments (last visited July 2, 202) ("In general, if you want to know how an investment is performing you look at the benchmark that tracks investments that are most like it."); FINRA, Evaluating Investment Performance, http://www.finra.org/investors/evaluating-investment-performance (last visited July 2, 2020) ("In measuring investment performance, you want to be sure to avoid comparing apples to oranges."); *cf. Tibble v. Edison Int'l*, 729 F.3d 1110, 1134 (9th Cir. 2013) (rejecting effort to compare mutual fund expenses to costs of institutional investments as "apples-to-oranges" comparison in light of material distinctions in investment features), *vacated on other grounds*, 135 S. Ct. 1823 (2015).

Respectfully submitted,


/s/ Lars L. Berg
Dee J. Kelly, Jr.
State Bar No. 11217250
dee.kelly.2@kellyhart.com
Lars L. Berg
State Bar No. 00787072
lars.berg@kellyhart.com
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Tel.: (817) 332-2500
Fax: (817) 878-9280

Brian D. Boyle* (D.C. Bar # 419773)
Shannon M. Barrett* (D.C. Bar # 476866)
Meaghan VerGow* (D.C. Bar # 977165)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Tel.: (202) 383-5300
Fax: (202) 383-5300
bboyle@omm.com
sbarrett@omm.com
mvergow@omm.com

Jeffrey I. Kohn* (N.Y. Bar # 1980838)
O'MELVENY & MYERS LLP
7 Times Square
New York, New York 10036
Tel.: (212) 326-2000
Fax: (212) 326-2061
jkohn@omm.com

*admitted *pro hac vice*

**ATTORNEYS FOR DEFENDANTS
AMERICAN AIRLINES, INC. AND THE
AMERICAN AIRLINES LENSION ASSET
ADMINISTRATION COMMITTEE**

**CERTIFICATE OF SERVICE**

On July 3, 2020, a true and correct copy of the foregoing document was served upon all persons who have requested notice and service of pleadings in this case via the Court's CM/ECF system.

/s/ Lars L. Berg
Lars L. Berg

34