UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| SALVADOR ORTIZ AND | § | |
| THOMAS SCOTT, | § | |
| *Plaintiffs* | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 4:16-cv-00151-A |
| AMERICAN AIRLINES, INC., THE | § | |
| AMERICAN AIRLINES PENSION | § | |
| ASSET ADMINISTRATION | § | |
| COMMITTEE, AND AMERICAN | § | |
| AIRLINES FEDERAL CREDIT UNION, | § | |
| *Defendants* | § | |

### DEFENDANT AMERICAN AIRLINES FEDERAL CREDIT UNION'S
### BRIEF IN SUPPORT OF ITS MOTION FOR FINAL SUMMARY JUDGMENT

Jonathan D. Neerman, Lead Counsel
Texas Bar No. 24037165
Edwin Buffmire
Texas Bar No. 24078283
Brian H. Oates
Texas Bar No. 24088144
**JACKSON WALKER LLP**
2323 Ross Avenue, Suite 600
Dallas, Texas 75201
(214) 953-5664 (Direct Dial)
(214) 661-6899 (Direct Fax)

**ATTORNEYS FOR DEFENDANT
AMERICAN AIRLINES FEDERAL
CREDIT UNION**

## **TABLE OF CONTENTS**

INDEX OF AUTHORITIES ................................................................................. ii

I.     SUMMARY OF THE ARGUMENT ................................................... 1

II.    STATEMENT OF FACTS ................................................................. 4

    A.   Background on Credit Unions ................................................. 4

    B.   The American Airlines Federal Credit Union ............................ 5

    C.   The Plan and the Credit Union Option ................................... 6

    D.   The Credit Union's Other Services and Deposit Account
       Options ............................................................................... 9

III.   ARGUMENT & AUTHORITIES ....................................................... 10

    A.   Summary Judgment Standard ............................................... 10

    B.   The Credit Union is Entitled to Summary Judgment on
       Count II Because Plaintiffs Lack Article III Standing to
       Bring They Have Failed to Establish That They Suffered an
       Injury in Fact ....................................................................... 11

    C.   The Credit Union is Entitled to Summary Judgment on
       Count II Because the Credit Union Is Not a Fiduciary for the
       Purposes Alleged in the Complaint ....................................... 14

    D.   The Credit Union is Entitled to Summary Judgment on
       Count II Because the Credit Union Did Not Use Plan Assets
       For Its Own Interest Or Its Own Accounts in Violation of 29
       U.S.C. § 1106 (b)(1) ........................................................... 17

    E.   The Credit Union is Entitled to Summary Judgment on
       Count II Because the Credit Union's Above-Average
       Dividends Show Its Returns Were Reasonable ......................... 20

CONCLUSION AND PRAYER ........................................................................ 22

CERTIFICATE OF SERVICE ......................................................................... 24

# INDEX OF AUTHORITIES

**Page(s)**

## Federal Cases

*Acosta v. Pacific Enterprises*,
  950 F.2d 611 (9th Cir. 1991) ................................................................19

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).............................................................................10

*Branch Bank & Trust v. Nat'l Credit Union Admin. Bd.*,
  786 F.2d 621 (4th Cir. 1986), *cert. denied*, 479 U.S. 1063 (1987)........................4, 5

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)...........................................................................10, 11

*Chao v. Hochuli*,
  244 F. Supp. 2d 92 (E.D.N.Y. 2003) ....................................................18

*Chao v. Johnson*,
  Civ. No. H-03-5394, 2005 U.S. Dist. LEXIS 40591 (S.D. Tex. Aug. 30, 2005) ...................18

*Chao v. Stuart*,
  Civ. No. H-04-1115, 2005 U.S. Dist. LEXIS 35424 (S.D. Tex. July 20, 2005).....................18

*Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*,
  474 F.3d 463 (7th Cir. 2007) ..........................................................15, 16

*Ford v. Freemen*,
  No. 3:18-CV-3095-B, 2020 U.S. Dist. LEXIS 17116 (N.D. Tex. Jan. 16,
  2020) ....................................................................................................10

*Gilliam v. Edwards*,
  492 F. Supp. 1255 (D. N.J. 1980) ........................................................18

*Haddock v. Nationwide Fin. Servs.*,
  419 F. Supp. 2d 156 (D. Conn. 2006).............................................18, 19

*Hecker v. Deere & Co.*,
  556 F.3d 575 (7th Cir. 2009) ...............................................................15

*Horvath v. Keystone Health Plan E., Inc.*,
  333 F.3d 450 (3d Cir. 2003).............................................................13, 14

*Insinga v. United of Omaha Life Ins. Co.*,
  Case No. 8:17CV179, 2017 U.S. Dist. LEXIS 178753 (D. Neb. Oct. 26, 2017) ...................16

*La Caisse Populaire Ste. Marie v. United States*,
　563 F.2d 505 (1st Cir. 1977) ....................................................................................4, 5

*Leigh v. Engle*,
　727 F.2d 113 (7th Cir. 1984) ............................................................................................18

*Little v. KPMG LLP*,
　575 F.3d 533, 541 (5th Cir. 2009) ...................................................................................11

*Lujan v. Defenders of Wildlife*,
　504 U.S. 555, 560–61 (1992) .....................................................................................11, 13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
　475 U.S. 574 (1986) .........................................................................................................10

*McCaffree Fin. Corp. v. Principal Life Ins. Co.*,
　811 F.3d 998 (8th Cir. 2016) ...........................................................................................14

*Midwest Cmty. Health Serv., Inc. v. Am. United Life Ins. Co.*,
　255 F.3d 374 (7th Cir. 2001) ...........................................................................................16

*NYSA-ILA Med., & Clinical Servs. Fund v. Catucci*,
　60 F. Supp. 2d 194 (S.D.N.Y. 1999)................................................................................18

*Patelco Credit Union v. Sahni*,
　262 F.3d 897 (9th Cir. 2001) ...........................................................................................18

*Pegram v. Herdrich*,
　530 U.S. 211 (2000)....................................................................................................14, 15

*Pension Benefit Guar. Corp. v. Solmsen*,
　671 F. Supp. 938 (E.D.N.Y. 1987) ..................................................................................18

