## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| SALVADORA ORTIZ and THOMAS SCOTT, on behalf of themselves and all others similarly situated, | § § § § | |
| | § | |
| Plaintiffs, | § | |
| | § | Case No. 4:16-cv-00151-A |
| v. | § | |
| | § | |
| AMERICAN AIRLINES INC., THE AMERICAN AIRLINES PENSION ASSET ADMINISTRATION COMMITTEE, and AMERICAN AIRLINES FEDERAL CREDIT UNION, | § § § § § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' OPPOSITION TO DEFENDANT AMERICAN AIRLINES FEDERAL CREDIT UNION'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT THEREOF

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................. iii

I.      INTRODUCTION ........................................................................................... 1

II.     APPLICABLE LEGAL STANDARDS ......................................................... 4

III.    STATEMENT OF FACTS ............................................................................. 5

      A.     The Plan ................................................................................................. 5

      B.     AAFCU Demand Deposit Option ........................................................... 5

      C.     Plaintiffs' Investments in the AAFCU Demand Deposit Option ............ 8

      D.     Plaintiffs' Claims Against The Credit Union .......................................... 9

IV.    ARGUMENT .................................................................................................. 9

      A.     Plaintiffs have Article III Standing ........................................................ 9

      B.     The Credit Union is a Fiduciary to the Plan ........................................ 13

      C.     The Credit Union Dealt in Plan Assets for its own interest, Which Is A Per Se Violation Of ERISA ................................................................. 19

      D.     The Credit Union Failed to Discharge its Burden to Establish that the Rates were Reasonable ................................................................. 22

V.     CONCLUSION ............................................................................................. 25

# TABLE OF AUTHORITIES

**Cases:**

*accord Golden Star, Inc. v. Mass Mut. Life Ins. Co.*,
  22 F. Supp. 3d 72 (D. Mass. 2014) ...................................................................17

*Cf. American Fed'n of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Soc.*,
  841 F.2d 658 (5th Cir. 1988) ...........................................................................18

*Cf. Leigh v. Engle*,
  727 F.2d 113 (7th Cir. 1984) ............................................................................21

*Charters v. John Hancock Life Ins. Co.*,
  583 F. Supp. 2d 189 (D. Mass. 2008) ..............................................................17

*Chao v. Hochuli*,
  244 F. Supp. 2d 92 (E.D.N.Y. 2003) ...............................................................21

*Chao v. Johnson*,
  Civ. No. H-03-5394, 2005 U.S. Dist. LEXIS 40591 (S.D. Tex. Aug. 30, 2005) ..............21

*Chao v. Stuart*,
  Civ. No. H-04-1115, 2005 U.S. Dist. LEXIS 35424 (S.D. Tex. July 20, 2005)...............21

*Chicago Bd. Options Exch., Inc. v. Connecticut Gen. Life Ins. Co.*,
  713 F.2d 254 (7th Cir. 1983) ............................................................................17

*Cutaiar v. Marshall*,
  590 F.2d 523 (3d Cir. 1979)..............................................................................20

*Donovan v. Cunningham*,
  716 F.2d 1455 (5th Cir. 1983) .......................................................................1, 23

*Donovan v. Mercer*,
  747 F.2d 304 (5th Cir. 1984) ............................................................................14

*Ed Miniat., Inc. v. Globe Life Ins. Group, Inc.*,
  805 F.2d 732 (7th Cir. 1986) ............................................................................16

*Edmonson v. Lincoln Nat'l Life Ins. Co.*,
  725 F.3d 406 (3d Cir. 2013)..............................................................................17

Emmalind Garcia, *ERISA: Its Fiduciary Duties and Investments for Social Purposes*,
  23 Rev. Jur. U.I.P.R. 53 (1988) .......................................................................20

*F.H. Krear & Co. v. Nineteen Named Trustees*,
  810 F.2d 1250 (2d Cir. 1987) ............................................................17

*Gilliam v. Edwards*,
  492 F. Supp. 1255 (D.N.J. 1980) ...................................................20, 21

*Horvath v. Keystone Health Plan E., Inc.*,
  333 F.3d 450 (3d Cir. 2003).............................................................13

*Insinga v. United of Omaha Life Ins. Co.*,
  Case No. 8:17CV179, 2017 U.S. Dist. LEXIS 178753 (D. Neb. Oct. 26, 2017) ........15, 16

*IT Corp. v. Gen. Am. Life Ins. Co.*,
  107 F.3d 1415 (9th Cir. 1997) ..........................................................13

*John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*,
  510 U.S. 86 (1993)......................................................................17, 19

*Kanawi v. Bechtel Corp.*,
  590 F. Supp. 2d 1213 (N.D. Cal. 2008) ..............................................21

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)....................................................................3, 9, 10

*Marshall v. Snyder*,
  572 F.2d 894 (2d Cir. 1978)..........................................................20, 23

*Midwest Cmty. Health Serv., Inc. v. Am. United Life Ins. Co.*,
  255 F.3d 374 (7th Cir. 2001) ............................................................18

*New York State Teamsters Council Health & Hosp. Fund v. Estate of DePerno*,
  816 F. Supp. 138 (N.D.N.Y. 1993)......................................................20

*NYSA-ILA Med., & Clinical Servs. Fund v. Catucci*,
  0 F. Supp. 2d 194 (S.D.N.Y. 1999)....................................................21

*Patelco Credit Union v. Sahni*,
  262 F.3d 897 (9th Cir. 2001) ...........................................................21

*Perez v. Bruister*,
  823 F.3d 250 (5th Cir. 2016) ...........................................................23

*Pension Benefit Guar. Corp. v. Solmsen*,
  671 F. Supp. 938 (E.D.N.Y. 1987) ....................................................21

*Pipefitters Local 636 Ins. Fund v. Blue Cross & Blue Shield of Michigan*,
    722 F.3d 861 (6th Cir. 2013) ...................................................................17, 21

*Quality Infusion Care, Inc. v. Health Care Service Corp.*,
    628 F.3d 725 (5th Cir. 2010) ...........................................................................4

*Quorum Health Resources, L.L.C. v. Maverick County Hosp. Dist.*,
    308 F.3d 451 (5th Cir. 2002) ...........................................................................4

*Reich v. Lancaster*,
    55 F.3d 1034 (5th Cir. 1995) ....................................................................14, 17

*Roberts v. Cardinal Services, Inc.*,
    266 F.3d 368 (5th Cir. 2001) ...........................................................................4

*Rozo v. Principal Life Ins. Co.*,
    949 F.3d 1071 (8th Cir. 2020) ........................................................................16

*Santomenno v. Transamerica Life Ins. Co.*,
316 F.R.D. 295 (C.D. Cal. 2016), *rev'd on other grounds*
*Santomenno v. Transamerica Life Ins. Co.*,
    883 F.3d 833 (9th Cir. 2018) ...........................................................................1

*Teets v. Great-W. Life & Annuity Ins. Co.*,
    919 F.3d 1232 (10th Cir. 2019) ......................................................................18

*Tittle v. Enron Corp. (In re Enron Corp. Sec. Derivative & ERISA Litig.)*,
    284 F. Supp. 2d 511 (S.D. Tex. 2003) ..........................................................15

## **Other:**

29 U.S.C. §1002 ......................................................................................14, 15

29 U.S.C. §1106 ................................................................4, 9, 12, 19, 20, 21

29 U.S.C. §1108 ................................................................2, 4, 12, 14, 23

Fed. R. Civ. P. 56 .....................................................................................4, 22

Ronald J. Cooke, ERISA Practice and Procedure,
§ 6.12 (2d ed. Supp. 2000) ............................................................................20

ERISA § 406 ........................................................................................ *Passim*

James F. Jorden, Waldemar J. Pflepsen, Jr. & Stephen H. Goldberg, Handbook on ERISA
Litigation, § 3.03[B][1] (2d ed. Supp. 2000) ...............................................20

Plaintiffs Salvadora Ortiz and Thomas Scott (together, "Plaintiffs") respectfully submit this brief in support of their opposition to Defendant American Airlines Federal Credit Union's ("AAFCU" or "Credit Union") Motion for Summary Judgment (Doc. 180).

