**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| SALVADORA ORTIZ and THOMAS SCOTT, on behalf of themselves and all others similarly situated, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Case No. 4:16-cv-00151-A |
| AMERICAN AIRLINES INC., THE AMERICAN AIRLINES PENSION ASSET ADMINISTRATION COMMITTEE, and AMERICAN AIRLINES FEDERAL CREDIT UNION, | § § § § § § | |
| Defendants. | § § | |

**AMENDED[1]
PLAINTIFFS' OPPOSITION TO DEFENDANTS AMERICAN AIRLINES, INC.'S AND
THE AMERICAN AIRLINES PENSION ASSET ADMINISTRATION COMMITTEE'S
MOTION FOR SUMMARY JUDGMENT
AND MEMORANDUM IN SUPPORT THEREOF**

---

[1] This document is "Amended" solely to add page numbering in the Table of Contents and Table of Authorities.  Otherwise, it is identical to Dkt. 211.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... iii

I.      INTRODUCTION ..................................................................................................1

II.     SUMMARY OF RELEVANT FACTS ..................................................................2

        The Plan ..................................................................................................................2

        The Credit Union Option .......................................................................................3

        Plaintiffs' Investments In The Credit Union Option..............................................6

        The Unreliability of Defendants' Evidence ...........................................................7

III.    LEGAL STANDARD............................................................................................8

IV.     ARGUMENTS AND AUTHORITIES..................................................................9

        A.      Plaintiffs Have Standing ...........................................................................9

                American Airlines' Standing Argument Fails On the Facts ...................9

                American Airlines' Standing Argument Fails On The Law .................10

        B.      American Airlines' Statute of Limitations Argument Ignores Supreme Court
                Precedent On Continuing Violations of ERISA .....................................15

        C.      Plaintiffs' Claim For Breach Of Defendants' Duty Of Prudence Should Proceed To
                Trial..........................................................................................................16

                Plaintiffs Have Identified An Appropriate Benchmark—Stable Value.................17

                The Performance Of Money Market Funds Is Irrelevant.......................19

                The Breadth of the Plan's Investment Menu Does Not Absolve American Airlines
                Of Liability For An Imprudent Investment Option...............................21

        D.      American Airlines Applies The Wrong Standard In Its Argument Concerning Co-
                Fiduciary Liability ..................................................................................23

V.      CONCLUSION....................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases:</u>

*Anderson ex rel. Bd. of Trs. v. DePhillips*,
No. 02 C 7685 2004 U.S. Dist. LEXIS 4264 (N.D. Ill. Mar. 15, 2004) ..............................9

*Bd. of Trs. of the S. Cal. IBEW-ENCA Defined Contribution Plan v. Bank of N.Y. Mellon Corp.*,
2011 U.S. Dist. LEXIS 142367 (S.D.N.Y. Dec. 9, 2011) ...................................................8

*Bell v. Pension Comm. of ATH Holding Co., LLC*,
No. 1:15-cv-02062-TWP-MPB, 2019 U.S. Dist. LEXIS 14625
(S.D. Ind. Jan. 30, 2019) ....................................................................................17, 20

*Bekker v. Neuberger Berman Group LLC*,
No. 16 CV 6123-LTS-BCM, 2018 WL 4636841 (S.D.N.Y. Sept. 27, 2018)...................13

*Boeckman v. A.G. Edwards, Inc.*,
No. 05-658-GPM, 2007 U.S. Dist. LEXIS 90251 (S.D. Ill. Aug. 31, 2007) ......................9

*Donovan v. Bierwirth*,
754 F.2d 1049 (2d Cir. 1985)....................................................................................11, 12

*Donovan v. Cunningham*,
716 F.2d 1455 ...............................................................................................................24

*Hecker v. Deere & Co.*,
569 F.3d 708 (7th Cir. 2009) .........................................................................................22

*Horvath v. Keystone Health Plan*,
333 F.3d 450  (3rd Cir. 2003) ........................................................................................13

*In re State St. Bank and Trust Co. Fixed*,
842 F. Supp. 2d 614 (S.D.N.Y. 2012)............................................................................12

*Little v. KPMG*,
575 F.3d 533  (5th Cir. 2009) ........................................................................................12

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)................................................................................................12, 13

*Maher v. Strachan Shipping Co.*,
CIVIL ACTION NO. 92-2834, SECTION "G", 1996 U.S. Dist. LEXIS 6771
(E.D. La. May 14, 1996) ..................................................................................................8

*Meyer v. Berkshire Life Ins. Co.*,
    250 F. Supp. 2d 544 (D. Md. 2003),
    *aff'd*, 372 F.3d. 261 (4th Cir. 2004) ...............................................................................11

*Perez v. Bruister*,
    54 F. Supp. 3d 629 (S.D. Miss. 2014)..........................................................................24

*Reich v. Valley National Bank*,
    837 F. Supp. 1259 (S.D.N.Y. 1993)...............................................................................11

*Renfro v. Unisys Corp.,*
    671 F.3d 314 (3d Cir. 2011)....................................................................................21, 22

*Ross v. Sigurdsson*,
    No. PWG 12-3627, 2014 U.S. Dist. LEXIS 61790 (D. Md. May 5, 2014).....................11

*Schweitzer v. Inv. Comm. of the Phillips 66 Sav. Plan*,
    960 F.3d 190 (5th Cir. 2020) ...............................................................................17, 20

*Sinclair v. State Farm Fire & Cas. Co.*,
    No. 09-447, 2010 U.S. Dist. LEXIS 144115 (E.D. La. Feb. 10, 2010)...........................8

*Sweda v. Univ. of Pa.*,
    923 F.3d 320 (3d Cir. 2019)........................................................................................22

*Terraza v. Safeway Inc.*,
    241 F. Supp. 3d 1057 (N.D. Cal. 2017) ........................................................................9

*Thole v. U.S. Bank N.A.*,
    140 S. Ct. 1615 (2020)..................................................................................................14

*Tibble v. Edison International,*
    135 S. Ct. 1823 (2015)..................................................................................................15

*Tittle v. Enron Corp. (In re Enron Corp. Sec. Derivative & ERISA Litig.)*,
    284 F. Supp. 2d 511 (S.D. Tex. 2003) .........................................................................24

*Trustees of Cent. States, Se. & Sw. Areas Pension Fund v. Golden Nugget, Inc.*,
    697 F. Supp. 1538 (C.D. Cal. October 20, 1988) .........................................................11

*United States v. Alhaggagi*,
    372 F. Supp. 3d 1005 (N.D. Cal. 2019) .........................................................................1

**Other:**

29 U.S.C. § 1001 ................................................................................................................13