*Pipefitters Local 636 Ins. Fund v. Blue Cross & Blue Shield of Mich.*,
　722 F.3d 861 (6th Cir. 2013) ...........................................................................................17

*Renfro v Unisys Corp.*,
　671 F.3d 314 (3d Cir. 2011)..............................................................................................14

*Spokeo, Inc. v. Robins*,
　136 S. Ct. 1540 (2016)......................................................................................................11

*Teets v. Great-W. Life & Annuity Ins. Co.*,
　919 F.3d 1232 (10th Cir. 2019) .......................................................................................16

*Teets v. Great-W. Life & Annuity Ins. Co.*,
　921 F.3d 1200 (10th Cir. 2019) .......................................................................................15

*Thole v. U.S. Bank, National Assoc.*,
   140 S. Ct. 1615 (2020) ..................................................................................11

*United States v. Maine*,
   524 F. Supp. 1056 (D. Me. 1981) ....................................................................5

*United States v. Michigan*,
   635 F. Supp. 944 (W.D. Mich. 1985), *aff'd*, 851 F.2d 803 (6th Cir. 1988)..............................5

*Vander Luitgaren v. Sun Life Assur. Co. of Canada*,
   966 F. Supp. 2d 59 (D. Mass. 2012) ...............................................................15

*Washburn v. Harvey*,
   504 F.3d 505 (5th Cir. 2007) ........................................................................10

**Federal Statutes**

12 U.S.C. §§ 1751, *et seq*..............................................................................4, 5

29 U.S.C. § 1106(b)(1) ..........................................................................*Passim*

29 U.S.C. § 1108(b)(4) ...................................................................................6

**Rules**

Fed. R. Civ. P. 10(c) ........................................................................................2

Fed. R. Civ. P. 56 .................................................................................2, 10, 11

**Regulations**

12 C.F.R. § 204.2(b) ........................................................................................7

12 CFR § 204.2(d)(2).......................................................................................7

29 C.F.R. § 2250.408b-4(c)(1)..........................................................................6

**Other Authorities**

FINRA, Evaluating Investment Performance ..................................................21

# I.   SUMMARY OF THE ARGUMENT

The Credit Union has for more than 40 years provided a demand deposit investment option (the "Credit Union Option") to Plan participants who want a conservative, federally protected, liquid investment option in their retirement account.  The Credit Union and the Plan participants were not strangers.  The Credit Union has served American Airlines employees and their families since 1936 by providing low-interest loans, depository services, and financial counseling.  The Credit Union Option has given thousands of employees of American Airlines the peace of mind that their retirement funds were safe, especially during turbulent periods in the financial markets.  Unlike a traditional money market fund, the Credit Union Option provides an above-market dividend rate when compared to other credit unions and financial institutions without the fees and withdrawal restrictions.  The offering of this Option was part of the Credit Union's continued commitment to its members, many of whom were also participants in the Plan, to help them meet their financial goals for themselves and their families.  The term "loyalty" for the Credit Union is not just a statutory element in ERISA; it is the cornerstone upon which its commitment to its members is built.

Mr. Scott and Ms. Ortiz jolted this valued relationship in 2016 when they filed this lawsuit alleging that the Credit Union violated its ***duty of loyalty*** to Plan participants.  (Doc. 1 at ¶¶ 44-51.)[1]  Plaintiffs allege that the Credit Union used Plan assets to:

> provide loans to Credit Union members and to make other investments and for which it earned substantial income, which in turn permitted Defendant AA Credit Union to offer substantially higher interest rates on similar demand deposit accounts to other

---

[1]  Plaintiffs' title Count II "Breach of Duties of Loyalty," but the substance of the allegations against the Credit Union deal with alleged violations of 29 U.S.C. § 1106(b)(1), ERISA § 406(b)(1).

customers of the AA Credit [U]nion than it provided to Plan participants.

(*Id.* at ¶ 47.)  Plaintiffs further claim that the Credit Union "used Plan assets to benefit itself and its other customers in violation of 29 U.S.C. § 1106(b)(1) resulting in significant losses for the Plan and members of the proposed Class."  (*Id.* at ¶ 50.)

Plaintiffs, however, allege neither an improper transaction nor an alleged improper benefit the Credit Union received.  The undisputed evidence establishes that the Credit Union used Plan assets to pay its corporate expenses, its corporate debts, or to pay fees to itself—nor do Plaintiffs allege as much.  Instead, Plaintiffs merely allege that the Credit Union used Plan assets to make improper loans to its members for its own benefit.  Even if the facts supported this allegation, which they do not, Plaintiffs' conclusory allegations against the Credit Union do not set forth a legal right to relief under ERISA § 406(b)(1).  The undisputed evidence undermines Plaintiffs' claims against the Credit Union.  Accordingly, the Credit Union is entitled to summary judgment under Rule 56.[2]

The Credit Union is entitled to summary judgment on Plaintiffs' single legal claim for at least four reasons.

***First***, Plaintiffs cannot meet their threshold burden of establishing standing.  Although the Court allowed Plaintiffs to pursue their claims as representatives of the Plan, Plaintiffs themselves must still show that they suffered an injury in fact to satisfy Article III requirements.  The uncontroverted evidence shows that the Credit Union (1) set a dividend rate every month for the

---

[2]  In addition, Plaintiffs' claims should be dismissed in their entirety for the reasons set forth in Defendants American Airlines, Inc.'s and The American Airlines Pension Asset Administration Committee's Motion for Summary Judgment, which the Credit Union fully joins and incorporates herein by reference pursuant to Fed. R. Civ. P. 10(c).

Credit Union Option in advance of payment and (2) paid to Plan participants that agreed rate. There is no evidence that Plaintiffs did not receive the agree dividend rate.  Consequently, Plaintiffs have no evidence they suffered an injury in fact.

*Second*, the Credit Union is not a fiduciary for the purpose of the selection, monitoring, or retention of the Credit Union Option in the Plan.  The Plan and its named fiduciaries have the responsibility for evaluating the dividend rate proposed by the Credit Union and ensuring its reasonableness for Plan participants.  The Credit Union does not have the authority or the responsibility for managing its own retention for the Plan or for monitoring the reasonableness of its dividend rate on behalf of the Plan.