## I. INTRODUCTION

Plaintiffs' case against the Credit Union arises out of its use of Plaintiffs' retirement savings for its own benefit.  Plaintiffs are participants in the American Airlines, Inc. 401(k) Plan, a tax-qualified retirement plan formerly known as the $uper $aver, (the "Plan").  The Credit Union held Plan assets as a fiduciary to the Plan and used those assets as working capital for years.  For its use of the Plan assets, the Credit Union paid Plaintiffs and other Plan participants an interest rate that was less than the rate that the Credit Union paid its members for their deposits in the Credit Union.  Because the Credit Union paid unreasonably low interest rates on the Plan assets, Plan participants collectively suffered losses of more than $61 million.  The Credit Union's motion for summary judgment ("the Credit Union's Motion") ignores the fact that, as a matter of law, engaging in a prohibited transaction is a *per se* violation of ERISA.  *See Donovan v. Cunningham*, 716 F.2d 1455, 1464-65 (5th Cir. 1983) ("The object of Section 406 was to make illegal per se the types of transactions that experience had shown to entail a high potential for abuse").  It matters not whether the Credit Union acted in bad faith; "a fiduciary cannot pay itself out of the plan assets over which the fiduciary exercises its fiduciary duties — period." *Santomenno v. Transamerica Life Ins. Co.*, 316 F.R.D. 295, 311 (C.D. Cal. 2016), *rev'd on other grounds Santomenno v. Transamerica Life Ins. Co.*, 883 F.3d 833 (9th Cir. 2018).

Defendant American Airlines Inc. ("American") is the sponsor and administrator of the Plan, and delegated certain fiduciary duties (including, among other things, the appointment of trustees and investment managers) to a specified group of officers of American who would perform

1

and exercise the duties and responsibilities of American as the Defendant American Airlines Pension Asset Administration Committee ("PAAC").   The Credit Union is a federally chartered credit union that held Plan assets as a fiduciary in demand deposit accounts in reliance on the prohibited transaction exemption set forth in ERISA § 408(b)(4), 29 U.S.C. § 1108(b)(4) ("Section 408(b)(4)"), which requires, among other things, that the Credit Union provide the Plan with a reasonable rate of interest on the deposits.   The failure to do so would result in a transaction prohibited by ERISA section 406(a).   *Id.*

From February 2010 until the end of 2015, there was only one capital preservation option available to the Plan: an option to invest in a demand deposit account offered by AAFCU (the "Credit Union Option").   These demand deposit accounts functioned essentially like checking accounts; American's workers who invested in them were paid a set interest rate on their investments as set by AACFU.   The gravamen of Plaintiffs' claim in this case is that the interest rate was unreasonable—indeed, it was among the lowest rates credited by the Credit Union on any of its deposit accounts despite the size and stability of Plan deposits, substantially exceeding one billion dollars for more than ten years, and was a fraction of the rate of inflation rate for most of the relevant period.

The Credit Union enjoyed the benefit of continuously having more than $1 billion worth of American Airlines' workers' retirement savings as low-cost working capital to provide loans and other services to its customers.   The interest rate that the Credit Union Option paid to Plan participants was far lower than the rates the Credit Union would have paid to borrow such working capital in the marketplace, and was less than the interest paid on demand deposits of the Credit Union held outside of the Plan.

Plaintiffs bring this action pursuant to Sections 502(a)(2) and 502(a)(3) of the Employee

2

Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1132(a)(2)-(3). Plaintiffs allege that the Credit Union, as a Plan fiduciary holding Plan assets and responsible for the investment of Plan assets, engaged in a prohibited transaction in violation of ERISA § 406 by using those Plan assets for its own benefit and failing to pay a reasonable rate of interest to the Plan, as required by ERISA § 408(b)(4).   The damages Plaintiffs seek from AAFCU "is the difference between (i) a reasonable rate of interest, taking into account the investment income earned by the AAFCU using the Plan's deposits, as well as the amount of interest paid to other depositors . . . , and (ii) the lower rate of interest that was actually paid to Plan participants." Doc. 154 at 3–4.

The Credit Union's Motion misconstrues Plaintiffs' claims, distorts the record in this case, and should be denied.  There are disputed factual issues with respect to each ground on which the Credit Union moves for summary judgment.  Specifically, the Credit Union disputes (1) whether Plaintiffs satisfy Article III standing requirements, (2) whether the Credit Union was a fiduciary to the Plan, (3) whether the Credit Union used Plan assets for its own interest, and (4) whether the dividend rates the Credit Union paid on Plan deposits were reasonable.  As shown below, Plaintiffs have discharged their burden to set forth evidence with respect to each issue.

*First*, Plaintiffs have Article III standing to bring their claims against AAFCU: Plaintiffs suffered an actual injury that is concrete and particularized (receiving unreasonably low dividend payments on their deposits in the Credit Union Option); this injury is fairly traceable to the Credit Union's conduct; and a favorable ruling would redress the injury.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

*Second*, AAFCU is a fiduciary to the Plan: Indeed, the Section 408(b)(4) exemption that the Credit Union asks the Court to apply is, by its terms, available only "if such bank or other

3

financial institution is a fiduciary." The Credit Union also holds Plan assets and exercises discretionary control over those assets.  *See* 29 U.S.C. §§1002(21) and 1108(b)(4).

*Third*, AAFCU dealt with Plan assets for its own interest: AAFCU used Plan assets as working capital to provide loans and other services to its customers.  *See* 29 U.S.C. § 1106(b)(1). *And fourth*, Plaintiffs' offer evidence that the dividend rates paid by the Credit Union on deposits in the Credit Union option were unreasonable while AAFCU failed to meet its burden to establish that the dividend rates were reasonable as a matter of law.

## II.  APPLICABLE LEGAL STANDARDS

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*  "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Quality Infusion Care, Inc. v. Health Care Service Corp.*, 628 F.3d 725, 728 (5th Cir. 2010).

When reviewing evidence in connection with a motion for summary judgment, "the court must disregard all evidence favorable to the moving party that the jury is not required to believe and should give credence to the evidence favoring the nonmoving party as well as that evidence supporting the moving party that is uncontradicted and unimpeached." *Roberts v. Cardinal Services, Inc.*, 266 F.3d 368, 373 (5th Cir. 2001).  "Credibility determinations are not part of the summary judgment analysis."  *Quorum Health Resources, L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 458 (5th Cir. 2002).