29 U.S.C. § 1105 ................................................................................................................24

29 U.S.C. § 1109 ................................................................................................................11

ERISA § 404 ......................................................................................................................24

ERISA § 405 ................................................................................................................23, 24


*AMR Corp. Announces Agreement to Sell Am. Beacon Advs., Inc. to Lighthouse Holdings, Inc., an Affiliate of Pharos Capital Group, LLC and TPG* Capital (Apr. 16, 2008), *available* at https://americanairlines.gcs-web.com/news-releases/news-release-details/amr-corporation-announces-agreement-sell-american-beacon ..................................................................5

*Share Insurance Fund Overview*, Nat'l Credit Union Admin. (Oct. 19, 2017) *available at* https://www.ncua.gov/services/pages/share-insurance.aspx ........................................18

Stable Value Inv. Ass'n, *Stable Value FAQ*, *available at* https://stablevalue.org/media/misc/Stable_Value_FAQ.pdf..........................................18

Plaintiffs Salvadora Ortiz and Thomas Scott, on behalf of the American Airlines 401(k) plan ("the Plan"), file this Response to the Motion for Summary Judgment filed by Defendants American Airlines, Inc. and the American Airlines Pension Asset Administration Committee ("the PAAC") (collectively, "American Airlines"), and would respectfully show as follows:

## I.    INTRODUCTION

American Airlines' motion for summary judgment suffers from what scholars refer to as the illusory truth effect— the principle that "repetition is often conflated with validity." *United States v. Alhaggagi*, 372 F. Supp. 3d 1005, 1015 (N.D. Cal. 2019).  The bogeymen that American Airlines uses to attack Plaintiffs' complaint are not new inventions, but the mere frequency of their repetition does not make them true.  This case is about the fact that American Airlines steered more than a billion dollars in its employees' hard-earned retirement savings to the Credit Union, which in exchange for that money provided returns that were so meager that participants' investments atrophied through the passage of time by the force of inflation alone.  Despite the fact that from 1999 through 2017 more than 70% of other retirement plans used better-performing, safe, and guaranteed investment options (and now more than 80% do today), American Airlines chose not to do so.  What is more, the evidence now shows that American Airlines never even *considered* another option.

American Airlines was desperate to steer the Plan's assets to the Credit Union.  In fact Ken Menezes, who submitted a declaration in support of American Airlines' motion for summary judgment, wrote in 2015 that American Airlines was working hard internally to try and "figure out a solution that involves the Credit Union," which he noted would "need to be managed well as we think highly of Galliard [the outside investment manager]."  *See* APPX 5.

1

One reason for American's desperation may be that, for many years, the Plan's assets invested in the Credit Union Option made up over 20% of the Credit Union's total deposits annually. Another may be that American Beacon, American Airlines' former in-house investment management arm that it sold but in which American retained an equity stake, was responsible for managing the Credit Union's assets including the Plan Assets in the Credit Union Option. The income earned by American Beacon from the management of those assets flowed, at least indirectly, to American Airlines until it sold its stake in American Beacon in 2015. And while the decision to leave the Credit Union Option in the Plan may have been good for American Airlines and good for the Credit Union, it was decidedly not good for the Plan and its participants.

Ultimately when, by chance, a better option was added to the Plan through a merger between American Airlines and U.S. Airways, American left its employees' investments to wither at the Credit Union.

This Court will have the opportunity to hear Plaintiffs' experts' testimony about the harm the Plan suffered as a result, and from Defendants' experts about all of the potential risks associated with stable value (which, by the way, American Airlines never considered throughout). It will be up to the Court to decide at trial how much weight to give that competing evidence. But summary judgment must be denied.

## II.     SUMMARY OF RELEVANT FACTS

### *The Plan*

The Plan is a participant-directed 401(k) plan that is maintained for the exclusive benefit of American Airlines and its employees for the purpose of providing retirement income. Summary Plan Description, App'x to Am. Airlines' Mot. for Summary Judgment, ECF No. 179-1 (July 3, 2020) ("AA Appendix") at APP11. From February 12, 2010 through the present (the "Relevant

Time Period"),[2] the PAAC (or its successor from 2014 onward, the Employee Benefits Committee or EBC) was the fiduciary responsible for the selection of Plan investment options. As required by ERISA and the relevant Department of Labor regulations, one of those investment options must be an "income-producing, low risk, liquid fund." 29 C.F.R. § 2550.404(c)-1(b)(2)(ii)(C)(2)(ii)). This type of investment option is sometimes referred to as a plan's "principal preservation option." Expert Report of James J. King, CFA ("King Rpt."), ECF No. 193 at 16.

***The Credit Union Option***

This case is about one of the Plan's investment options—the American Airlines Federal Credit Union Option ("the Credit Union Option"). Compl. at ¶ 18. The Credit Union Option "seeks income by earning dividends on deposits in the American Airlines Federal Credit Union." AA Appendix at APP121. The majority (76.4%, according to the Credit Union) of Plan participants who invested in the Credit Union Option were also members of the Credit Union.[3] *See* Declaration of Lewis Cohen ("Cohen Decl."), ECF No. 183 at ¶ 17. From 2010-2017, the Credit Union's average annual percentage yield was .57%—just 57 cents on every $100. King Rpt. at 12. During the same time period, the average rate of annual inflation was 1.69%. *Id.* From 2010-2017, the Credit Union Option failed to outpace inflation.

---

[2] American Airlines' Motion for Summary Judgment attempts to inject uncertainty about the Relevant Time Period where none exists. In its Motion (ECF No. 178) in footnote 1 at page 4, American Airlines argues that the relevant time period must end "at the latest [by] October 2016." But in their joint statement to the Court, and as communicated during the Parties' October 28, 2019 meeting, the relevant time period runs through the date the Credit Union Option is removed from the Plan or the date of judgment, whichever is later. *See* Order Re: Plaintiffs' Trial Experts, ECF No. 168 (June 15, 2020) at 3.

[3] Membership in the Credit Union is extended to anyone working in the airline industry, not even to just American Airlines employees. Expert Report of Dr. Walter Torous, ECF No. 205 at 9.

The Plan assets invested with the Credit Union through the Credit Union Option represent a substantial amount of the Credit Union's assets—on average, the Credit Union Option represented more than 20% of all Credit Union deposits.  Expert Report of Neil Librock ("Librock Rpt."), ECF No. 203 at 11.