*Third*, the Credit Union did not deal in Plan assets for its own interest or its own account in violation of 29 U.S.C. § 1106 (b)(1).  The Credit Union acted with the intent of benefitting the Plan participants by (1) holding Plan funds in conservative interest bearing assets, (2) ensuring that Plan participants' funds held by the Credit Union were liquid and payable on demand, (3) setting a reasonable dividend rate, and (4) paying that dividend rate.  The Credit Union has always ensured that it maintains sufficient liquidity to return the entire balance of the Credit Union Option to the Plan upon demand.  The Credit Union did not receive management fees for offering the Credit Union Option, nor did it use Plan assets to pay its own corporate expenses.  The Credit Union did not take any actions with respect to the Plan that put any Plan participant at risk.  The uncontroverted evidence defeats Plaintiffs' bare-bone allegation in their Complaint.

*Fourth*, the Credit Union Option's dividend rate was reasonable when compared to the appropriate benchmarks.  The Credit Union Option dividend rates exceeded dividend rates for other credit union deposit accounts, the appropriate benchmark for the Credit Union to use when

setting dividend rates.  Plaintiffs' reliance on a single account offered by the Credit Union called a "Priority" checking account is an apples-to-oranges comparison.  The higher interest rate offered in the "Priority" checking account applied only to a portion of the member's deposit, and the account had other requirements not necessary for other demand deposit options.  There is no requirement in law or fact that required the Credit Union to offer the ***identical*** dividend rate to Plan participants as it did for a portion of funds in this one deposit account.  Plaintiffs have otherwise failed to show that the Option's dividend rate or the process used by the Credit Union was unreasonable.

## II.      STATEMENT OF FACTS

### A.      Background on Credit Unions.

Congress created federal credit unions in 1934 by enacting the Federal Credit Union Act, 12 U.S.C. §§1751, *et seq*.  In doing so, Congress expressly found that credit unions:

> are member-owned, democratically operated, not-for-profit organizations generally managed by volunteer boards of directors and because they have the specified mission of meeting the credit and savings needs of consumers, especially persons of modest means.

12 U.S.C. § 1751; *see also Branch Bank & Trust v. Nat'l Credit Union Admin. Bd.*, 786 F.2d 621, 625-26 (4th Cir. 1986), *cert. denied*, 479 U.S. 1063, 107 S. Ct. 948 (1987).

Federal credit unions enable the federal government to make credit available to millions of working class Americans.  One court aptly describe a credit union as "a democratically controlled, cooperative, nonprofit society organized for the purpose of encouraging thrift and self-reliance among its members . . .[I]t is fundamentally distinguishable from other financial institutions in that the customers may exercise effective control." *La Caisse Populaire Ste. Marie v. United States*,

563 F.2d 505, 509 (1st Cir. 1977).  By its express terms, the Federal Credit Union Act limits membership in every federal credit union to members of definable "groups."  12 U.S.C. § 1759. Because large financial entities generally refuse to extend credit to individuals without traditionally accepted forms of collateral, entities offering usurious interest rates are too often the only other viable source of credit for many working class people.  *See Branch Bank & Trust*, 786 F.2d at 621 (outlining formation of credit unions in response to entities offering usurious rates).

The Federal Credit Union Act authorizes credit unions to issue loans and dividends to their members.  12 U.S.C. § 1757; *see also* 12 U.S.C. § 1763.  It also authorizes federal credit unions to invest their funds in obligations of the United States, invest in securities, or make deposits in national banks.  *Id*.  Indeed, federal credit unions serve as fiscal agents of the United States and depositories for public monies.  *United States v. Maine*, 524 F. Supp. 1056, 1059 (D. Me. 1981); *see also United States v. Michigan*, 635 F. Supp. 944, 947 (W.D. Mich. 1985), *aff'd* , 851 F.2d 803 (6th Cir. 1988); 12 U.S.C. § 1767(a) ("Each Federal credit union organized under this chapter . . . shall act as fiscal agent of the United States . . . [and] any Federal credit union . . . shall be a depository of public money . . . .").

## B.    The American Airlines Federal Credit Union.

A small group of American Airlines employees who shared the goal of creating a member-owned, cooperative financial institution founded the American Airlines Federal Credit Union in 1936.[3]  The Credit Union holds a corporate charter under the provisions of the Federal Credit Union Act and is highly regulated by the National Credit Union Administration ("NCUA").  (*Id*.)

---

[3] (Declaration of Lewis Cohen, Ex. A ("Cohen Decl.") at ¶ 2, App. AAFCU-1.)

The Credit Union is fully independent from American Airlines and maintains separate decision-making capabilities.

Because the Credit Union is a member-owned, not-for-profit organization, its loan rates are generally lower than those offered by conventional, for-profit financial institutions. (*Id* at ¶ 3, App. AAFCU-1.) This also allows the Credit Union to offer favorable loan terms and higher dividends on deposits to its member-owners. (*Id*.) Members' shares are the deposit accounts in the Credit Union, which are federally insured for as much as $250,000 by the National Credit Union Share Insurance Fund. (*Id*, App. AAFCU-2.)

## C.    The Plan and the Credit Union Option.

American Airlines is the sponsor of the Plan. (*Id*. at ¶ 4, App. AAFCU-2.) Since 1985, the Plan has offered the Credit Union Option as a low-risk option to Plan participants. (*Id*. at ¶ 5, App. AAFCU-2.) ERISA expressly contemplates that "all or part of a plan's assets" may be invested in "deposits" with a "bank or similar financial institution." 29 U.S.C. § 1108(b)(4); 29 C.F.R. § 2250.408b-4(c)(1) (defining "bank or similar institution" to include a credit union).

During the relevant period for this lawsuit, the majority of participants in the Credit Union Option were also members of the Credit Union. (*Id*. at ¶ 17, App. AAFCU-5.) For example, as of June 30, 2014, of the 26,200 Credit Union Option participants, 20,012 (76.4%) were also members of the Credit Union. (*Id*.) As of that same date, Credit Union Option participants accounted for 41,343 deposit accounts and 16,368 loans at the Credit Union. (*Id*.)