## III.  STATEMENT OF FACTS

### A.      The Plan

The Plan is a participant-directed, 401(k) plan that enables eligible American Airlines employees to save for retirement by investing a portion of their pre-tax compensation.  APPX5. From February 12, 2010 through the present (the "Relevant Time Period"),[1] the PAAC (or its successor from 2014 onward, the Employee Benefits Committee or "EBC") was the fiduciary responsible for the selection of Plan investment options.  *Id.* at -3296–97; APPX49; Doc. 178, American Airlines' Mot. for Summary Judgment, at 4, n. 2 (citing Doc. 179-1, Decl. of David Pulford, Ex. A, at App. 13).

The Plan "is intended to comply with ERISA Section 404(c) and regulations thereunder" (a "404(c) plan").  APPX5.  Among other things, a 404(c) plan must offer at least three investment choices that constitute a broad range of investment alternatives, one of which must be "an income-producing, low risk, liquid fund."  29 C.F.R. § 2550.404(c)-1(b)(2)(ii)(C)(2)(ii).  This type of investment option is sometimes referred to as a plan's principal preservation option.  *See* ECF No. 193, Expert Report of James J. King, CFA ("King Rpt."), at ¶ 16.  As its principal preservation option, the Plan offered the AAFCU Demand Deposit Option.  King Rpt. ¶ 3; Doc. 178, American Airlines' Mot. for Summary Judgment, at 5.

### B.      AAFCU Demand Deposit Option

The AAFCU Demand Deposit Option "seeks income by earning dividends on deposits in

---

[1]      American Airlines' Motion for Summary Judgment attempts to inject uncertainty about the Relevant Time Period where none exists.  In its Motion (ECF No. 178) in footnote 1 at page 4, American Airlines argues that the relevant time period must end "at the latest [by] October 2016." But in their joint statement to the Court, and as communicated during the Parties' October 28, 2019 meeting, the relevant time period runs through the date the Credit Union Option is removed from the Plan or the date of judgment, whichever is later.  *See* Order Re: Plaintiffs' Trial Experts, Doc. 168 (June 15, 2020) at 3.

the American Airlines Federal Credit Union." Doc. 179-1, AA Defs. App'x, at APP 121. The majority (76.4%, according to the Credit Union) of Plan participants who invested in the AAFCU Demand Deposit Option were also members of the Credit Union. *See* Doc. 183, Decl. of Lewis Cohen, ¶ 17, App.-AAFCU 000005.

In 2009, for example, the Credit Union Option held approximately $1.26 billion in Plan deposits of the Credit Union's total $4.43 billion deposits. 2010 AAFCU Annual Report at 19. Those numbers, respectively, were $1.25 billion and $4.63 billion in 2010[2], $1.75 billion and $5.34 billion in 2011[3], APPX248, $1.31 billion and $5.07 billion in 2012[4], APPX250, $1.19 billion and $4.95 billion in 2013[5], APPX252, $1.01 billion and $4.98 billion in 2014[6], APPX 254, $1.22 billion and $5.30 billion in 2015[7], APPX256, and $1.33 billion and $5.73 billion in 2016.[8] APPX 258. Thus, the Credit Union Option represented a significant portion of AAFCU deposits, totaling more than $1 billion, and averaging more than twenty percent of AAFCU's total deposits. ECF No. 203, Expert Report of Neil Librock ("Librock Rpt."), ¶ 43, APPX 16.

Loans are the Credit Union's main source of income. Deposition of Lewis Cohen ("Cohen Dep.") at 37:3-11, APPX231. The Credit Union's deposits fund those loans. *Id.* at 37:12-15. The Credit Union uses interest income from the Plan's assets, which are deposited at the Credit Union through the Credit Union Option, to pay corporate expenses, corporate debts, and commissions and fees (including, in some cases, to itself). *Id.* at 43:8-44:2 ("Q. So just to be clear. The Credit Union uses income from all of its assets to pay corporate expenses, corporate debts, commissions

---

[2]   *Id.*
[3]   2011 AAFCU Annual Report at 21, APPX248.
[4]   2012 AAFCU Annual Report at 20, APPX 250.
[5]   2013 AAFCU Annual Report at 18, APPX252.
[6]   2014 AAFCU Annual Report at 19, APPX 254.
[7]   2015 AAFCU Annual Report at 18, APPX 256.
[8]   2016 AAFCU Annual Report at 18, APPX 258.

and fees, including interest income from Plan assets; is that correct?  A. The Plan assets, yes.").[9]
The interest earned by the Credit Union from those Plan assets is substantial—between 20% and
50% of the Credit Union's total investment income.  *Id.* at 46:12-47:9.

   While Plan deposits have provided more than twenty percent of the Credit Union's working
capital over the last ten years, "the Credit Union Option (and the Plan participants who invested in
it) did not receive a commensurate proportion of the interest paid by the Credit Union during that
same time."  Librock Rpt., ¶ 50, APPX 17.  For example, in 2010, the Credit Union paid a dividend
rate on deposits in the Credit Union Option of 1.01% in 2010, 0.83% in 2011, 0.51% in 2012,
0.24% in 2013, and 0.24% in 2014.  APPX262 at -91, -102, -111, -127, -135.[10]  In 2010, the Credit
Union paid a total of $66.8 million in interest on all deposits (1.44% of total deposits)[11], APPX260,
$64.9 million in 2011 (1.22%)[12] APPX 254, $51.8 million in 2012 (1.02%)[13] APPX 250, $46.9
million in 2013 (0.95%)[14] APPX252, and $48.7 million in 2014 (0.91%).[15] APPX 254. Thus, "[i]n
2012, for example, the Plan provided the Credit Union with 25% of its total deposits but received
only 14.6% of the interest credited on deposits."  Librock Rpt., ¶ 50, APPX 17.  From 2013 until

---

[9]     At the end of his deposition, and during questioning from the Credit Union's counsel, Mr.
Cohen partially contradicted his prior testimony and said that "[t]he majority of all interest
income [from the Credit Union Option] is used to pay the dividend on the deposits of the Credit
Union."  Cohen Dep. at 75:23-76:3, APPX231.  While his statement concerning "the majority"
of the interest income is not completely contradictory to his prior testimony, which is
exceedingly clear, the contradiction itself creates a disputed issue of material fact.  The Court
will have the opportunity to weigh Mr. Cohen's competing statements and afford them the
appropriate level of credibility at trial.
[10]    From 2010 to 2017, the Credit Union Option's average annual percentage yield was
0.57%—just 57 cents on every $100 deposited.  King Rpt. at ¶ 15.  During the same time period,
the average rate of annual inflation was 1.69%.  *Id.*  Thus, from 2010 to 2017, the AAFCU Demand
Deposit Option failed to outpace inflation.
[11]    2010 AAFCU Annual Report at 8, APPX 260.
[12]    2011 AAFCU Annual Report at 6, APPX 254.
[13]    2012 AAFCU Annual Report at 6, APPX 250.
[14]    2013 AAFCU Annual Report at 8, APPX252.
[15]    2014 AAFCU Annual Report at 8, APPX 254.

the beginning of 2020, the regular share dividend rate at the Credit Union was higher than the dividend rate paid to the Plan through the Credit Union Option.  Cohen Dep. At 52:25-53:9, APPX231.