The Credit Union Option, which again is simply a vehicle for Plan participants to deposit money at the Credit Union, is not the only "income-producing, low risk, liquid fund" available to 401(k) plans like the one American Airlines was responsible for managing for its employees.  King Rpt. at 8.  One option that has been used by 73.4% of 401(k) plans from 1999-2017 is called a stable value fund.  *Id.*  All stable value funds guarantee that participants can transact at 100% of their principal, plus interest, in order to re-direct the investment of their account or receive distributions.  *Id.*  While the Credit Union Option returned just .57% from 2010-2017, the average return of stable value funds was 2.40%, more than four times as much, over the same time period.  King Rpt. at 12.  Stable value funds are not new, unproven investments—indeed, the vast majority of 401(k) plans have used them since at least 1999.  King Rpt. at 8.

The returns provided by the Credit Union Option were substantially lower than other products offered by the Credit Union.  Indeed, and from January 2013 until early 2020, the interest rate for the Credit Union Option was less than the interest rate paid on regular dividend-bearing shares of the Credit Union,  Deposition of Lewis Cohen ("Cohen Dep.") at 52:25-53:9, APPX 8, even though in 2011 and 2012, the Credit Union Option received the same interest rate as regular shares.  Minutes of the AAFCU Bd. of Directors Mtg. (Jan. 21, 2011), AAFCU 002349, 002364, APPX23.

Despite the foregoing, American Airlines never considered removing the Credit Union Option, or including any other capital preservation option.  In 2015, American Airlines selected

the Credit Union Option as the "plan level default fund." APPX101.  Although there was a stable value fund in the Plan at that time (as a consequence of the Plan's merger with the 401(k) plan of U.S. Airways), this selection required Plan participants who previously had no other principal preservation option to take an additional, affirmative step to get their investments out of the Credit Union Option and into the new stable value fund.  King Rpt. at 16.

Other disinterested third parties had concerns about American Airlines' choices in this regard.  *See* APPX106.  CEM Benchmarking, an industry group with 80 million member plans managing over $15 trillion in assets, conducted a review of the Plan in 2013.  *Id.*  As part of that review CEM cautioned American Airlines that the Plan had almost twice as many investment options as its peers, and that "[o]ffering more investment options to participants is not necessarily better."  *Id.* at -43320.  CEM went on to remind American Airlines that "you have a fiduciary duty to monitor ***each*** of the investment options that you offer participants to ensure that they continue to be prudent choices."  *Id.*

### The Connection Between American Airlines and the Credit Union:  American Beacon

American Beacon Advisors, Inc. ("American Beacon") was an in-house investment management firm at American Airlines that was sold in 2008.  *See AMR Corp. Announces Agreement to Sell Am. Beacon Advs., Inc. to Lighthouse Holdings, Inc., an Affiliate of Pharos Capital Group, LLC and TPG* Capital (Apr. 16, 2008), *available* at https://americanairlines.gcs-web.com/news-releases/news-release-details/amr-corporation-announces-agreement-sell-american-beacon (last visited Jul. 9, 2020), APPX131.  American Airlines retained an equity stake in American Beacon as a result of the sale.  *Id.*  American Airlines had "significant continuing involvement with American Beacon post-sale. . ."  Am. Airlines' 2009 SEC Form 10-K ("AA 2009 10-K") at 85, APPX137.  American Airlines continued to earn income from its stake in

American Beacon in (at least) 2010 and 2011.  *See* Am. Airlines' 2010 SEC Form 10-K  ("AA 2010 10-K") at 82, APPX614, Am. Airlines 2011 SEC Form 10-K ("AA 2011 10-K") at 75, APPX831.

Part of the income American Beacon earned during the Relevant Time Period was earned pursuant to an investment management agreement between American Beacon and the Credit Union.  *See* APPX1098.  As of 2013, the Credit Union paid American Beacon .10% on the first $250 million under management, .06% on the next $250 million, .04% on the next $250 million, and .01% on any amounts in excess of $750 million.  *Id.*  The assets being managed by American Beacon for the Credit Union "may indirectly include assets invested in the AAFCU investment option in the $uper $aver Plan."  *Id.*  As discussed above, American Airlines owned an equity stake in American Beacon during the Relevant Time Period and reported income from that ownership during the same timeframe.

### *Plaintiffs' Investments In The Credit Union Option*

Plaintiffs Salvadora Ortiz ("Ortiz") and Thomas Scott ("Scott") were both American Airlines employees and participants in the Plan.  Ortiz and Scott both invested in the Credit Union Option during the Relevant Time Period.  For example:

- Ortiz started 2010 with a balance of $16,859, contributed $3,756 throughout the year, and ended 2010 with an AA Credit Union Option account balance of $20,802, including $187 in earnings on her investments in the Credit Union Option in the Plan.  *See* APPX1104.

- Scott's beginning balance in the Credit Union Option in 2010 was $368,950. He transferred out of the Credit Union Option entirely on or about January 11, 2010, and the reinvested approximately $200,800 on or about October 19, 2010.  That amount, plus additional contributions of approximately $5,600, plus earnings, remained invested in the

Credit Union Option until he transferred the entire amount again on or about October 21, 2011.  *See* APPX1161.

As a result of those investments and the lost investment income they should have had if American Airlines had chosen a prudent option other than the Credit Union Option, Plaintiffs suffered damages of more than $1,100 (with respect to Ortiz) and $1,843 (with respect to Scott) from 2010-2016.  Librock Rpt. at 10, 11.

The aforementioned damages were calculated by comparing the returns that Plaintiffs actually received to the returns that other Credit Union members received on their deposits.  *See* Librock Rpt. at Exhibit 1.  The returns that other members received during the Relevant Time Period, which were much higher than the returns of the Credit Union Option in the Plan, are detailed in Mr. Librock's report.  The entire Plan suffered damages of approximately $61 million by the same measure.  *Id* at 13.

### The Unreliability of Defendants' Evidence

Although the foregoing facts are supported by documents in the case record (and expert testimony supported by those documents), Defendants have attempted to freight the record with favorable facts by submitting expert reports that are supported by "interviews" conducted with interested employees of Defendants in the recent weeks.  American Airlines' expert Dr. Walter Torous' use of these interviews is particularly egregious.  Dr. Torous opines that, based on his July 10, 2020 interview with Kenneth Menezes (and nothing else), the Plan "at least twice" considered proposals from stable value providers and "received feedback that such a vehicle would be unsuitable for the Plan given the Plan's trading volatility."  Expert Report of Dr. Walter Torous, ECF No. 205 at 34.  The Credit Union's expert Jeffrey Gaia conducted two similar interviews with Lewis Cohen, an employee of the Credit Union, although it is impossible to tell from Mr. Gaia's

report for what purpose Mr. Gaia relied on that interview.  *See* Expert Report of Jeffrey Gaia, ECF No. 206 at 32.[4]