This Credit Union Option is the functional equivalent of an interest-bearing checking account. (*Id*. at ¶ 5, App. AAFCU-2.) Demand deposit vehicles such as the Credit Union Option are unique relative to other low-risk/low-return investment options in that assets invested therein

are both payable on demand without transfer restrictions, and guaranteed (up to $250,000) by the full faith and credit of the United States government. *See* 12 C.F.R. § 204.2(b) (defining "demand deposit"); (Cohen Decl. at ¶ 3, App. AAFCU-2.)  Unlike savings accounts, the Credit Union Option has no transfer restrictions.[4]

The Credit Union sets its regular share dividend rate on a monthly basis.  (Cohen Decl. at ¶ 8, App. AAFCU-2.)  The Credit Union reviews the dividend rates offered by other credit unions and financial institutions to remain competitive.  (*Id*.)  The Credit Union then sets the dividend rate for the Credit Union Option based on any adjustments made to the regular share dividend rate.  (*Id*, App. AAFCU-3.)  Although the two rates have not always been identical, adjustments to regular share dividend rates have coincided with the same changes to the Credit Union Option dividend rates.  (*Id*.)

The Credit Union sets each of its dividend rates, including that for the Credit Union Option, in advance of their monthly implementation.  (*Id*. at ¶ 9, App. AAFCU-3.)  The Credit Union notifies the Plan in advance of the intended dividend rate for the Credit Union Option.  (*Id*.)  At all times relevant to this lawsuit, the Credit Union has paid the set dividend rate disclosed in advance to the Plan.  (*Id*.)  The dividend rate paid to Plan participants in the Credit Union Option varied during the relevant period of this lawsuit, ranging from 0.25% to 1.0% during the relevant period.  (*Id*. at ¶ 7, App. AAFCU-2.)

The Credit Union receives no management fees or commissions for holding Plan assets.  (*Id*. at ¶ 6, App. AAFCU-2.)  The Credit Union has never used Plan assets to pay corporate

---

[4] Regulation D requires that an account, to be classified as a ''savings deposit,'' must not permit more than six convenient transfers or withdrawals per month from the account.  12 CFR 204.2(d)(2).

expenses or debts.  (*Id*. at ¶ 7, App. AAFCU-2.)  The Credit Union largely holds the Plan assets in cash reserves and short-term investments to meet the liquidity needs of Plan participants.  (*Id*. at ¶ 13, App. AAFCU-4.)  The Credit Union does not consider these funds core deposits and treats them as short-term, liquid, rate sensitive funds for interest rate risk management purposes.  (*Id*.)  During the relevant period for this lawsuit, the Credit Union has on average held on its balance sheet $2.71 billion in cash and short-term investments, while at the same time the Plan assets have averaged $1.26 billion.  (*Id*. at ¶ 14, App. AAFCU-4.)  The Credit Union would be able to fund the withdrawal of the entirety of the Plan assets by drawing down its cash balance and (if necessary) selling investments.  (*Id*.)

The Credit Union maintains these Plan assets to meet the liquidity (withdrawal) needs of its members and Plan participants.  (*Id*. at ¶ 15, App. AAFCU-4.)  The Plan, as the result of a decision by the Plan's fiduciaries or by the decisions of individual participants, can withdraw either all or some of its cash from the Credit Union to reallocate to other non-Credit Union investment options daily.  (*Id*.)  The Credit Union also has to be prepared to remit to the Plan for participant redemptions, retirements, or reallocation to other investment options within the Plan.  (*Id*.)  For example, during the first five days of February 2016, the Plan or Plan participants withdrew $25,619,604.17 from the Credit Union.  (*Id.*)  The Credit Union also plans for turbulent flows of cash into and out of the Credit Union Option during volatility in the financial markets.  (*Id*. at ¶ 16, App. AAFCU-5.)  For example, the Credit Union received deposits totaling $172.36 million between May and August 2010.  Between September 2010 and January 2011, the Credit Union had an outflow of $164.40 million.  (*Id*.)  Similarly, the Credit Union received $163.02 million

between August and September 2017, while sending out $245.68 million from the Credit Union Option between October 2017 and January 2018.  (*Id*.)

**D.     The Credit Union's Other Services and Deposit Account Options.**

The Credit Union offers depository account and lending services to its members.  Credit Union members with a traditional "Flagship" checking account received dividend rates between 0.25% and 0.50% during the relevant period.  (*Id*. at ¶ 10, App. AAFCU-3.)  This Flagship dividend rate was always equal to or below the dividend rate offered for the Credit Union Option during the relevant period.  (*Id*.)  Members with a Flagship checking account pay $5.75/month if the monthly balance is below $750.  (*Id*.)

Credit Union members with a "Priority" checking account do not receive an interest rate of 2.25% on the entire balance in their accounts.  (*Id*. at ¶ 11, App. AAFCU-3.)  Instead, a qualifying account received (as of May 1, 2016) a dividend rate of 2.25%[5] on the first $5,000 and 0.05% on the remaining deposit.  (*Id*.)  This means the effective rate for a qualifying account with a $10,000 balance is actually 1.15%.  The effective rate for a qualifying account with a $15,000 balance is 0.78%.

The higher dividend rate in the Priority account was only available if the member met a series of requirements:

- Registered for online statements;
- Has a valid email address;
- Conducted 15 debit transactions per month (ATM excluded); and
- Has a direct deposit of at least $250 per month.

---

[5] This higher rate ranged from 1.00% to 2.50% during the relevant period.