"All of the features of the Credit Union Option indicate that the Plan participants should be receiving one of the highest rates of interest offered by the Credit Union's suite of products. Instead, they received one of the lowest."  Librock Rpt., ¶ 52, APPX 17.  "The nature of the Credit Union Option . . . in that it provided a stable and virtually expense-free source of capital for the Credit Union, should have justified one of the highest rates offered by the Credit Union on any form of deposit account.  However, other products offered by the Credit Union during the same time period received much higher returns."  *Id.*, ¶ 54, APPX 18.  The Credit Union Option deposits should have received "rates of return equivalent to certificates of deposit."  *Id.*, ¶ 19, APPX 9.

### C.    Plaintiffs' Investments in the AAFCU Demand Deposit Option

Plaintiffs Salvadora Ortiz ("Ortiz") and Thomas Scott ("Scott") were both American Airlines employees and participants in the Plan.  Salvadora Ortiz, Oct. 3, 2018, Depo. Tr. at 31–32; APPX319; Thomas Scott, Sept. 26, 2018, Depo. Tr. at 10; APPX327.  Ortiz and Scott both invested in the Credit Union Option during the Relevant Time Period.  For example:

- Ortiz invested a total of $20,614.34 ($16,858.82 as a beginning balance and $3,755.52 in pre-tax contributions) in the Credit Union Option in 2010 and earned $187.41 as a result. *See* APPX262.

- Scott invested a total of $369,936.00 ($368,590.72 as a beginning balance and $1,345.28 in pre-tax contributions) in 2010 and earned $516.02 as a result.  *See* APPX336.

As a result of those investments and the lost investment income they should have had if AAFCU paid a competitive interest rate, Plaintiffs suffered damages of more than $1,100 (with

8

respect to Ortiz) and $1,800 (with respect to Scott).  Librock Rept., ¶¶ 36–37, APPX 13–14.  The entire Plan suffered damages of approximately $61 million by the same measure.  *Id.* at ¶ 45, APPX 16.

### D.     Plaintiffs' Claims Against The Credit Union

Plaintiffs allege that the Credit Union, as a Plan fiduciary holding Plan assets and responsible for the investment of Plan assets, breached its fiduciary duties by using those Plan assets for its own benefit, in violation of ERISA § 406(b)(l), 29 U.S.C. § 1106(b)(1).  More specifically, the Credit Union "used those [P]lan assets to provide loans to Credit Union members and to make other investments and for which it earned substantial income, which in turn permitted [the Credit Union] to offer substantially higher interest rates on similar demand deposit accounts to other customers of [the Credit Union] than it provided to Plan participants."  Doc. 1, ¶ 47.  The damages Plaintiffs seek from the Credit Union "is the difference between (i) a reasonable rate of interest, taking into account the investment income earned by the AAFCU using the Plan's deposits, as well as the amount of interest paid to other depositors . . . , and (ii) the lower rate of interest that was actually paid to Plan participants."  Doc. No. 154 at 3–4.

## IV.  ARGUMENT

### A.     Plaintiffs have Article III Standing.

Plaintiffs have Article III standing to pursue their claims against the Credit Union.  To establish Article III standing, Plaintiffs must present an injury that is: (1) "concrete, particularized, and actual or imminent," (2) "fairly traceable to the defendant's challenged behavior," and (3) "likely to be redressed by a favorable ruling."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  As the Supreme Court held in *Lujan*, standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.* with the manner and

degree of evidence required at the successive stages of the litigation." *Id.* at 561. Thus, at the summary judgment stage, "the plaintiff . . . must set forth by affidavit or other evidence specific facts . . . which for purposes of the summary judgment motion will be taken to be true." *Id.* (internal quotations omitted).

Here, Plaintiffs' evidence shows that they suffered an actual injury that is concrete and particularized—they, and other Plan participants, would have received greater returns on the Plan assets that were deposited in the Credit Union Option had the Credit Union paid a reasonable interest rate on those assets. This injury is fairly traceable to the Credit Union's challenged conduct—had the Credit Union paid a reasonable interest rate, Plaintiffs would not have suffered the injury. And Plaintiffs' injury would be redressed by a favorable ruling in this case—they seek damages from the Credit Union in the amount of the difference between what the Credit Union paid and what a reasonable interest rate would have been.

The Credit Union argues that Plaintiffs' injuries are "too speculative to confer Article III standing." Br. at 11 (quoting *Little v. KPMG, LLP*, 575 F.3d 533, 541 (5th Cir. 2009)).[16] However, it does not explain how Plaintiffs' injuries are speculative and offers no evidence in support of this assertion. In the Article III context, injuries are speculative when the "likelihood of suffering any concrete adverse effect from the challenged action" is in question. *See Lujan*, 504 U.S. at 583–84; *see also id.* at 564, n.2 ("injury is not too speculative for Article III purposes . . . [if] the injury is certainly impending") (quotations omitted). Here, Plaintiffs complain about past injuries that are definite, they do not seek relief for future injuries where the likelihood of suffering any harm

---

[16]     All "Br." references herein are to Defendant American Airlines Federal Credit Union's Brief in Support of its Motion for Final Summary Judgment, Doc. 181 (July 3, 2020).

is in doubt.[17]

The Credit Union makes a legal argument that Plaintiffs lack Article III standing. However, this argument is premised on a misstatement of Plaintiffs' claims against AAFCU and the measure of damages Plaintiffs seek from the Credit Union. The Credit Union accurately states that Plaintiffs' theory "is that they could [have] earned better returns had the Credit Union paid a higher dividend rate." Br. at 11-12. It is also accurate that "Plaintiffs' theory of liability is that "the ***inclusion*** of the AAFCU Demand Deposit Option as an investment option was disloyal and imprudent." Br. at 13 (quoting Doc. 142) (emphasis in original). However, this latter theory of liability applies only to American and the PAAC, not the Credit Union. With respect to the Credit Union, Plaintiffs' theory is, and always has been, that the Credit Union engaged in a prohibited transaction by using Plan assets for its own interest and by failing to pay a reasonable rate of return. Thus, the Credit Union's argument—that it "had no decision-making authority with regard to what investment options were selected and retained within the Plan and, accordingly, the Credit Union owed no fiduciary duties to the Plan in connection with such decisions" (Br. at 13)—misses the mark. Plaintiffs have never claimed that the Credit Union was responsible for the fiduciary breaches of American and the PAAC. Rather, independent of the breaches by American and PAAC, the Credit Union is responsible for using Plan assets for its own benefit at the expense of Plan participants.