These "interviews" are not hearsay "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject," and are therefore not competent evidence on which Defendants' experts can rely.  *Sinclair v. State Farm Fire & Cas. Co.*, No. 09-447, 2010 U.S. Dist. LEXIS 144115, at *10 (E.D. La. Feb. 10, 2010) (citing Fed. R. Civ. P. 703).  Even if they are admissible, the self-interested nature of these interviews conducted in the midst of litigation and on the eve of trial makes them unreliable and of little evidentiary value.[5]

## III.    LEGAL STANDARD

"[C]ourts are hesitant to grant summary judgment" in cases involving an alleged breach of fiduciary duty under ERISA.  *Maher v. Strachan Shipping Co.*, CIVIL ACTION NO. 92-2834, SECTION "G", 1996 U.S. Dist. LEXIS 6771, at *19 (E.D. La. May 14, 1996).  "The fiduciary standard imposed by ERISA requires the application of a reasonableness standard. Rarely will such a determination be appropriate on a motion for summary judgment."  *Bd. of Trs. of the S. Cal. IBEW-ENCA Defined Contribution Plan v. Bank of N.Y. Mellon Corp.*, 2011 U.S. Dist. LEXIS

---

[4] It is noteworthy that Defendants opposed the taking of two depositions in this matter in June, but presented these two witnesses for secret interviews to support their experts' opinions in July.

[5] Dr. Torous admitted at his deposition he did not verify any of the information regarding Credit Union Option cash-flows despite the production by the Credit Union of a report of daily cash-flows for the Credit Union Option for an eight-year period beginning Jan. 1, 2010.  Deposition of Walter Torous ("Torous Dep.") at 79:20-81:1 (citation to rough transcript because final transcript not yet available).  Even worse, the cash flow information provided by Mr. Menezes is contradicted by the Defendant American Airlines Federal Credit Union's Brief In Support Of Its Motion For Final Summary Judgment, Dkt. 181 at 8-9.  This constitutes, at the very least, a disputed issue of material fact.

142367, at \*14-19 (S.D.N.Y. Dec. 9, 2011); *see also Terraza v. Safeway Inc.*, 241 F. Supp. 3d

1057, 1078 (N.D. Cal. 2017) (citing *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014))

("Because such cases "involve[] the application of a reasonableness standard, rarely will such a

determination be appropriate on a motion for summary judgment.").

      Whether ERISA fiduciaries acted prudently often involves fact-intensive questions

precluding summary judgment. *See, e.g.*, *Anderson ex rel. Bd. of Trs. v. DePhillips*, No. 02 C

7685, 2004 U.S. Dist. LEXIS 4264, at \*27 (N.D. Ill. Mar. 15, 2004) ("Whether ERISA fiduciaries

acted 'prudently' involves a question of fact precluding summary judgment."), *Boeckman v. A.G.*

*Edwards, Inc.*, No. 05-658-GPM, 2007 U.S. Dist. LEXIS 90251, at \*12 (S.D. Ill. Aug. 31, 2007)

("To say that a fiduciary's decision was objectively reasonable requires taking into account

everything that the fiduciary should have known at the time of the decision. Thus, the causal

connection between breach and loss, like breach itself, is a fact-intensive inquiry….") (editing

marks removed).

## IV.    ARGUMENTS AND AUTHORITIES

### A. Plaintiffs Have Standing.

      American Airlines has been advancing the standing "bogeyman" in this case for years.

American Airlines is wrong, on the facts and on the law.  Plaintiffs ***do*** have standing.  They, and

all of the other Plan participants who invested in the Credit Union Option from 2010-present, lost

real money as a result of American Airlines' breach of fiduciary duty.

### *American Airlines' Standing Argument Fails On the Facts.*

      Plaintiffs' experts' have confirmed that Plaintiffs have suffered concrete and particularized

injury in fact and that they have constitutional standing to represent the Plan.  As illustrated by the

expert report of Mr. Librock (Exhibit 2), the Plaintiffs suffered individual damages as a result of

the breaches of fiduciary duty alleged in their Complaint.  If Plan deposits in the Credit Union

Option had been credited with only the same effective interest rate that the Credit Union credited

to member deposits held as Regular Shares (savings account) and Individual Retirement

Accounts[6], Plaintiff Ortiz would have earned $1,116.37 more than she actually did.  Librock Rpt.

at Exh. 2.  That difference constitutes Plaintiff Ortiz's individual damages suffered as a result of

the AAFCU's breach of fiduciary duty.  Likewise, Plaintiff Scott would have earned $1,843.19

more than what was actually credited to his account.  *Id.*

The amount of Plaintiffs' lost earnings is even more substantial when comparing the actual

earnings of Plaintiffs' investments in the Credit Union Option to the earnings they would have

received had the Plan fiduciaries replaced the Credit Union Option with even an average stable

value fund or insurance company guaranteed interest account.  Had that happened, Mr. King

calculated that Plaintiffs Ortiz and Scott would have earned an additional $3,000 and $8,400,

respectively, for the periods in which they were invested. King Rpt. at 12.[7]

### *American Airlines' Standing Argument Fails On The Law.*

American Airlines' legal argument boils down to the following arguments, both of which

are made without citation to any authority:  1) Lost investment income is not damages, and 2) even

if it were, Plaintiffs would have to prove that they (and all of the other participants in the Plan)

would "***necessarily***" have invested their money in a better-performing option.  AA Defs. Mot. at

13 ("Plaintiffs must establish that if the Credit Union Option did not exist, they would have

---

[6] Bearing in mind that in 2011 and 2012 the Credit Union Option did receive the same interest rate as Regular Shares and IRAs.

[7] Likewise, American's expert Dr. Torous calculated that had Plan accounts been invested in a stable value fund that earned the same return as the weighted average return of the two stable value funds actually held in the Plan (one inherited from US Airways and the other finally selected in 2018), the Plan would have earned an additional $103 million just through the end of 2017.  Dkt. 205, Exh.18B.

*necessarily* allocated their accounts across the Plan's options in a way that would have generated greater retirement wealth") (emphasis in original).  But neither of those arguments are true, and American Airlines' suggestion that the Court add elements to Plaintiffs' burden of proof on the eve of trial is not well-taken.