(*Id.* at ¶ 11, App. AAFCU-3.)  Otherwise, the account was considered a "non-qualifying" account and received 0.05% for the entire deposit account balance.  (*Id.*)  Because a large percentage of Credit Union members do not meet the qualifying requirements, the effective dividend rate on this account is well below the offering rate of 2.25% on the first $5,000.  (*Id.*)

### III.    ARGUMENT & AUTHORITIES

**A.    Summary Judgment Standard**

The Credit Union moves for summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure.  Summary judgment is proper if there is "no genuine issue as to any material fact," and the movant is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The movant must state the basis for the motion and identify material that shows the absence of fact issue.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007).  The moving party has the initial burden to identify those portions of the record that it believes show the lack of a genuine issue of material fact.  *Ford v. Freemen*, No. 3:18-CV-3095-B, 2020 U.S. Dist. LEXIS 17116, at *6 (N.D. Tex. Jan. 16, 2020).  When the moving party has carried its burden of proving the absence of a genuine issue of material fact, the nonmoving party bears the burden of presenting "specific facts showing there is a genuine issue for trial."  *Id.*

"If the evidence identified could not lead a rational trier of fact to find in favor of the nonmoving party as to each essential element of the nonmoving party's case, there is no genuine dispute for trial and summary judgment is appropriate."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court will not consider disputed fact

issues that are "irrelevant and unnecessary" in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23; Fed. R. Civ. P. 56(e).

**B.     The Credit Union is Entitled to Summary Judgment on Count II Because Plaintiffs Lack Article III Standing to Bring They Have Failed to Establish That They Suffered an Injury in Fact.**

Plaintiffs lack Constitutional standing to pursue their lone claim against the Credit Union. Plaintiffs must present an injury that is: (1) "concrete, particularized, and actual or imminent," (2) "fairly traceable to the defendant's challenged behavior," and (3) "likely to be redressed by a favorable ruling." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Courts require that plaintiffs meet that these elements whether the case is pursued as a class action or under the provisions of ERISA alone. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–1549 (2016). In order to satisfy Article III, Plaintiffs must not only demonstrate a violation of a statutory right, but must also provide evidence of having suffered a particularized and concrete injury. *Id.* at 1549. The Supreme Court recently underscored this standing requirement for ERISA plan participants by making clear that "in order to claim the interests of others, the litigants themselves still must have suffered an injury in fact in order to satisfy Article III of the Constitution." *Thole v. U.S. Bank, National Assoc.*, 140 S. Ct. 1615, 1620 (2020).

Plaintiffs have failed to meet their burden. The injuries Plaintiffs have alleged are far "too speculative to confer Article III standing." *Little v. KPMG LLP*, 575 F.3d 533, 541 (5th Cir. 2009). Plaintiffs do not claim that they lost their principal investments in the Credit Union Option. Rather, Plaintiffs theory in their Complaint is that they could earned better returns had the Credit Union

paid a higher dividend rate.  As will be explained below, the undisputed evidence defeats Plaintiffs' apples-to-oranges comparison in their Complaint.  *See* discussion *infra* Section III(E). Furthermore, the Credit Union Option dividend rate met or exceeded similar demand deposit rates offered by national credit unions.  (*Id*.)

Plaintiffs' ever-changing theories of liability and damages with respect to the Credit Union highlights their lack of standing.  Plaintiffs' initially based their theory of damages as to the Credit Union on disgorgement of the Credit Union's purported "ill-gotten gains" from its improper use of Plan assets.[6]  Plaintiffs advanced two different damages theories in their Complaint and in their request for class certification : (1) a "lost profits" model measured by the difference between what the Plan actually earned on the purportedly imprudent investment as compared to what the Plan would have earned had the funds been invested in a comparable, but prudent, investment, and (2) a disgorgement of profits from improper use of Plan assets by the Credit Union.[7]  (Doc. 89 at 7-8.)

Plaintiffs subsequently and expressly abandoned the latter theory against the Credit Union:

> While Plaintiffs have previously proffered several alternative methods to measure the damages suffered by the Plan, in light of the Court's comments at the recent hearing, *Plaintiffs now request only that the Court make the proposed Plaintiff class whole by ordering Defendants to pay to the Plan the difference between the investment returns actually earned by participants who invested in the AAFCU Demand Deposit Option and the returns those participants would have earned if they had invested the same amounts in a properly-performing capital preservation option, such as a stable value fund,*

---

[6]  Plaintiffs characterize their damages claim in their Complaint as "any losses to the Plan resulting from the Credit Union's alleged misconduct."  (Doc. 1 at ¶ 51.)  Although not explained, this appears to be a restatement of Plaintiffs' disgorgement theory.  Plaintiffs have also abandoned this theory.

[7]  Plaintiffs did not specifically address damages in their Complaint.  In the course of settlement approval, Plaintiffs highlight their competing damages theories.

*during the same time period.*

(*Id.* at 8) (emphasis in original.)[8]  Plaintiffs did not amend their Complaint to reflect the changes to their damages theories.

Plaintiffs' sole-remaining damages model does not measure damages resulting from the injury resulting from the Credit Union's alleged misconduct.  Plaintiffs' theory of liability is that "the ***inclusion*** of the AAFCU Demand Deposit Option as an investment option in the Plan was disloyal and imprudent."  (Doc. 142 at 7) (emphasis added.)  The Credit Union had no decision-making authority with regard to what investment options were selected and retained within the Plan and, accordingly, the Credit Union owed no fiduciary duties to the Plan in connection with such decisions.  *See* discussion *infra* Section III(C).

Plaintiffs' liability theory for the Credit Union—improper use of Plan assets—necessarily requires a damages model that measures the amount of the Credit Union's "ill-gotten gains" or "outsized profits" and seeks to return those to the Plan through a disgorgement theory.  Because Plaintiffs have effectively dismissed their disgorgement damages theory, Plaintiffs no longer have any damages theories based on the Credit Union's purported wrongful conduct.  The result leaves an incongruent theory of liability and damages as to the Credit Union that is not permitted, demonstrating that the Credit Union is entitled to summary judgment.

Plaintiffs cannot establish that they suffered a concrete injury resulting from any alleged misconduct by the Credit Union.  *See Lujan*, 504 U.S. at 560; *Horvath v. Keystone Health Plan E., Inc.*, 333 F.3d 450, 457 (3d Cir. 2003) (holding plan participant lacked standing under ERISA

---

[8]  "Plaintiffs no longer submit that disgorgement is a reason of damages that should be considered by the Court." (Doc. 142 at 2.)

where injury was "too speculative to serve as the basis for a claim of individual loss"). For these reasons, the Credit Union respectfully requests that the Court find Plaintiffs lack standing and grant summary judgment as to Count II.