Contrary to its suggestion about "Plaintiffs' ever-changing theories of liability and

---

[17]    *Little* is inapposite and does not help AAFCU's position. There, plaintiffs were an accounting firm's competitors whose alleged injury was lost business. 575 F.3d at 535. The Fifth Circuit held that it was speculative the firm's clients would have replaced the firm with one of the competitors had the firm not engaged in the challenged activity. *Id.* at 540. Because the competitors' claim of injury depended on several layers of decisions by third parties, it was too speculative to confer Article III standing. *Id.* at 540–41.

damages" (Br. at 12), Plaintiffs' claims against the Credit Union have not changed since Plaintiffs filed their Complaint.  Plaintiffs alleged that at "all relevant times, [the Credit Union] was a federally chartered credit union that held assets of the Plan in demand deposit accounts pursuant to the terms of ERISA § 408(b)(4), 29 U.S.C. § 1108(b)(4), which permits plan assets to be invested in deposits that bear a reasonable interest rate in a bank or similar financial institution supervised by the United States or a State if such institution is a fiduciary of such plan.  Thus, [the Credit Union] is a fiduciary under ERISA[.]"  Doc. 1 at ¶ 9.  In Count II of the Complaint, Plaintiffs alleged that the Credit Union, a plan fiduciary, dealt with plan assets for its own account in violation of ERISA § 406(b)(l), 29 U.S.C. § 1106(b)(1).  Doc. 1 at ¶¶ 44–51.  The Complaint alleges that the Credit Union, a plan fiduciary, used the "one billion dollars in plan assets" in the Credit Union option for its own purposes, but paid "substantially higher interest rates on similar demand deposit accounts to other customers of the AA Credit Union that it provided to Plan participants."  *Id.* at ¶ 47.  The Complaint also asserts that, as a result of these prohibited transactions, the Credit Union "is liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate."  Dkt. No. 1 at ¶ 51.

The Credit Union next argues that Plaintiffs' liability theory against AAFCU "necessarily requires a damages model that measures the amount of the Credit Union's 'ill-gotten gains' or 'outsized profits' and seeks to return those to the Plan through a disgorgement theory."  Br. at 13.  Not so.  The Credit Union provides no explanation as to how Plaintiffs' liability theory necessitates a disgorgement analysis is the case, nor does it provide any authority to support its position.  As explained above, the damages Plaintiffs seek from the Credit Union "is the difference between (i) a reasonable rate of interest, taking into account the investment income earned by the AAFCU

12

using the Plan's deposits, as well as the amount of interest paid to other depositors . . . , and (ii) the lower rate of interest that was actually paid to Plan participants."  Doc. 154 at 3–4.  Indeed, Plaintiffs' expert Neil Librock calculated that had AAFCU paid a competitive interest rate on Plan deposits, Plaintiff Ortiz would have received more than $1,100 in additional investments returns, Plaintiff Scott more than $1,800, and Plan participants collectively more than $61 million.  Librock Rept., ¶¶ 36, 37, 45.

*Horvath v. Keystone Health Plan E., Inc.*, 333 F.3d 450, 457 (3d Cir. 2003), does not advance the Credit Union's position.  In *Horvath*, the court found plaintiff lacked standing to bring claims for restitution and disgorgement because she failed to demonstrate that she suffered individual loss based on defendant HMO's challenged practices.  *Id.* at 456–57.  By contrast here, Plaintiffs have alleged and demonstrated their individual financial losses that were caused by the Credit Union's acts.  *See* Librock Rept., ¶¶ 36–37.

For these reasons, the Credit Union's argument that Plaintiffs lack Article III standing to pursue their claims against AAFCU should be rejected.  At a minimum, Plaintiffs have raised a disputed factual issue as to their standing.

## B.      The Credit Union is a Fiduciary to the Plan

Plaintiffs' evidence demonstrates that the Credit Union is a fiduciary to the Plan.  For its part, the Credit Union has offered no evidence that contradicts Plaintiffs' but relies on faulty legal arguments in disputing its fiduciary status with respect to the Plan.

The Credit Union is a fiduciary to the Plan because the Credit Union holds Plan assets and exercises discretionary control over those assets.  *See IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415, 1421 (9th Cir. 1997) ("'Any' control over disposition of plan money makes the person who has the control a fiduciary").  Under ERISA, "a person is a fiduciary with respect to a plan to the

extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  29 U.S.C. § 1002(21); *see also Reich v. Lancaster*, 55 F.3d 1034, 1046 (5th Cir. 1995) ("An ERISA fiduciary includes anyone who exercises discretionary authority over the plan's management, anyone who exercises authority over the management of its assets, and anyone having discretionary authority or responsibility in the plan's administration. . . . We give the term fiduciary a liberal construction in keeping with the remedial purpose of ERISA.") (citations, quotations, and brackets omitted); *Donovan v. Mercer*, 747 F.2d 304, 308 (5th Cir. 1984) ("'fiduciary' under ERISA [is] to be broadly construed.").

The Credit Union is a Plan fiduciary for at least three reasons.  *First*, the Credit Union is a fiduciary to the Plan because it holds Plan assets pursuant to ERISA § 408(b)(4), 29 U.S.C. § 1108(b)(4).  Section 408(b)(4) permits plan assets to be invested "in deposits which bear a reasonable interest rate in a bank or similar financial institution supervised by the United States or a State, *if such bank or other institution is a fiduciary of such plan*[.]" 29 U.S.C. § 1108(b)(4) (emphasis added).  Because the Plan's assets are deposited with AAFCU pursuant to Section 408(b)(4), AAFCU is necessarily, by statute, a fiduciary to the Plan.

*Second*, year after year the Credit Union held more than a billion dollars in Plan assets and had control over the use of those assets, as well as control over the interest rate it paid for that use, and is, therefore, a fiduciary to the Plan.[18]  ERISA defines a fiduciary in two instances:  one who

---

[18]     Indeed, the Credit Union's expert highlights the discretionary nature of the Credit Union's rate setting in his report: "AAFCU based the pricing of its deposit products on a rigorous set of analytic processes governed by its Board of Directors.  Specifically, deposit pricing was reviewed on a product by product basis, and the process employed formal corporate considerations, competitive surveys, loan to deposit ratios, and was decided on a monthly basis by the Board of

exercises discretionary authority or control over the management of a plan, and one who exercises *any* authority or control over the disposition of a plan's assets.  29 U.S.C. § 1002(21)(A).  Courts have, in deference to the statutory language, rightly noted that discretion is only a factor in the first instance where fiduciary duty attaches in the management context, and not in the second instance where it attaches in the disposition of plan assets.  *See, e.g.*, *Tittle v. Enron Corp. (In re Enron Corp. Sec. Derivative & ERISA Litig.)*, 284 F. Supp. 2d 511, 544 (S.D. Tex. 2003).  The Credit Union's Motion attempts to skirt fiduciary liability by emphasizing its lack of participation in the management of the Plan while downplaying the inescapable fact that it has control and authority over the disposition of, annually, more than $1 billion in Plan assets.  That alone is enough to confer fiduciary status.  And the Credit Union used those assets as its operating capital to help its own business.