"A significant purpose of ERISA is to immunize an employee benefit plan from the employer's interest, and so the statute requires conformity to extremely high standards."  *Reich v. Valley National Bank*, 837 F. Supp. 1259, 1286 (S.D.N.Y. 1993).  The language of ERISA that describes the scope of damages available for the breach of those standards, 29 U.S.C. § 1109(a), is clear:  "a breaching fiduciary is personally liable to make good to such plan *any losses to the plan resulting for each such breach*.  (Emphasis added).  Consistent with that purpose and statutory language, it of course makes sense that lost investment profits are losses that result from certain breaches of fiduciary duty.  *See Trustees of Cent. States, Se. & Sw. Areas Pension Fund v. Golden Nugget, Inc.*, 697 F. Supp. 1538, 1548 (C.D. Cal. October 20, 1988) ("The Court instructed the jury that lost investment profits were an available measure of damages on the ERISA claim."). (citing 29 U.S.C. 1109(a), *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985)).

Contrary to American Airlines' protestations, courts routinely award damages for breaches of fiduciary duty under ERISA based on lost investment income.  *See Ross v. Sigurdsson*, No. PWG 12-3627, 2014 U.S. Dist. LEXIS 61790, at *4 (D. Md. May 5, 2014) ("As all Defendants are liable under Count I, damages for breach of fiduciary duty in an ERISA case should be awarded. Such damages include any losses to the Plan resulting from the breach, 29 U.S.C. § 1109 (a); here, the amount converted *plus lost profits from investment funds*.") (emphasis added) (citing *Dardaganis v. Grace Capital Inc.*, 889 F.2d 1237, 1243 (2d Cir. 1989) *Meyer v. Berkshire Life*

11

*Ins. Co.*, 250 F. Supp. 2d 544, 572 (D. Md. 2003), *aff'd,* 372 F.3d. 261 (4th Cir. 2004); *In re State St. Bank and Trust Co. Fixed*, 842 F. Supp. 2d 614 (S.D.N.Y. 2012).

Defendant's argument regarding Plaintiff's burden proof was rejected long ago by the Second Circuit in the seminal case of *Donovan v. Bierwith*:

> In determining what the Plan would have earned had the funds been available for other Plan purposes, the district court should presume that the funds would have been treated like other funds being invested during the same period in proper transactions. ***Where several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these***. ***The burden of proving that the funds would have earned less than that amount is on the fiduciaries*** found to be in breach of their duty. ***Any doubt or ambiguity should be resolved against them***.

754 F.2d 1049, 1056 (2d Cir. 1985) (emphasis added).  American Airlines' citations to other, non-ERISA cases to buttress their standing arguments cannot save them.  *Little v. KPMG*, a 2009 Fifth Circuit decision cited on page 13 of American Airlines' Motion, concerned tortious interference claims brought primarily under common law and Texas state law.  575 F.3d 533 at 537.  The case was brought by clients and would-be competitors of an accounting firm who claimed that employees of KPMG had cost them business by operating in Texas without registering as an accountant under the relevant section of the Texas Occupational Code.  *Id.* at 534.  In *Little*, the Fifth Circuit affirmed the district court's dismissal of the *Little* plaintiffs' complaint because they presented no evidence that if KPMG had not been allowed to practice public accountancy that their clients would have hired the *Little* plaintiffs instead. *Id.* at 540.  Little has nothing to do with ERISA, financial instruments, fiduciary duties, or retirement plans.

In the United States, even "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562-63 (1992).  Here, there is ample, data-driven evidence of Plaintiffs' individual losses based on the claims they advance.  In the Article III context, injuries are

12

speculative when the "likelihood of suffering any concrete adverse effect from the challenged action" is in question.  *See Lujan*, 504 U.S. at 583–84; *see also id.* at 564, n.2 ("injury is not too speculative for Article III purposes . . . [if] the injury is certainly impending") (quotations omitted).  Here, Plaintiffs complain about past injuries that are definite, they do not seek relief for future injuries where the likelihood of suffering any harm is in doubt.  That is more than enough to confer Article III standing.

*Horvath v. Keystone Health Plan*, a 2003 Third Circuit decision cited on page 15 of American Airlines' Motion, fares no better.  While that case did involve claims under ERISA, it involved a claim for injunctive relief under the health benefits provisions of ERISA (29 U.S.C. § 1001 *et seq.*), not the fiduciary duties applicable to retirement plans.  333 F.3d 450, 452.  In *Horvath* the plaintiff sought injunctive relief, not damages, for the alleged failure to disclose that her HMO had a physician incentive program encouraging doctors to provide cost-effective treatment.  *Id.* at 455.  The Third Circuit affirmed the dismissal of the plaintiff's claims in *Horvath* because she conceded that the services she received were never affected by the existence of physician incentives.  *Id.* at 456.  The reasoning in *Horvath* is inapplicable to this case.

Moreover, the law is clear that, in a defined contribution plan like the Plan, lower returns relative to available alternative investments are sufficient to confer Article III standing. *Bekker v. Neuberger Berman Group LLC*, No. 16 CV 6123-LTS-BCM, 2018 WL 4636841, at *4 (S.D.N.Y. Sept. 27, 2018) ("Diminished returns relative to available alternative investments and high fees represent concrete injuries, implicating a financial loss in comparison to what a plaintiff might have received but for the defendant's alleged breach of duty, which can support a cognizable injury regardless of whether the plaintiff suffered an actual loss on his investment or simply realized a more modest gain")).

13

The Supreme Court's recent decision in *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615 (2020) undermines Defendants' standing arguments. In *Thole*, the Court held that participants in a defined *benefit* plan lacked standing to bring an ERISA fiduciary breach claim, but distinguished defined *contribution* plans, like the Plan at issue in this case. The Court explained that:

> In a defined-benefit plan, retirees receive a fixed payment each month, and the payments do not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions. By contrast, ***in a defined-contribution plan, such as a 401(k) plan, the retirees' benefits are typically tied to the value of their accounts, and the benefits can turn on the plan fiduciaries' particular investment decisions***…. [T]he participants in a defined-benefit plan are not similarly situated to the beneficiaries of a private trust or to the participants in a defined-contribution plan. … In the private trust context, ***the value of the trust property and the ultimate amount of money received by the beneficiaries will typically depend on how well the trust is managed, so every penny of gain or loss is at the beneficiaries' risk***. By contrast… [t]he benefits paid to the participants in a defined-benefit plan are not tied to the value of the plan.

131 S. Ct. at 1618–20 (emphasis added). Thus where, as here, a fiduciary breach diminishes "the ultimate amount of money received by the beneficiaries," the participants in a defined contribution plan have an injury-in-fact. *Id.* Here, American Airlines' poor decisions regarding the Credit Union Option (which was held, managed, and invested by the Credit Union) directly impacted "the ultimate amount of money" Plaintiffs and others were entitled to receive. Moreover, unlike a defined benefit plan, here "every penny of gain or loss is at [Plaintiff's] risk" because the Plan is a defined contribution plan.