**C.    The Credit Union is Entitled to Summary Judgment on Count II Because the Credit Union Is Not a Fiduciary for the Purposes Alleged in the Complaint.**

Plaintiffs fail to allege any specific facts supporting their theory that the Credit Union acted in a fiduciary capacity with respect to the Plan. Plaintiffs simply state that the Credit Union is an ERISA fiduciary because the Credit Union held Plan assets. (Doc. 1 at ¶ 9.) Plaintiffs do not otherwise expand on the breadth of the Credit Union's fiduciary duty. "Because [the Credit Union] is not a named fiduciary of the plan, [Plaintiffs] need to plead facts demonstrating that [the Credit Union] acted as a fiduciary 'when taking the action subject to complaint.'" *McCaffree Fin. Corp. v. Principal Life Ins. Co.*, 811 F.3d 998, 1002 (8th Cir. 2016) (*quoting Pegram v. Herdrich*, 530 U.S. 211, 226, 120 S. Ct. 2143, 147 L. Ed. 2d 164 (2000)); *Renfro v Unisys Corp.*, 671 F.3d 314, 321 (3d Cir. 2011).

The evidence is undisputed that the Credit Union was not a named fiduciary for the Plan. (Cohen Decl. at ¶ 4, App. AAFCU-4.) That leaves Plaintiffs with the burden of proving that the Credit Union acted as a "functional fiduciary":

> Under ERISA, a party involved in managing a benefit plan takes on fiduciary obligations in one of two ways. First, the instrument establishing a plan must specify at least one fiduciary—typically the employer or a trustee—that will have the "authority to control and manage the operation and administration of the plan." These are "named fiduciaries." Second, a party not named in the instrument can nonetheless be a "functional fiduciary" by virtue of the authority the party holds over the plan. Under § 3(21)(A) of ERISA, a party becomes a functional fiduciary when
>
> (i)  he exercises any discretionary authority or discretionary control

> respecting management of such plan or exercises any authority or
> control respecting management or disposition of its assets, (ii) he
> renders investment advice for a fee or other compensation, direct or
> indirect, with respect to any moneys or other property of such plan,
> or has any authority or responsibility to do so, or (iii) he has any
> discretionary authority or discretionary responsibility in the
> administration of such plan.

*Teets v. Great-W. Life & Annuity Ins. Co.*, 921 F.3d 1200, 1206 (10th Cir. 2019), *cert. denied*,

2019 WL 6257428 (Nov. 25, 2019) (internal citations omitted); *Vander Luitgaren v. Sun Life*

*Assur. Co. of Canada*, 966 F. Supp. 2d 59, 63 (D. Mass. 2012) ("A defendant is only liable for

breach of its fiduciary duties imposed by these provisions if it was 'acting as a fiduciary (that is

performing a fiduciary function) when taking the action subject to complaint.'") (citing *Pegram*,

530 U.S. at 226).

Plaintiffs do not specifically identify what actions the Credit Union took that would confer

it with "functional fiduciary" status.  Plaintiffs imply in their Complaint that the Credit Union

acted as a fiduciary with respect to the selection and retention of the Credit Union Option for the

Plan.  (Doc. 1 at ¶¶ 41-43.)[9]  The Credit Union cannot, as a matter of law, be a fiduciary for the

purpose of ***its own inclusion*** as an option in the Plan.  *See Hecker v. Deere & Co*., 556 F.3d 575,

583 (7th Cir. 2009) (Defendant "[did] not act as a fiduciary with respect to the terms in the service

agreement if it did not control the named fiduciary's negotiation and approval of those terms.");

*see also Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463, 472-73

n.4 (7th Cir. 2007) (holding that defendant was not a fiduciary with respect to a fixed fee that was

---

[9] Plaintiffs went to great lengths to make their theory of liability clear in their class certification briefing was that "the ***inclusion*** of the AAFCU Demand Deposit Option as an investment option in the Plan was disloyal and imprudent." (Doc. 142 at 7) (emphasis added.)

set by an agreement negotiated at arm's length).  The uncontroverted evidence that the Credit Union had no such responsibility or authority for selecting investment options for the Plan also undermines Plaintiffs' allegation.  (Cohen Decl. at ¶ 4, App. AAFCU-2.)

Plaintiffs next imply that the Credit Union acted as a fiduciary when setting the dividend rates for the Credit Union Option.  (Doc. 1 at ¶¶ 41-43.)  This theory is flawed for the same reasons as above.  Moreover, the Credit Union's mere setting of a monthly dividend rate does not convert it to a fiduciary.  *See Insinga v. United of Omaha Life Ins. Co.*, Case NO. 8:17CV179, 2017 U.S. Dist. LEXIS 178753 (D. Neb. Oct. 26, 2017).  The *Insinga* Court granted a service provider's Motion to Dismiss, in part, because the Plaintiff failed to allege facts demonstrating that the service provider acted as a fiduciary when declaring a monthly dividend rate:

> If Insinga is unhappy with the investment options that his Plan has contracted to provide, those complaints are more appropriately addressed to the Plan.  United setting the Guaranteed Interest Rate did not change the Contract, nor did United exercise any other ability to change the contractual terms here.  Simply put, United does not become a fiduciary by declaring the monthly Guaranteed Interest Rate.

*Insinga*, 2017 U.S. Dist. LEXIS 178753, at *7-8.

The evidence also establishes that the Credit Union sets the dividend rates for the Credit Union Option, in advance of monthly implementation.  (Cohen Decl. at ¶ 9, App. AAFCU-3.)  The Credit Union notifies the Plan in advance of the intended dividend rate for the Credit Union Option.  (*Id*.)  This gives the Plan and its fiduciaries the opportunity to question the reasonableness of the rate before it goes into effect.  *See, e.g., Teets v. Great-W. Life & Annuity Ins. Co.*, 919 F.3d 1232, 1244 (10th Cir. 2019); *Midwest Cmty. Health Serv., Inc. v. Am. United Life Ins. Co*., 255 F.3d 374, 377-78 (7th Cir. 2001) (holding service provider was fiduciary when it could make changes to plan

contract without plan approval and would assess a fee for plans withdrawing funds).  At all times

relevant to this lawsuit, the Credit Union has paid the set dividend rate disclosed in advance to the

Plan.