*Third*, the Credit Union's Annual Report provides that "[d]ividends on members' shares, excluding share certificates, are based on available earnings at the end of a dividend period and are not guaranteed by the Credit Union.  Dividend rates are approved by the Credit Union's Board of Directors."  2016 Annual Report at 9, Note l.  The Credit Union argues that its "mere setting of a monthly dividend rate does not convert it to a fiduciary."  Br. at 16.  But this assertion ignores the fact that AAFCU is a fiduciary because it holds and exercises discretion over Plan assets.  This assertion relies on *Insinga v. United of Omaha Life Ins. Co.*, Case No. 8:17CV179, 2017 U.S. Dist. LEXIS 178753 (D. Neb. Oct. 26, 2017), which is off point.  In *Insinga*, plaintiff participated in a 401(k) plan that negotiated a contract with defendant to provide various investment services for plan members.  *Id.* at *2.  Under the contract, the plan had the option to invest in three accounts,

---

Directors.  This process included an analysis of the impact of such decisions on net income, capital levels, and periodic special dividends. . . . [T]he process of setting deposit dividend rates at AAFCU was a complex combination of art and science[.]"  Doc. 206, Expert Report of Jeffrey P. Gaia, at 5–6 (footnotes omitted).

one of them a Maturity Account, where contributions are held for a fixed period of time.  *Id.*  Under

the contract, at least once a month, defendant declared a Guaranteed Interest Rate for any

contributions directed to a Maturity Account.  *Id.* at **2–3.  Plaintiff argued that defendant's

"ability to declare a new Guaranteed Interest Rate every month amounts to 'a grant of power to

change terms' and constitutes discretion over the Contract."  *Id.* at *7.  Defendant argued that "its

declaration of the new interest rate as merely a term of the Contract."  *Id.*  The court concluded

that defendant did

> not change the terms of the Contract when it declares a new Guaranteed
> Interest Rate every month. The Plan entered into the Contract to gain,
> among other options, the chance to invest money into an account where the
> interest is guaranteed. The Plan received that exact benefit. The interest rate
> is declared before any investments into a Maturity Account are made by the
> Plan. If the Plan determines that the declared interest rate is too low, it has
> full discretion to invest in a different fund.

*Id.* at **7–8.  *Insinga* is off point because (1) the defendant was not operating within the confines

of ERISA § 408, and (2) the new declared interest rate there applied only to new deposits in the

Maturity Accounts when the plan and its participants still had the option of investing their monies

elsewhere.  Here, the dividend rate set by the Credit Union applies to Plan participants' deposits

that were already invested in the Credit Union Option—the Plan and its participants had no option

but to accept the rates set by the Credit Union.  *See Rozo v. Principal Life Ins. Co.*, 949 F.3d 1071,

1073–75 (8th Cir. 2020) (plan service provider was plan fiduciary because it set guaranteed rate

of return on funds invested in plan).  The Credit Union's ability to set the rates on funds already

on deposit in the Credit Union Option makes it an ERISA fiduciary.  *See, e.g.*, *Ed Miniat., Inc. v.

Globe Life Ins. Group, Inc.*, 805 F.2d 732, 738 (7th Cir. 1986) (universal right to change the rate

of return constituted requisite authority over an asset of the plan to create fiduciary duty); *CBOE*,

713 F.2d at 260 (ability to alter value of plan assets subjected insurer to ERISA fiduciary

16

obligations).

The Credit Union was also a fiduciary because it determined, in its unilateral discretion, what earnings to credit the Plan participants with respect to Plan assets in the Credit Union Option, and what earnings to keep itself.  The Fifth Circuit and other courts court have concluded that a fiduciary's unilateral discretion over its own compensation, unfettered by contractual limitations, is sufficient for fiduciary status under ERISA.  *See, e.g.*, *Reich v. Lancaster*, 55 F.3d 1034, 1049 (5th Cir. 1995) (insurance agent was fiduciary because he was "decision maker when it came to insurance purchases and the payment of compensation to those who procured it on behalf of the Fund," including himself); *Pipefitters Local 636 Ins. Fund v. Blue Cross & Blue Shield of Michigan*, 722 F.3d 861, 867 (6th Cir. 2013); *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1259 (2d Cir. 1987); *accord Golden Star, Inc. v. Mass Mut. Life Ins. Co.*, 22 F. Supp. 3d 72, 81 (D. Mass. 2014) ("a service provider's retention of discretion to set compensation can create fiduciary duties under ERISA with respect to its compensation.").

Furthermore, when a plan or the plan's participants cannot reject the service provider's action, the service provider is a fiduciary.  *See, e.g.*, *Charters v. John Hancock Life Ins. Co.*, 583 F. Supp. 2d 189, 199 (D. Mass. 2008).  Fiduciary status turns on whether the service provider can force plans or participants to accept its choices about plan management or assets.  *See, e.g.*, *Chicago Bd. Options Exch., Inc. v. Connecticut Gen. Life Ins. Co.*, 713 F.2d 254, 260 (7th Cir. 1983) (finding fiduciary status where service provider "determined what type of investment the Plan must make") ("*CBOE*"); *see also Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 422 (3d Cir. 2013) (service provider's discretionary decision making–though authorized by contract– is "cabined by ERISA's fiduciary duties" unless plans or participants can freely reject the service provider's choices).

17

The Credit Union's other cases do not support its position.  In *Teets v. Great-W. Life & Annuity Ins. Co.*, the court held that the defendant insurance company (not holding plan assets pursuant to ERISA § 408) was not a fiduciary because plaintiff had not adduced evidence that the plan or participants were prevented from rejecting a change to an investment return rate set by defendant.  919 F.3d 1232, 1248 (10th Cir. 2019).  By contrast here, the Credit Union Option was the only principal preservation option available to the Plan and, therefore, the Plan and its participants had no option but to accept the rates set by the Credit Union.  Even if other principal preservation options were available to Plan participants, that would not relieve the Credit Union of its fiduciary status with respect to those participants who chose to remain in the fund.  *Cf. American Fed'n of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Soc.*, 841 F.2d 658, 663 (5th Cir. 1988) ("fiduciary status was not diminished by the [plaintiff's] trustees' final authority to grant or deny claims and approve investments.").  And *Midwest Cmty. Health Serv., Inc. v. Am. United Life Ins. Co.*, 255 F.3d 374 (7th Cir. 2001), actually supports Plaintiffs' position.  There, the court held that an insurer with discretionary authority over a contract with an ERISA plan was a fiduciary to the plan because it had the ability to amend the value of the contract.  *Id.* at 377.

Despite all of this, the Credit Union contends that it is not a fiduciary to the Plan; however, this contention is grounded on a faulty premise.  The Credit Union wrongly asserts that Plaintiffs claim "that the Credit Union acted as a fiduciary with respect to the selection and retention of the Credit Union Option for the Plan." Br. at 15 (citing Compl., ¶¶ 41-43[19]).  In reality, Plaintiffs allege that *American* and *PAAC* acted as fiduciaries with respect to the selection and retention of the

---

[19]     These paragraphs of the Complaint relate to Plaintiffs' allegations against American and PAAC only, not AAFCU.

Credit Union Option for the Plan. Plaintiffs have never alleged that the Credit Union is "a fiduciary for the purposes of *its own inclusion* as an option in the Plan." *See* Br. at 15 (emphasis in original). The Credit Union, as outlined above, acted as a fiduciary to the Plan with respect to the management and disposition of the Plan's assets.

As the foregoing discussion establishes, the Credit Union is a fiduciary to the Plan. At a minimum, Plaintiffs have raised disputed issues of fact as to the Credit Union's fiduciary status.