As described above, Plaintiffs' experts have offered detailed calculations describing the Plan's damages as a result of American Airlines' decision to include the Credit Union Option in the Plan's investment menu. There is nothing speculative about these calculations. It is, of course, up to the Court to weigh those expert opinions against those opinions of Defendants' experts. But those competing questions of fact are not resolvable at summary judgment.

\* \* \*

14

There are, at the very least, disputed issues of fact concerning the damages suffered by Plaintiffs. Plaintiffs' experts offer two different metrics by which they independently determined that Plaintiffs lost thousands of dollars of their retirement savings. *Compare* King Rpt. at 12 *with* Librock Rpt. at Exh. 2. Whether the Court ultimately agrees with American Airlines' legal arguments or the data-driven observations of Plaintiffs' experts is an issue for trial, not summary judgment. For these reasons, Defendants' motions for summary judgment on the issue of standing must be denied.

### B. American Airlines' Statute of Limitations Argument Ignores Supreme Court Precedent On Continuing Violations of ERISA.

American Airlines devotes a single paragraph to its argument that Plaintiffs' claims are time-barred because American first introduced the Credit Union Option in 1985. *Am. Airlines' Mot.* at 16. Its argument can be dealt with just as swiftly: American Airlines ignores the U.S. Supreme Court's 2015 decision in *Tibble v. Edison International*, which held that "[s]o long as a plaintiff's claim alleging breach of the continuing duty of prudence occurred within six years of suit, the claim is timely." 135 S. Ct. 1823, 1829 (2015).

That is exactly what Plaintiffs allege here: That American Airlines' decision to leave the Credit Union Option in the Plan, despite its dismal returns, harmed participants and violated American Airlines' duty of prudence. Pls.' Compl. at ¶ 39 ("The scope of the fiduciary duties and responsibilities of American Airlines and the PAAC includes ***direct responsibility for evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones***, and ensuring that the Plan offers prudent investment options that will provide meaningful financial benefits to participants.") (emphasis added). The Credit Union Option remains in the Plan today, and American Airlines' breach of fiduciary duty (and the harm suffered by the Plan and its participants) with respect thereto is continuing.

15

**C. Plaintiffs' Claim For Breach Of Defendants' Duty Of Prudence Should Proceed To Trial.**

American Airlines' Motion for Summary Judgment attacks Plaintiffs' prudence claim by recasting it as an entirely new set of theories and arguments. These new creations could very well be susceptible to disposition by summary judgment, but they are not the claims before this Court. American Airlines' motion for summary judgment should be denied.

For example, American Airlines believes that Plaintiffs' prudence claim is that "no prudent fiduciary would include [a demand deposit] option in a 401(k) plan as a capital preservation vehicle." Am. Airlines' Mot. at 17. American Airlines deftly attacks this straw man in the next sentence by correctly pointing out that "nothing in ERISA or its accompanying regulations precludes plans from including credit union demand deposit vehicles as an investment option." *Id.* But that has ***never*** been the gravamen of Plaintiffs' prudence claim. Plaintiffs point out in their Complaint that ERISA expressly allows for retirement plans to invest in bank deposits "***which bear a reasonable interest rate*** . . . ." Compl. at ¶ 56 (emphasis in original). The fact that the Credit Union Option's interest rate was so abysmally low (lower even than the rate of inflation and the interest rate of regular dividend shares at the Credit Union[8]) is perhaps the most central element of Plaintiffs' claims. The fact that the Credit Union Option involved a bank deposit is not.

In the Fifth Circuit, ERISA claims for breach of a fiduciary's duty of prudence revolve around the process that the defendant undertook regarding the challenged fiduciary decision. ERISA fiduciaries must determine "that ***each investment*** is reasonably designed, as part of the portfolio to further the purposes of the plan, taking into consideration the risk of loss and the

---

[8] *See* Section II, *supra*, at 4-5, Cohen Dep. at 52:25-53:9, APPX 8.

16

opportunity for gain." *Schweitzer v. Inv. Comm. of the Phillips 66 Sav. Plan*, 960 F.3d 190, 196-97 (5th Cir. 2020) (internal editing marks and quotations removed) (emphasis added). "[F]iduciaries must engage in a reasoned decision-making process for investigating the merits of each investment option and ensure that ***each one remains in the best interest of plan participants***." *Id.* (emphasis added).

Plaintiffs have alleged that American Airlines failed to do what over 70% of other retirement plans across the country did in choosing a capital preservation option with competitive returns. In reviewing the minutes of the various employee benefit committees who were responsible for investment decisions relating to the Plan at the time, Plaintiffs' expert Mr. King reviewed the minutes of the PAAC and its successors and concluded that American Airlines ***never*** considered removing the Credit Union Option from the Plan. King Rpt. at 1 n.1. That failure is emblematic of Plaintiffs' larger concerns that American Airlines failed to engage in a reasoned decision-making process regarding the merits of the Credit Union Option. Furthermore, Plaintiffs have in fact addressed every element of their prudence claim that American Airlines contends is undisputed. American Airlines' motion for summary judgment should be denied.

### *Plaintiffs Have Identified An Appropriate Benchmark—Stable Value.*

American Airlines argues that it is entitled to summary judgment because Plaintiffs "have not identified any *comparable* fund that outperformed the Credit Union Option." Am. Airlines' Mot. at 18. First and foremost, American's emphasis of the word "comparable" underscores the fact that its argument is not that Plaintiffs have not identified a comparable fund, but that American simply disagrees about how comparable it is. This is a question of fact not resolvable at summary judgment. *See, e.g.*, *Bell v. Pension Comm. of ATH Holding Co., LLC*, No. 1:15-cv-02062-TWP-MPB, 2019 U.S. Dist. LEXIS 14625, at *19-20 (S.D. Ind. Jan. 30, 2019).

17

Additionally, if there is a factual dispute as to the prudence of American Airlines' fiduciary process, there is no need for the Court to determine whether the Credit Union Option substantively meets ERISA's fiduciary standard. *Id.* ("Because a genuine issue of disputed fact exists as to the prudence of the Pension Committee's process, the Court need not determine whether an issue of disputed facts exists as to whether the substantive funds offered met ERISA's prudent fiduciary standard.").

But Plaintiffs have identified a comparable fund to the Credit Union Option—a stable value fund. As Mr. King, Plaintiffs' expert, opined, "it is my expert opinion that a stable value fund was a comparable, better-performing principal preservation alternative to the Credit Union Option for the Plan from 2010 through the present." King Rpt. at 7.