For this reason, the Credit Union respectfully requests that the Court grant summary

judgment to the Credit Union as to Count II.

**D.      The Credit Union is Entitled to Summary Judgment on Count II Because the Credit Union Did Not Use Plan Assets For Its Own Interest Or Its Own Accounts in Violation of 29 U.S.C. § 1106 (b)(1).**

Count II in Plaintiffs' Complaint fails as a matter of law because Plaintiffs do not allege

any facts, and there is no evidence, that could establish that the Credit Union used any of the Plan's

assets for its "own interest or for [its] own account," as they must under the plain terms of the

statute.  29 U.S.C. § 1106(b)(1).  Indeed, Plaintiffs' only complaint is that the Credit Union used

Plan assets to

> provide loans to Credit Union members and to make other investments and for which it earned substantial income, which in turn permitted [the Credit Union] to offer substantially higher interest rates on similar demand deposit accounts to other customers of the [Credit Union] than it provided to Plan participants.

(Doc. 1 at ¶ 47.)

This alleged conduct by the Credit Union, even taken as true, does not rise to the level of

prohibited conduct under ERISA § 406(b)(1).  *See, e.g., Pipefitters Local 636 Ins. Fund v. Blue*

*Cross & Blue Shield of Mich.*, 722 F.3d 861, 868 (6th Cir. 2013) (finding plan administrator

breached ERISA § 406(b)(1) when it unilaterally collected a fee from plan assets for its own

account); *Chao v. Johnson*, Civ. No. H-03-5394, 2005 U.S. Dist. LEXIS 40591 (S.D. Tex. Aug.

30, 2005) (Defendant failed to remit the employee contributions to the Plans and instead used them

to company operating expenses in violation of § 406(b)(1); *Chao v. Stuart,* Civ. No. H-04-1115, 2005 U.S. Dist. LEXIS 35424 (S.D. Tex. July 20, 2005) (finding defendant violated ERISA § 406(b)(1) by diverting employee retirement contributions to pay company operating expenses); *Chao v. Hochuli,* 244 F. Supp. 2d 92, 99 (E.D.N.Y. 2003) (finding fiduciary in breach of § 406(b)(1) where plan funds were used for the benefit of corporation partially owned by the fiduciary); *Patelco Credit Union v. Sahni*, 262 F.3d 897 (9th Cir. 2001) (finding violation of ERISA § 406(b)(1) when plan administrator used its own discretion when setting a fee for his services); *NYSA-ILA Med., & Clinical Servs. Fund v. Catucci*, 60 F. Supp. 2d 194, 203 (S.D.N.Y. 1999) (holding that president and sole shareholder breached § 406(b)(1) by using plan assets to pay corporate expenses); *Pension Benefit Guar. Corp. v. Solmsen*, 671 F. Supp. 938 (E.D.N.Y. 1987) (holding president of bankrupt corporation in violation of § 1106(b)(1) for using employee contributions to fund the company and not remitting contributions to the plan); *Gilliam v. Edwards*, 492 F. Supp. 1255 (D. N.J. 1980) (holding the fiduciary defendant in violation of § 1106(b)(1) for having himself hired as fund administrator when he also served as the trustee of the fund and business manager of union to which fund participants belonged).

The breadth of the provision in ERISA § 406(b)(1) requires courts to look carefully at the alleged improper transaction to decide whether plan assets were used "by or for the benefit of" a party in interest, or whether a fiduciary dealt with the plan assets "in his own interest." *Leigh v. Engle*, 727 F.2d 113, 126 (7th Cir. 1984). "Plan assets" include items a defendant holds or receives: (1) as a result of its status as a fiduciary or its exercise of fiduciary discretion or authority, and (2) ***at the expense of plan participants or beneficiaries***. *Haddock v. Nationwide Fin. Servs*., 419 F. Supp. 2d 156, 170 (D. Conn. 2006) (emphasis added). For Plaintiffs to succeed on their

claim, they must establish that the Credit Union actually used its power to deal in Plan assets when making loans to its members. *See Acosta v. Pacific Enterprises*, 950 F.2d 611, 621 (9th Cir. 1991) (holding that to state a claim under 29 U.S.C. § 1106(b)(1), a plaintiff must establish that defendant "actually used its power to deal with the assets of the plan for its own benefit or account").

Here, the uncontroverted evidence establishes that the Credit Union never used assets of the Plan for its own interest. The Credit Union maintained the Plan assets in cash reserves and short-term investments to meet the liquidity needs of Plan participants. (Cohen Decl. at ¶ 13, App. AAFCU-4.) The Credit Union does not consider these funds core deposits and treats them as short-term, liquid, rate sensitive funds for interest rate risk management purposes. (*Id*.) During the relevant period for this lawsuit, the Credit Union has on average held on its balance sheet $2.71 billion in cash and short-term investments, while at the same time the Plan assets have averaged $1.26 billion. (*Id*. at ¶ 14.) The Credit Union would be able to fund the withdrawal of the entirety of the Plan assets by drawing down its cash balance and (if necessary) selling investments. (*Id*.)

The Credit Union also has to be prepared to remit to the Plan for participant redemptions, retirements, or reallocation to other investment options within the Plan. (*Id*. at ¶ 15, App. AAFCU-4.) For example, during the first five days of February 2016, the Plan or Plan participants withdrew $25,619,604.17 from the Credit Union. (*Id.*) The Credit Union also plans for turbulent flows of cash into and out of the Credit Union Option during volatility in the financial markets. (*Id*. at ¶ 16, App. AAFCU-5.) For example, the Credit Union received deposits totaling $172.36 million between May and August 2010. Between September 2010 and January 2011, the Credit Union had an outflow of $164.40 million. (*Id*.) Similarly, the Credit Union received $163.02 million in

deposits between August and September 2017, while sending out $245.68 million back to the Plan between October 2017 and January 2018.  (*Id.*)

The Credit Union is entitled to summary judgment on Count II because uncontroverted evidence shows that the Credit Union did not deal with Plan assets in its own interest in violation of 29 U.S.C. § 1106(b)(1).