**C.    The Credit Union Dealt in Plan Assets for its own interest, Which Is A Per Se Violation Of ERISA.**

Plaintiffs have set forth evidence showing that the Credit Union used Plan assets for its own interest. The Credit Union has offered a single declaration from one of its Vice Presidents in an attempt to overcome Plaintiffs' showing. This contradiction in the evidence shows that summary judgment is improper.

The Credit Union used Plan assets as operating and investment capital. Lewis Cohen, the Credit Union's Vice President of Finance and Data Analytics, testified that the Credit Union Option (and the Plan assets held within it) constitute between 20% and 50% of the Credit Union's total interest income. Cohen Dep. at 46:12-47:9, APPX231. The Credit Union used that interest income earned from the Credit Union Option to pay corporate expenses, corporate debts, and commissions and fees (including, in some cases, to itself). *Id.* at 43:8-44:2.

Thus, the Credit Union's actions constitute a prohibited transaction under ERISA § 406(b)(1), which provides that a "fiduciary with respect to a plan shall not . . . deal with the assets of the plan in his own interest or for his own account[.]" 29 U.S.C. § 1106(b)(1); *see John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 89–90 (1993) (insurance company holding plan assets in its general account is plan fiduciary). Violation of 29 U.S.C § 1106(b)(1) occurs whenever a fiduciary deals with assets of a plan in his own interest; financial

loss to the fund is not required.  *See, e.g.*, *New York State Teamsters Council Health & Hosp. Fund v. Estate of DePerno*, 816 F. Supp. 138, 147 (N.D.N.Y. 1993).[20]

Dealing with Plan assets for one's own interest is a *per se* violation of ERISA.  Ronald J. Cooke, ERISA Practice and Procedure, § 6.12 (2d ed. Supp. 2000) (footnote omitted) ("In essence, the prohibited transaction rules of ERISA § 406 develop a per se rule prohibiting certain transactions between a plan and a party in interest."); Emmalind Garcia, *ERISA: Its Fiduciary Duties and Investments for Social Purposes*, 23 Rev. Jur. U.I.P.R. 53, 73 (1988) (Section 406(a) "covers per se prohibitions"); James F. Jorden, Waldemar J. Pflepsen, Jr. & Stephen H. Goldberg, Handbook on ERISA Litigation, § 3.03[B][1] (2d ed. Supp. 2000) (footnotes omitted) ("Prohibited 'party in interest' transactions are often characterized by the courts as 'per se' violations of ERISA because liability may be imposed even where such transactions are entered into in good faith, where such transactions would be found to be prudent under ERISA's prudence standard, and where no harm results to the plan.").

The statutory exemptions set forth the only possible ways in which what the Credit Union did would not constitute a prohibited transaction, and the Credit Union's attempt to inject other factors to consider is irrelevant.  *See Cutaiar v. Marshall*, 590 F.2d 523, 530 (3d Cir. 1979) (Congress' intent was "to create, in § 406(b), a blanket prohibition of certain transactions, no matter how fair, unless the statutory exemption procedures are followed.").  § 1106(b) establishes a blanket prohibition "in order to facilitate Congress' remedial interest in protecting employee benefit plans." *Gilliam v. Edwards*, 492 F. Supp. 1255, 1263 (D.N.J. 1980).  "Per se violations of

---

[20]      Thus, the Credit Union's argument that it "has to be prepared to remit to the Plan for Participant redemption, retirements, or reallocation to other investment options within the Plan" (Br. at 19) or that it "would be able to fund the withdrawal of the entirety of the Plan assets by drawing down its cash balance and (if necessary) selling investments" (*id.*) is of no moment.

ERISA § 406 are broadly construed to impose liability even when there is 'no taint of scandal, no hint of self-dealing, no trace of bad faith.'" *Kanawi v. Bechtel Corp.*, 590 F. Supp. 2d 1213, 1223 (N.D. Cal. 2008) (quoting *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1213 (2d Cir. 1987))). In other words, the exemptions associated with ERISA's prohibited transaction rules define the universe of permissible otherwise-prohibited transactions and the factors relied upon by the Credit Union are irrelevant.

The Credit Union asserts that the "alleged conduct by the Credit Union, even taken as true, does not rise to the level of prohibited conduct under ERISA § 406(b)(1)."  Br. at 17.  But the Credit Union does not explain how this is so.  The cases cited by AAFCU merely stand for the proposition that *other* types of self-interested dealing on the part of plan fiduciaries violate Section 406(b)(1).[21]  The cases do not stand for the proposition that a credit union may use plan assets to make loans to its members and offer its members substantially higher interest rates on similar demand deposit accounts than it provides to plan participants, which is the case here.  *Cf. Leigh v. Engle*, 727 F.2d 113, 127 (7th Cir. 1984) ("[i]n light of ERISA's broad language and protective

---

[21]    *See* Br. at 17–18, citing *Pipefitters Local 636 Ins. Fund v. Blue Cross & Blue Shield of Mich.*, 722 F.3d 861, 868 (6th Cir. 2013) (plan administrator violated § 406(b)(1) when it unilaterally collected a fee from plan assets for its own account); *Chao v. Johnson*, Civ. No. H-03-5394, 2005 U.S. Dist. LEXIS 40591 (S.D. Tex. Aug. 30, 2005) (defendant violated § 406(b)(1) when he failed to remit the employee contributions to the Plans and instead used them for company operating expenses); *Chao v. Stuart*, Civ. No. H-04-1115, 2005 U.S. Dist. LEXIS 35424 (S.D. Tex. July 20, 2005) (same); *Chao v. Hochuli*, 244 F. Supp. 2d 92, 99 (E.D.N.Y. 2003) (fiduciary violated § 406(b)(1) where plan funds were used for the benefit of corporation partially owned by the fiduciary); *Patelco Credit Union v. Sahni*, 262 F.3d 897 (9th Cir. 2001) (plan administrator violated § 406(b)(1) when it used its own discretion when setting a fee for his services); *NYSA-ILA Med., & Clinical Servs. Fund v. Catucci*, 60 F. Supp. 2d 194, 203 (S.D.N.Y. 1999) (president and sole shareholder violated § 406(b)(1) by using plan assets to pay corporate expenses); *Pension Benefit Guar. Corp. v. Solmsen*, 671 F. Supp. 938 (E.D.N.Y. 1987) (president of corporation violated § 1106(b)(1) by using employee contributions to fund the company and not remitting contributions to the plan); *Gilliam v. Edwards*, 492 F. Supp. 1255 (D. N.J. 1980) (fiduciary violated § 1106(b)(1) for having himself hired as fund administrator when he also served as the trustee of the fund and business manager of union to which fund participants belonged).

provisions, . . . [courts] should read broadly the term 'interest' in Section 406(b)(1)").

Here, the evidence shows that AAFCU used Plan deposits as working capital.  Cohen Dep. at 43:8-44:2, APPX231 ("Q.  So just to be clear.  The Credit Union uses income from all of its assets to pay corporate expenses, corporate debts, commissions and fees, including interest income from Plan assets; is that correct?  A. The Plan assets, yes.").  Thus, the Credit Union is incorrect when it argues that "the uncontroverted evidence establishes that the Credit Union never used assets of the Plan for its own interest." Br. at 19.