Stable value funds and the Credit Union Option both have guarantees that allow participants to transact at book value—the Credit Union Option is guaranteed (up to $250,000) by the federal government, and stable value funds are "wrapped" by the same guarantee provided by banks or insurance companies. *See Share Insurance Fund Overview*, Nat'l Credit Union Admin. (Oct. 19, 2017) *available at* https://www.ncua.gov/services/pages/share-insurance.aspx (last visited Jul. 17, 2020), APPX1224, Stable Value Inv. Ass'n, *Stable Value FAQ*, *available at* https://stablevalue.org/media/misc/Stable_Value_FAQ.pdf (last visited Jul. 17, 2020), APPX1226.

Indeed, Defendants' own expert Dr. Longstaff prepared a chart grouping the Credit Union Option and Stable Value Options together in the larger class of investments of Capital Preservation investments. *See* Expert Report of Francis Longstaff, ECF No. 103-2, at APP438. Dr. Longstaff's opinion also embraces the comparison. *Id.* at APP398 ("Demand deposit funds (such as the Plan's

18

Credit Union Option), money market funds, and stable value funds are examples of investments known as "capital preservation" (or "principal preservation") vehicles.")").

In response, American Airlines contends that stable value funds are riskier and less liquid than demand deposit accounts such as the Credit Union Option, and that therefore the comparison is inapt. *See* Am. Airlines' Mot. at 20, 23. But the support for those arguments boils down to generalizations ("Typically, stable value funds will require at least 12 months' notice before a fiduciary can move a plan's funds to another investment option") and hypotheticals ("[I]f those institutions fail, a stable value investor will be left with only the market value of the investments. . . ."). *Id.* at 22, 24. Indeed, American Airlines admits that these hypothetical consequences have not come to pass. *Id.* at 23 ("While those risks have not yet materialized with the Plan's stable value choices. . ."). Those suppositions are not competent summary judgment evidence.

What is more, American Airlines has presented ***zero*** evidence that it considered any of these hypothetical concerns at the time. That failure is key to Plaintiffs' claim that American Airlines failed to employ a prudent process in diverting more than $1 billion in Plan assets to the Credit Union. If anything, there remains a disputed issue of material fact as to the appropriateness of Plaintiffs' comparison of the Credit Union Option to stable value. For that reason, summary judgment must be denied.

### The Performance Of Money Market Funds Is Irrelevant.

American Airlines next attempts to bootstrap its bid for summary judgment by presenting a comparison between money market funds and the Credit Union Option as a substitute for Plaintiffs' comparison to stable value. *See* Am. Airlines' Mot. at 25 ("the annual returns of the Credit Union option exceeded the returns of more than 88% to 99% of bank money market

accounts and more than 85% to 99% of money market mutual fund accounts."). This comparison is irrelevant.

The comparison is also at odds with this Court's prior orders. As this Court previously concluded in its November 18, 2016 Order, "All parties to this action seem to take as a given that money market funds, though perhaps riskier, generally generate higher returns on a participant's investment than a demand deposit fund such as the AA Credit Union Fund." Order, ECF No. 54 (Nov. 18, 2016) at 24. The Court went on to note that "[a]t least one authority has recognized that "Stable Value Funds simply outperform money market funds." *Id.* American Airlines' encouragement of the Court to reverse course is not well-founded.

As discussed above, what matters for Plaintiffs' claim that American Airlines violated its duty of prudence is whether American Airlines "engage[d] in ***a reasoned decision-making process for investigating the merits of each investment option*** and ensure that ***each one*** remains in the best interest of plan participants." *Schweitzer v. Inv. Comm. of the Phillips 66 Sav. Plan*, 960 F.3d 190, 196-97 (5th Cir. 2020) (internal editing marks and quotations removed) (emphasis added). Plaintiffs' identification of a stable value fund as a better-performing conservative investment with similar benefits is illustrative of the larger point that American Airlines never effectively investigated the merits of retaining the Credit Union Option in the Plan. American Airlines' preferred comparison of the Credit Union Option to a money market fund misses the point.

Likewise, the litany of out-of-circuit, district court cases American Airlines cites in which courts have rejected claims under ERISA for fiduciaries' failure to include a stable value fund instead of a money market fund is also irrelevant. *See* Am. Airlines' Mot. at 26 n.20. While the vast majority of those decisions (*Pledger, White*, *Dorman*, *Larson*, *Ferguson*, and *Bell*) were decided on a motion to dismiss and therefore under a different standard than is applicable here, at

20

best they stand for the unremarkable proposition that the absence of a stable value fund is not itself a *per se* violation of ERISA.

The new comparison proffered by American Airlines to meet Plaintiffs' comparison to stable value simply underscores the disputed nature of the factual question regarding whether American's decision to retain the Credit Union Option as a Plan investment was prudent. Summary judgment must be denied.

***The Breadth of the Plan's Investment Menu Does Not Absolve American Airlines Of Liability For An Imprudent Investment Option***.

Finally, American Airlines urges the Court to judge "the role of the Credit Union Option in the Plan's broadly diversified lineup." Am. Airlines' Mot. at 27. In essence, American Airlines believes, citing the Third Circuit's decision in *Renfro v. Unisys Corp.*,[9] that whatever harm the Credit Union Option had on participants' retirement savings can be diluted based on the sheer presence of available investment options. American is wrong.

For one, disinterested third parties told American during the Relevant Time Period that simply having many investment options was not a shortcut to discharging its fiduciary duties. *See* APPX106. CEM Benchmarking, an industry group with 80 million member plans managing over $15 trillion in assets, conducted a review of the Plan in 2013. *Id.* As part of that review CEM cautioned American Airlines that the Plan had almost twice as many investment options as its peers, and that "[o]ffering more investment options to participants is not necessarily better." *Id.* at -43320. CEM went on to remind American Airlines that "you have a fiduciary duty to monitor ***each*** of the investment options that you offer participants to ensure that they continue to be prudent choices." *Id.*

---

[9] 671 F.3d 314, 327–28 (3d Cir. 2011).

American Airlines' argument also ignores more recent Third Circuit precedent that explains *Renfro* and clarifies that the Plan's "broadly diversified lineup" does not justify the inclusion of an imprudent option. In *Sweda v. University of Pennsylvania*, the Third Circuit clarified that *Renfro* does not mean "that a meaningful mix and range of investment options insulates plan fiduciaries from liability for breach of fiduciary duty." *Sweda v. Univ. of Pa.*, 923 F.3d 320, 330 (3d Cir. 2019). Indeed, as the Third Circuit went on to note, "[s]uch a standard would allow a fiduciary to avoid liability by stocking a plan with hundreds of options, even if the majority were overpriced or underperforming." *Id.* The Seventh Circuit and the Secretary of Labor agree:

> The Secretary [of Labor] also fears that our opinion could be read as a sweeping statement that any Plan fiduciary can insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them. She is right to criticize such a strategy. It could result in the inclusion of many investment alternatives that a responsible fiduciary should exclude. It also would place an unreasonable burden on unsophisticated plan participants who do not have the resources to pre-screen investment alternatives.

*Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). American's argument embraces exactly what the Third Circuit, the Seventh Circuit, and the Secretary of Labor have all rejected: that the Plan's larger lineup of investment options insulates the Plan from any harm from the inclusion of the Credit Union Option, and if anyone was harmed the participants are who to blame. *See* Am. Airlines' Mot. at 27 ("[P]articipants have always had a choice between the federal guarantee of the Credit Union Option and the potentially higher returns—and commensurately higher risks—of alternative capital preservation options."). Although American claims the object of this case is "paternalistic" (*id.*), it is simply the responsible discharge of American's fiduciary duty to its employees.

22

**D. American Airlines Applies The Wrong Standard In Its Argument Concerning Co-Fiduciary Liability.**

American Airlines advances two arguments as to why it is entitled to summary judgment on the issue of whether American can be liable as a co-fiduciary under ERISA § 405(a) for the Credit Union's prohibited transaction involving its use of Plan assets for its own benefit: 1) that the Credit Union's actions do not constitute a prohibited transaction, and 2) even if it did, that American Airlines did not know that the Credit Union's actions were a breach of fiduciary duty. American is wrong, on both fronts.

*First*, and with respect to ERISA § 405(a)(2), there are myriad disputed facts as to whether the Credit Union's use of more than $1 billion of Plan assets for its own benefit constitutes a prohibited transaction. These are addressed in more detail in Plaintiffs' separate opposition to the Credit Union's motion for summary judgment. Lewis Cohen, the Credit Union's Vice President of Finance and Data Analytics, testified that the Credit Union earns between 20% and 50% of its total investment income from the Plan's assets deposited with the Credit Union and that the Credit Union uses that income to pay corporate expenses, corporate debts, and commissions and fees (including, in some cases, to itself). *See* Deposition of Lewis Cohen ("Cohen Dep.") at 43:8-44:2, 46:12-47:9, APPX 8.[10] By retaining the Credit Union Option as an investment option in the Plan, American Airlines enabled the Credit Union's prohibited transaction (dealing with those Plan assets for its own benefit). This alone is sufficient to establish co-fiduciary liability under ERISA

---

[10] At the end of his deposition, and during questioning from the Credit Union's counsel, Mr. Cohen partially contradicted his prior testimony and said that "[t]he majority of all interest income [from the Credit Union Option] is used to pay the dividend on the deposits of the Credit Union." Cohen Dep. at 75:23-76:3, APPX 8. While his statement concerning "the majority" of the interest income is not completely contradictory to his prior testimony, which is exceedingly clear, the contradiction itself creates a disputed issue of material fact. The Court will have the opportunity to weigh Mr. Cohen's competing statements and afford them the appropriate level of credibility at trial.

§ 405(a)(2). *See* 29 U.S.C. § 1105(a)(2) ("if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach. . . ").

*Second*, and as to § 405(a)(1) and (3), American is wrong about what kind of knowledge as to the Credit Union's misconduct is required for co-fiduciary liability.  American argues, based on a single sentence from the Fifth Circuit's 1983 decision in *Donovan v. Cunningham*, that American needed to have actual knowledge that the Credit Union's actions were a prohibited transaction to be liable.  716 F.2d 1455.  Subsequent cases have clarified that co-fiduciary liability under ERISA § 405(a) is co-extensive with fiduciaries' duties to monitor one another under ERISA § 404.  *Perez v. Bruister*, 54 F. Supp. 3d 629, 672 (S.D. Miss. 2014) ("For the same reasons the Court finds a breach of prudence and a failure to monitor, it likewise finds that Bruister, Henry, and Smith are liable as co-fiduciaries."), *aff'd Perez v. Bruister* 832 F.3d 250 (5th Cir. 2016) (noting that the court did not approve of derivative liability for failure to monitor, but that "[c]o-fiduciary derivative liability under ERISA § 405(a) was found by the district court and applies as a matter of course.") (internal citations omitted).  Fiduciaries in similar contexts have been held liable under ERISA § 405(a) when they "knew or should have known" that their co-fiduciary's conduct violated ERISA.  *See Tittle v. Enron Corp. (In re Enron Corp. Sec. Derivative & ERISA Litig.)*, 284 F. Supp. 2d 511, 583, 591 (S.D. Tex. 2003) (holding that Northern Trust was liable for following the instructions of the fiduciary committee, which violated ERISA).  Taken together, *Tittle* and the Fifth Circuit's more recent decision in *Perez* clarify that a fiduciary can be held liable under ERISA § 405(a) when it knew **or should have known** that its co-fiduciary's behavior violated ERISA.

24

This is the gravamen of Plaintiffs' co-fiduciary liability claim against American Airlines. American knew or should have known that allowing the Credit Union use of over a billion dollars of Plan assets in exchange for a meager interest rate that was less than inflation and the interest rate of the Credit Union's other products was a prohibited transaction.  The issue of whether that rate was reasonable is disputed, and therefore summary judgment is inappropriate.

## V.      CONCLUSION

American Airlines' Motion for Summary Judgment should be denied.

Dated:  July 21, 2020                  Respectfully submitted,

                                       /s/ Jonathan T Suder
                                       jts@fsclaw.com
                                       Michael T Cooke
                                       mtc@fsclaw.com
                                       FRIEDMAN SUDER & COOKE PC
                                       Tindall Square Warehouse # 1
                                       604 E 4th Street, Suite 200
                                       Fort Worth, TX 76102
                                       Phone:  817-334-0400
                                       Fax:  817-334-0401

                                       Peter Schneider
                                       pschneider@schneiderwallace.com
                                       SCHNEIDER WALLACE COTTRELL KONECKY, LLP
                                       3700 Buffalo Speedway, Ste. 1100
                                       Houston, TX 77098
                                       Phone:  713-338-2560
                                       Fax: 866-505-8036

                                       Todd M. Schneider
                                       tschneider@schneiderwallace.com
                                       Jason H. Kim
                                       jkim@schneiderwallace.com
                                       Kyle G. Bates
                                       kbates@schneiderwallace.com
                                       SCHNEIDER WALLACE COTTRELL KONECKY, LLP
                                       2000 Powell Street, Suite 1400
                                       Emeryville, CA 94608
                                       Phone:  415-421-7100
                                       Fax: 415-421-7105
                                       **ATTORNEYS FOR PLAINTIFFS**


## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of July, 2020, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, Fort Worth Division using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.


                                       */s/ Jonathan T. Suder*