**E.    The Credit Union is Entitled to Summary Judgment on Count II Because the Credit Union's Above-Average Dividends Show Its Returns Were Reasonable.**

Plaintiffs premise their breach of loyalty claim against the Credit Union on the faulty assertion that it failed to pay a reasonable dividend rate.[10]  (Doc. 1 at ¶ 13.)  Plaintiffs challenge the reasonableness of the Credit Union Option's dividend rate by making an inapposite comparison to the rate offered for a portion of a member's deposit in the "Priority" checking account that the Credit Union offered during the same period.  (Doc. 1 at ¶ 20.)

Plaintiffs' proposed measure of performance is inaccurate and misplaced for at least two reasons.  First, contrary to the suggestion in the Complaint, "Priority" checking account customers do not receive an interest rate of 2.27% on the entire balance in their accounts.  Instead, a qualifying account received (as of May 1, 2016) a dividend rate of 2.25% on the first $5,000 and .05% on the remaining deposit.  (Cohen Decl. at ¶ 11, App. AAFCU-3.)  Furthermore, this dividend rate is only available if the member meets a series of requirements:  (1) registers for online statements; (2) has a valid email address; (3) conducts 15 debit transactions per month (ATM excluded); and (4) has

---

[10]  As explained above, the Credit Union was not a fiduciary for the purpose of monitoring the reasonableness of the Credit Union Option's dividend rate for the Plan.  *See* discussion *infra* Section III(C).

a direct deposit of at least $250 per month.  (*Id.*)  Otherwise, the account is a "non-qualifying" account and receives 0.05% for the entire deposit account balance.  (*Id.*)

Second, Plaintiffs fail to distinguish the significant differences between the Credit Union Option and the other demand deposit accounts offered by the Credit Union.  As explained earlier, the two types of Priority checking accounts have different dividend rates and features.  (Cohen Decl. at ¶¶ 10-12, App. AAFCU-3,4.)  The Credit Union Option in the Plan has no such minimum requirements or restrictions, making Plaintiffs' comparison even more strained.  Plaintiffs also fail to acknowledge that Credit Union members may pay fees for their accounts, while Credit Union Option participants pay no fees to the Credit Union.  (Cohen Decl. at ¶¶ 6,10, App. AAFCU-2, 3.)

Plaintiffs' theory fails for the additional reason that the dividend rate offered and paid to Plan participants in the Credit Union Option was reasonable when compared to similar investment products.  The appropriate measure of an investment's performance is how that performance compares to the market of investment vehicles with similar features and terms.  "In measuring investment performance, you want to be sure to avoid comparing apples to oranges.  Finding and applying the right evaluation standards for your investments is important. If you don't, you might end up drawing the wrong conclusions."  FINRA, Evaluating Investment Performance, https://www.finra.org/investors/learn-to-invest/key-investing-concepts/evaluating-investment-performance (last visited July 2, 2020).

The Credit Union sets it regular share dividend rate on a monthly basis reviewing the dividend rates offered by other credit unions and financial institutions to remain competitive.  (Cohen Decl. at ¶ 8, App. AAFCU-2.)  The Credit Union then sets the dividend rate for the Credit Union Option based on any adjustments made to the regular share dividend rate.  (*Id.*)  Although

the two rates have not always been identical, adjustments to regular share dividend rates have coincided with the same changes to the Credit Union Option dividend rates.  (*Id*.)

The dividend rate paid to Plan participants in the Credit Union Option varied during the relevant period of this lawsuit.  The dividend rates ranged from 0.25% to 1.0% during the relevant period.  (*Id*. at ¶ 7.)  These rates not only roughly double the national average returns of bank and credit union demand deposit accounts, but also exceed the national average returns of less liquid options, such as certificates of deposit with three-month terms.[11]

Consequently, because the Credit Union Option's dividend rate is reasonable when compared to appropriate investment benchmarks, and Plaintiffs have no evidence proving otherwise, the Credit Union is entitled to summary judgment on Count II of the Complaint.

## CONCLUSION AND PRAYER

For all the foregoing reasons, Defendant American Airlines Federal Credit Union moves for an order granting its Motion for Summary Judgment and for any other relief to which it may be justly entitled.

---

[11] (Declaration of Brian Oates, Ex. B ("Oates Decl."), Ex. 1 at AAFCU-App. 9-59.)

Dated:  July 3, 2020                         Respectfully submitted,

By: _____

     Jonathan D. Neerman
     Texas Bar No. 24037165
     Edwin Buffmire
     Texas Bar No. 24078283
     Brian H. Oates
     Texas Bar No. 24088144

JACKSON WALKER L.L.P.
2323 Ross Avenue, Suite 600
Dallas, Texas 75201
(214) 953-5664 (Direct Dial)
(214) 661-6899 (Direct Fax)

**ATTORNEYS FOR AMERICAN AIRLINES
FEDERAL CREDIT UNION**

## CERTIFICATE OF SERVICE

I hereby certify that on July 3, 2020, a true and correct copy of the above and foregoing document has been served upon the following parties of record via the Court's ECF system:

Peter B. Schneider
**SCHNEIDER WALLACE COTTRELL**
**KONECKY WOTKYNS LLP**
3700 Buffalo Speedway, Suite 1100
Houston, TX 77098
pschneider@schneiderwallace.com

Shannon Barrett
**O'MELVENY & MYERS LLP**
1625 Eye Street, NW
Washington, DC 20006
sbarrett@omm.com

Jonathan T. Suder
Michael T. Cooke
Todd I. Blumenfeld
**FRIEDMAN, SUDER & COOKE**
604 E. Fourth Street, Suite 200
Fort Worth, TX 76102
jts@fsclaw.com
mtc@fsclaw.com
blumenfeld@fsclaw.com

Dee J. Kelly, Jr.
Lars L. Berg
**KELLY HART & HALLMAN**
201 Main Street, Suite 2500
Fort Worth, TX 76102
dee.kelly.2@kellyhart.com
lars.berg@kellyhart.com

_____
Jonathan D. Neerman

**DEFENDANT AMERICAN AIRLINES FEDERAL CREDIT UNION'S**
**BRIEF IN SUPPORT OF ITS MOTION FOR FINAL SUMMARY JUDGMENT**
26160293

**Page 24 of 24**