The Credit Union relies exclusively on the Declaration of Mr. Cohen to support its argument that it did not use Plan assets in its own interest.  *See* Br. at 19.  The Cohen declaration avers that:

- the Credit Union "maintained the Plan assets in cash reserves and short-term investments to meet the liquidity needs of Plan participants";
- the Credit Union "does not consider these funds core deposits and treats them as short-term, liquid, rate sensitive funds for interest rate risk management purposes";
- the Credit Union "has on average held on its balance sheet $2.71 billion in cash and short-term investments, while as the same time the Plan assets have averaged $1.26 billion"; and
- the Credit Union "would be able to fund the withdrawal of the entirety of the Plan assets by drawing down its cash balance and (if necessary) selling investments."

*Id.* (citing Cohen Decl. at ¶¶ 13-14, App. AAFCU-4).  However, these assertions, individually or collectively, do not establish as a matter of law that the Credit Union did not use Plan assets for its own interest.  Indeed, Mr. Cohen testified to the contrary.  At most, the Credit Union's assertions give rise to a material factual dispute, showing that summary judgment is improper.  *See* Fed. R. Civ. P. 56(a).

**D.    The Credit Union Failed to Discharge its Burden to Establish that the Rates were Reasonable.**

The Credit Union bears the burden to establish that the dividend rates it paid on deposits in the Credit Union Option were reasonable.  Plaintiffs have offered evidence that shows those

rates were unreasonable.  Because the issue of whether the rates were reasonable is in conflict, summary judgment should be denied.

The Credit Union has claimed reliance on an exemption to the alleged prohibited transaction provided by ERISA § 408(b)(4), 29 U.S.C. § 1108(b)(4).  A necessary condition for that exemption, however, is that the bank must pay "a reasonable interest rate" on the deposits.  29 U.S.C. § 1108(b)(4).  There is at least a factual dispute as to whether the Credit Union has done so.

The prohibited transaction exemptions set out in ERISA § 408 are affirmative defenses and defendant fiduciaries who seek the protection of § 408 bear the burden of proving its provisions apply.  *See Perez v. Bruister*, 823 F.3d 250, 262 (5th Cir. 2016) ("fiduciaries have the burden to prove [the] affirmative defense" of ERISA § 408); *Donovan v. Cunningham*, 716 F.2d 1455, 1467–68 & n.27 (5th Cir. 1983) ("[I]t seems 'fair and reasonable' to place the burden of proof upon a party who seeks to bring his conduct within a statutory exception to a broad remedial scheme."); *Marshall v. Snyder*, 572 F.2d 894, 864 (2d Cir. 1978) ("The settled law is that in such situations the burden of proof is always on the party to the self-dealing transaction to justify its fairness.").  The Credit Union has failed to discharge its burden to establish the rates it paid on Plan deposits were reasonable.

During the relevant period, the Credit Union paid far more interest to its other depositors than it paid to Plan participants.  Librock Rept., ¶ 19.  The fact that the Credit Union paid its other depositors a much higher rate of interest than it paid to Plan depositors casts doubt on whether the Credit Union met the requirement that it pay a reasonable interest rate on Plan deposits.  Indeed, Plaintiffs' expert has concluded that the rates paid by the Credit Union on Plan deposits "were not competitive" (*id.*) and that the Plan suffered approximately $61 million in damages because the

23

rates paid by the Credit Union were unreasonable (*id.* at ¶ 45).

The Credit Union disputes that the Credit Union Option's dividend rate was unreasonably low, pointing to allegations in Plaintiffs' Complaint concerning "Priority" checking accounts that it offers to its members.  Br. at 20.  The Credit Union argues that the "Priority" accounts only offered a dividend rate of 2.25% on the first $5,000 deposited in the account (and .05% on the remaining deposit), and that this dividend rate is only available if the member meets certain requirements.  *Id.* at 20–21.  However, even taking this into account, the effective interest rate that these other accountholders received was still higher than what Plan participants received on their assets in the Credit Union Option.  Librock Rept. ¶¶ 18–19, 41–42.  Furthermore, prior to 2013, Plan investments in the Credit Union Option received the same dividend rate as did Regular Shares and IRAs.  In 2013, however, the Credit Union reduced the rates credited to Plan investments by 25 to 30 basis points relative to rates credited to other members who held Regular Shares or Individual Retirement Accounts (or "IRAs").  Librock Rept. at ¶ 19.  The Credit Union has no answer for that fact.

The Credit Union attempts to discharge its burden by arguing that "the Credit Union Option's dividend rate is reasonable when compared to appropriate investment benchmarks, and Plaintiffs have no evidence proving otherwise[.]"  Br. at 22.  This is insufficient and incorrect. *First*, Plaintiffs have evidence that the Credit Union's dividend rate was unreasonable relative to the rates credited to other deposits.  *And second*, the Credit Union fails to establish that the Credit Union Option dividend rate is reasonable when compared to ***appropriate*** investment benchmarks. In support of its assertion that the rates paid on Plan deposits were reasonable, the Credit Union has merely offered a series of printouts published by the National Credit Union Administration, titled, "Comparison of Average Savings and Loan Rates at Credit Unions (CUs) and Banks."  *See*

24

Br. at 22, n.11 (citing Declaration of Brian Oates).  The Credit Union offers no support for the conclusion that the information provided in these printouts provides the appropriate comparison to the rates paid to Plan participants (or even that the information in the printouts is reliable).  Nor does the Credit Union provide any analysis of the information contained in the printouts beyond the bald assertion that the Credit Union Option rates were "double the national average of returns of bank and credit union deposit accounts, [and] also exceed the national average returns of less liquid options[.]"  Br. at 22.  At most, the Credit Union has shown that whether the rates it paid were reasonable is a disputed issue (on which the Credit Union bears the burden) that is not properly resolved on a motion for summary judgment.

## V.  CONCLUSION

For the foregoing reasons, the Credit Union's motion for summary judgment should be denied.

Dated:  July 21, 2020     Respectfully submitted,

            */s/ Jonathan T Suder*
            jts@fsclaw.com
            Michael T Cooke
            mtc@fsclaw.com
            FRIEDMAN SUDER & COOKE PC
            Tindall Square Warehouse # 1
            604 E 4th Street, Suite 200
            Fort Worth, TX 76102
            Phone:  817-334-0400
            Fax:  817-334-0401

            Peter Schneider
            pschneider@schneiderwallace.com
            SCHNEIDER WALLACE COTTRELL KONECKY, LLP
            3700 Buffalo Speedway, Ste. 1100
            Houston, TX 77098
            Phone:  713-338-2560
            Fax: 866-505-8036

Todd M. Schneider
tschneider@schneiderwallace.com
Jason H. Kim
jkim@schneiderwallace.com
Kyle G. Bates
kbates@schneiderwallace.com
SCHNEIDER WALLACE COTTRELL KONECKY, LLP
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Phone:  415-421-7100
Fax: 415-421-7105
**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 21st day of July, 2020, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, Fort Worth Division using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

*/s/ Jonathan T. Suder*