# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| SALVADORA ORTIZ and THOMAS SCOTT, on behalf of themselves and all others similarly situated, | § § § § | |
| | § | |
| Plaintiffs, | § § | Case No. 4:16-cv-00151-A |
| v. | § § | |
| AMERICAN AIRLINES INC., THE AMERICAN AIRLINES PENSION ASSET ADMINISTRATION COMMITTEE, and AMERICAN AIRLINES FEDERAL CREDIT UNION, | § § § § § § | |
| | § | |
| Defendants. | § | |

**DEFENDANTS AMERICAN AIRLINES, INC.'S AND THE AMERICAN AIRLINES PENSION ASSET ADMINISTRATION COMMITTEE'S REPLY MEMORANDUM IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Dee J. Kelly, Jr. (S.B. # 11217250)
Lars L. Berg (S.B. # 00787072)
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Tel.: (817) 332-2500
Fax: (817) 878-9280
dee.kelly.2@kellyhart.com
lars.berg@kellyhart.com

Jeffrey I. Kohn (*admitted pro hac vice*)
(N.Y. Bar # 1980838)
Karen Gillen (*admitted pro hac vice*)
(N.Y. Bar # 2963338)
O'Melveny & Myers LLP
7 Times Square
New York, New York 10036
Tel.: (212) 326-2000
Fax: (212) 326-2061
jkohn@omm.com
kgillen@omm.com

*Cont'd on Next Page*

Brian D. Boyle (*admitted pro hac vice*)
(D.C. Bar # 419773)
Shannon M. Barrett (*admitted pro hac vice*)
(D.C. Bar # 476866)
Meaghan VerGow (*admitted pro hac vice*)
(D.C. Bar # 977165)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Tel.: (202) 383-5300
Fax: (202) 383-5300
bboyle@omm.com
sbarrett@omm.com

*Attorneys for Defendants American Airlines, Inc. and
the American Airlines Pension Asset Administration Committee*

## TABLE OF CONTENTS

**Page**

ARGUMENT .................................................................................................................. 3

I.     PLAINTIFFS CANNOT PROCEED ON THEIR CLAIM THAT
DEFENDANTS IMPROPERLY SELECTED OR RETAINED THE
CREDIT UNION OPTION (COUNT I). ............................................................. 3

     A.    Plaintiffs Lack Article III Standing To Bring Their Imprudence
Claim. .................................................................................................. 4

     B.    Plaintiffs Cannot Establish That Plan Fiduciaries Imprudently
Offered the Credit Union Option to Participants. ................................ 7

          1.    *Reasonable Fiduciaries Can and Do Include Safe, Liquid
Funds Like the Credit Union Option in Their Investment
Lineups* ................................................................................... 8

          2.    *Plaintiffs Have Failed to Identify a Superior Comparable
Alternative to the Credit Union Option* ..................................... 11

     C.    The Court Can Ignore Plaintiffs' Manufactured Factual Disputes. ......... 14

          1.    *Plaintiffs' Allegations About American's Fiduciary Process
Are Both Irrelevant and Factually Unfounded* ........................... 15

          2.    *Plaintiffs' Remaining Arguments Are Irrelevant and Ill-
Conceived* .............................................................................. 17

II.     PLAINTIFFS CANNOT PROCEED WITH THEIR CLAIM FOR CO-
FIDUCIARY LIABILITY AGAINST AMERICAN AIRLINES
(COUNTS I AND II). ...................................................................................... 18

III.    PLAINTIFFS HAVE ABANDONED ANY CLAIM THAT AMERICAN
ENGAGED IN A PROHIBITED TRANSACTION (COUNT III). ................... 19

CONCLUSION .............................................................................................................. 19

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
　　477 U.S. 242 (1986)....................................................................................14, 15

*Cunningham v. Cornell Univ.*,
　　2019 WL 4735876 (S.D.N.Y. Sept. 27, 2019)...................................................11, 12

*Davis v. Wash. Univ. in St. Louis*,
　　960 F.3d 478 (8th Cir. 2020) ....................................................................7, 11, 12

*Donovan v. Bierwirth*,
　　754 F.2d 1049 (2d Cir. 1985)........................................................................5, 6

*Donovan v. Cunningham*,
　　716 F.2d 1455 (5th Cir. 1983) ....................................................................18, 19

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
　　284 F. Supp. 2d 511 (S.D. Tex. 2003) ...................................................................18

*Fifth Third Bancorp v. Dudenhoeffer*,
　　573 U.S. 409 (2014)....................................................................................7

*Lujan v. Defenders of Wildlife*,
　　504 U.S. 555 (1992)....................................................................................5, 6

*McDonald v. Provident Indem. Life Ins. Co.*,
　　60 F.3d 234 (5th Cir. 1995) .............................................................................7

*Meiners v. Wells Fargo & Co.*,
　　898 F.3d 820 (8th Cir. 2018) ...........................................................................12

*Moitoso v. FMR LLC*,
　　—F. Supp. 3d—, 2020 WL 1495938 (D. Mass Mar. 27, 2020) .....................................16, 17

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*,
　　712 F.3d 705 (2d Cir. 2013)............................................................................8, 9

*Perez v. Bruister*,
　　54 F. Supp. 3d 629 (S.D. Miss. 2014)....................................................................19

*Perez v. Bruister*
　　823 F.3d 250 (5th Cir. 2016) ...........................................................................19

*Pledger v. Reliance Trust Co.*,
　　240 F. Supp. 3d 1314 (N.D. Ga. 2017) ..................................................................10

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Singh v. RadioShack Corp.*,
    882 F.3d 137 (5th Cir. 2018) ......................................................................5

*White v. Chevron Corp.*,
    2017 WL 2352137 (N.D. Cal. May 31, 2017) ..........................................10

**Statutes**

29 U.S.C. § 1105(a)(2)..................................................................................19

**Regulations**

29 C.F.R. § 404c-1(b)(1)(ii)...........................................................................13

29 C.F.R. § 404c-1(b)(2)................................................................................13

29 C.F.R. § 404c-1(b)(3)................................................................................13

**Other Authorities**

NCUA, Share Insurance Fund Overview........................................................13

Plaintiffs maintain that American[1] breached its fiduciary duties under ERISA by failing to remove its longstanding Credit Union Option from its 401(k) investment lineup.  But Plaintiffs agree, as they must, that a "prudent fiduciary [c]ould include a demand deposit option in a 401(k) plan as a capital preservation option."  Opp. at 16 (alterations omitted).  In the end, they make clear that their claim is not necessarily about the Plan's *inclusion* of a bank deposit option but rather about its *failure to include* a stable value alternative earlier.  *Id.*  That concession dooms their claims twice over.

*First*, it undermines any argument that Plaintiffs have standing to pursue their fiduciary breach claim.  Plaintiffs allege they suffered an injury from "lost investment income," which they calculate as the difference between the interest rate offered by the Credit Union Option and that associated with *a stable value fund*.  *Id.* at 14.  But that theory assumes that Plaintiffs would have actually invested in a stable value fund and thus realized those higher rates of return.  That is a speculative proposition.  As an initial matter, if the Plan offered nothing more than a stable value option as a capital preservation choice in the Plan's core lineup, Plaintiffs may well have exited to the Plan's brokerage window for more liquid alternatives (as Plaintiff Scott did himself).  More pertinently, if the Plan had offered a stable value fund *in addition to* other demand deposit options (which, again, Plaintiffs agree it could have done so prudently, *id*. at 16), Plaintiffs have no proof that they would have chosen the stable value fund instead of other more liquid, and more conservative, capital preservation options.  Indeed, all the record evidence

---

[1] This brief refers to Defendants American Airlines Inc. ("American Airlines") and the American Airlines Pension Asset Administration Committee (the "PAAC") together as "American" or 'Defendants."  It refers to American's opening brief filed in support of its motion for summary judgment (ECF No. 185-1) as "Mot." and Plaintiffs' opposition to that brief (ECF No. 215) as "Opp."  It otherwise adopts the same abbreviations as the opening brief.

contradicts that assumption.  Plaintiffs thus cannot connect the alleged breach to any economic

injury to their accounts, and Defendants are entitled to summary judgment accordingly.

     ***Second***, Plaintiffs' grudging concession that prudent fiduciaries can and do offer more

liquid capital preservation alternatives alongside stable value choices defeats their claims on the

merits.  The "most central" reason that the Credit Union Option was improper, Plaintiffs say, is

that its rates of return were "abysmally low."  *Id*. at 16.  But Plaintiffs' own expert agrees that

"the returns to the Credit Union Option ***exceeded the returns of other demand deposit options***

***and money market funds***."  ECF 193 (Report of James King ("King Report")) ¶ 15 (emphasis

added).  So if American could prudently include a "demand deposit[] option" within its 401(k)

lineup, Opp. at 16, it follows that it could prudently include the Credit Union Option.  Only a

ruling that no prudent plan fiduciary could ever offer these highly-liquid capital preservation

options could sustain Plaintiffs' Credit Union theory.  After all, if American cannot offer the

Credit Union Option because its returns are too "meager," *id*. at 1, how could it offer other,

worse performing demand deposit options or money market options?  Plaintiffs and their stable

value champion *cum* expert, James King, offer no answer because there is none.  In fact, as

American explained in its opening brief, the majority of 401(k) plan fiduciaries have consistently

offered such capital preservation vehicles in their lineups over the relevant period, and court

decisions rejecting any ERISA requirement for a stable value choice have only cumulated during

the pendency of this litigation.

     Having painted themselves into a corner, Plaintiffs dedicate much of their response to

misdirection.  Principally, they try to manufacture a dispute of fact by claiming there is "***zero***

***evidence***" that American properly "monitored" the Credit Union Option or considered inclusion

of a stable value fund.  *Id*. at 19-20.  But that argument is both irrelevant and wrong.  It is

2

irrelevant because Plaintiffs' theory has never turned on any alleged failure to "monitor" the Plan's capital preservation options; rather, their claim is that the Credit Union Option was so inherently imprudent that no amount of monitoring could redeem it. It is wrong because the record shows that American regularly received reports on the value of the Credit Union Option and expressly considered the risks and liquidity concerns associated with stable value funds. *See infra* at 15-16. Plaintiffs thus have no basis for claiming American acted imprudently in retaining the Credit Union Option, and this Court should reject their claim on that basis.

Plaintiffs' remaining counts fail just as roundly. To establish co-fiduciary liability (Count II), Plaintiffs must show either that (i) American Airlines itself committed a breach; or (ii) American Airlines had actual knowledge of a breach by the Credit Union. They cannot make the former showing for the reasons just explained; they do not even attempt to make the latter one. Nor do Plaintiffs bother to defend Count III. In its opening brief, American explained why the Plan's investment in the Credit Union Option was not a prohibited transaction, as undisputed evidence showed that the transaction was exempt under ERISA § 408(b). Plaintiffs' nowhere address that exemption and have thus forfeited any argument to the contrary.

For the foregoing reasons, and as detailed below and in American's opening brief, Defendants are entitled to summary judgment on all claims.

## **ARGUMENT**

## I.   **PLAINTIFFS CANNOT PROCEED ON THEIR CLAIM THAT DEFENDANTS IMPROPERLY SELECTED OR RETAINED THE CREDIT UNION OPTION (COUNT I).**

In response to this Court's Order, Plaintiffs committed to the following theory of relief: American "breached its fiduciary duty by imprudently and disloyally **. . . *retaining*** [the Credit Union Option]" rather than replacing it with a "readily available" alternative, i.e. a "stable value fund[]." *See* ECF No. 154 at 3 (emphasis added). For all their efforts at distraction, Plaintiffs

cannot escape the fatal flaws with this theory: They do not have standing to pursue relief, and, independently, their claim fails on the merits.

### A.    Plaintiffs Lack Article III Standing To Bring Their Imprudence Claim.

Plaintiffs offer one real theory for why they have standing to bring Count I: they claim they "[l]ost investment income" by investing in the Credit Union Option instead of a stable value fund.[2] Opp. 10-11. They thus present "detailed calculations" as to the return they would have earned had they invested in a stable value fund instead of the Credit Union Option. *Id.* 10; King Report ¶¶ 48-49. But as American explained in its opening brief, Mot. 12-13, that theory of injury depends on a threshold question: would Plaintiffs have actually invested in the stable value fund had American Airlines eliminated the Credit Union Option? If not, Plaintiffs' expert opinion is simply irrelevant, as Plaintiffs would not have realized the higher rate of return regardless of American's actions.[3]

Plaintiffs have not made, and cannot make, that showing. They assure this Court (for good strategic reasons) that the Plan did not need to eliminate all demand deposit or money market options and channel every participant dollar into a stable value fund instead. Opp. at 16. But so long as the Plan offered its participants some freedom to choose among investment

---

[2] Plaintiffs also suggest that they might have earned higher interest rates "[i]f Plan deposits in the Credit Union Option had been credited with . . . the same effective interest rate" that it applied to member saving accounts or Individual Retirement Account. Opp. at 10. That theory of injury relates to their standing to bring Count II, which claims that the Credit Union should have offered (but did not offer) a demand deposit option with higher interest rates. *See* ECF No. 1 (Compl.), ¶ 49. But that theory has nothing to do with whether Plaintiffs have standing to bring Count I. Because the Credit Union did not actually offer the higher rates Plaintiffs point to, the question whether it could have done so is irrelevant to whether, as Plaintiffs argue, American acted imprudently by retaining the Credit Union Option instead of "readily available" alternatives. ECF No. 168 at 4.

[3] For that reason, Plaintiffs are wrong that there are "disputed issues of fact" concerning whether they suffered injury. Opp. at 15. Indeed, they proceed to recognize that the standing debate turns on whether "the Court ultimately agrees with American Airlines' ***legal arguments***" that Plaintiffs' evidence is insufficient to establish an injury-in-fact. *Id.* (emphasis added).

4

options, Plaintiffs would be "entitled to receive" the returns of a stable value fund only if they chose to invest in that fund when offered the choice. *See id.* at 14. And Plaintiffs provide no evidence—none—that suggests that either Ms. Ortiz or Mr. Scott would have made that investment choice, let alone whether other participants in the Plan would have done so. Instead, all the available evidence belies such a claim. As American explained in its opening brief, Mot. at 13-15, the Plan ***has*** offered a stable value fund since 2015, yet neither Plaintiff has ever made any use of it. This was no mere matter of investing "inertia." *Cf.* King Report ¶ 43. Mr. Scott eschewed the stable value fund even as he shifted investments away from the Credit Union Option into other capital preservation options (like the money market fund and low-interest cash reserve funds) and to relatively high-risk vehicles (like the US Small/Mid Cap Stock Fund). *See* Mot. at 14.

Plaintiffs nowhere grapple with their own telltale investing pattern. Instead, they maintain that it is not their "burden" to establish how they would have invested their funds. Opp. at 12. Not so. It is axiomatic that a plaintiff has the burden to establish "each element" of their standing claim, including by showing that their injury is not speculative. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992); *Singh v. RadioShack Corp.*, 882 F.3d 137, 150–51 (5th Cir. 2018) (holding in ERISA context that the "plaintiffs seeking redress in federal court have the burden of proving that they have standing") (internal citation omitted). At the summary judgment stage, that requires Plaintiffs to "set forth by affidavit or other evidence specific facts" that support their standing claim. *Lujan*, 504 U.S. at 561 (internal quotation marks omitted).

In arguing otherwise, Plaintiffs rely primarily on an inapposite out-of-circuit decision, *Donovan v. Bierwirth*, 754 F.2d 1049 (2d Cir. 1985). There, the court considered how to ***calculate damages*** against fiduciaries that had ***directly*** controlled and mismanaged plan assets.

*Id.* at 1050-52.  More specifically, the defendants in that case had used plan assets to purchase additional shares of their own stock in order to thwart a takeover bid, actions the Plaintiffs said breached defendants' duties as  fiduciaries.  *Id.* at 1051.  To calculate damages, the court held that the district court should presume that if the plan managers had not acted out of self-interest, those fiduciaries would have treated the plaintiffs' funds "like other funds being invested during the same period in proper transactions."  *Id.* at 1056.

That case has no bearing on the standing analysis here.  Under American Airlines' 401(k) Plan, ***participants***—not the Plan fiduciaries—are responsible for deciding whether to invest, how much to invest, and in which options to invest based on their individualized risk and reward preferences.  *See* ECF 185-3 (2009 Plan SPD), at App. 46.  In other words, Plaintiffs at all relevant times had total control over how their assets were invested.  That means that this Court cannot simply assume that, absent the Credit Union Option, Plaintiffs would have allocated their accounts exactly as Plaintiffs' own expert would have advised.  Indeed, Plaintiffs' own expert describes "[p]articipants [as] infamous for not taking action or for making irrational decisions." King Report ¶ 42.  Accordingly, this Court needs something more before it can conclude that Plaintiffs would have reallocated their Credit Union balances to a stable value fund had one been offered earlier—say, an affidavit from the two Plaintiffs attributing their avoidance of the Plan's stable value choice in 2015 and beyond to extraordinary circumstances unique to that time frame, or "some other evidence" of that nature.  *See Lujan*, 504 U.S. at 561.  Plaintiffs offer nothing, and a litigation affidavit at this stage would lack all credibility given the investment behavior described above.  *See supra* at 5.  Plaintiffs' inability to prove economic injury dooms all of their claims against American.

**B.**   **Plaintiffs Cannot Establish That Plan Fiduciaries Imprudently Offered the Credit Union Option to Participants.**

Independently, Plaintiffs cannot prevail on the merits.  Again, Plaintiffs' theory is that it was imprudent for American to "retain[]" the Credit Union Option as part of its investment lineup.  *See* ECF No. 154 at 3.[4]  The "most central" reason that is so, Plaintiffs say, is that Credit Union Option's rate of return was "abysmally low."  Opp. at 16.  Plaintiffs repeat this refrain throughout their brief, trying to cast this case as "about the fact" that the Credit Union Option provided "meager" returns.  *Id.* at 1.

But American explained in its opening brief why that theory runs into a brick wall.  "For an investment-by-investment challenge like this one, a [Plaintiff] cannot simply make a bare allegation that . . . returns are too low" in a vacuum.  *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 484 (8th Cir. 2020).  Instead, Plaintiffs must establish that the fund underperformed relative to some "meaningful benchmark," *id.* (quotation omitted), such that a prudent fiduciary under like circumstances would not have retained the Credit Union Option within its 401(k) lineup. *See Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 410-11 (2014).  It is Plaintiffs' burden to make that showing, *see McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234, 237 (5th Cir. 1995); *see also* Mot. at 16 n.12, but even construing the record in the light most favorable to Plaintiffs, they have failed to do so.

---

[4] While Plaintiffs have previously suggested they meant to challenge the "***selection***" of the Credit Union Option, American has explained why such a claim is time-barred under ERISA's six-year statute of limitations.  Mot. at 15-16 (emphasis added).  Plaintiffs do not respond to that argument, explaining instead why their challenge to American's ***retention*** of the Credit Union Option into and through the repose period is timely.  Opp. at 15 (arguing that American's "decision to leave the Credit Union Option" in place causes it ongoing harm).  Defendants thus understand Plaintiffs to have abandoned their challenge to the fund's initial selection and do not address it in this Reply.

7

1.   _Reasonable Fiduciaries Can and Do Include Safe, Liquid Funds Like the Credit Union Option in Their Investment Lineups_

Most fundamentally, Plaintiffs' claim fails because they offer no competent evidence "that a prudent fiduciary in like circumstances would have acted differently" than American.  *See Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 720 (2d Cir. 2013).  The **only** evidence that Plaintiffs offer in this vein is a report from James King, a self-proclaimed "guardian" of stable value funds who has spent his career "developing and promoting . . . Stable Value product[s]" in a sales capacity for a large financial institution.  Ex. 1 (King Tr.)[5] 40:2-8 at App. 2.[6]  In his report, Mr. King stresses repeatedly that stable value funds "outperform" other capital preservation options, such as money market funds.  King Report ¶ 7.  Hence, in his view, stable value funds are "absolute[ly] superior[]" to money market funds—and "[b]y extension" the Credit Union Option," *id.* ¶ 11—such that the latter options should be offered only in "extenuating circumstances."  King Tr. at 115:9-25, at App. 6 (explaining such circumstances would include where a stable value option is unavailable to the Plan).

Defendants explain below why Mr. King's comparison to stable value funds is unsound (*see infra* Part I.B.2), but this Court can also simply discard his opinion as inapposite.  The dispute in this case is not over—as Mr. King stresses—whether stable value funds generated higher returns than the Credit Union Option during the relevant period, King Report ¶ 7, as American concedes that they did.  They are different products with different features.  The dispute thus turns on whether a "prudent fiduciary" could include a Credit Union Option (or,

---

[5] Plaintiffs did not designate Mr. King as an expert until July 6, 2020, and Defendants therefore did not depose Mr. King until July 15, 2020.  Both events were after Defendants submitted their Motion for Summary Judgment on July 3, 2020.  Because Plaintiffs rely heavily on the King Report in their Opposition, Defendants include in an appendix excerpts of Mr. King's deposition discussing that Report.

[6] "App." as applied herein for Exhibits 1 through 3, refers to the Appendix to Defendants' Reply Memorandum in Further Support of Their Motion for Summary Judgment.

indeed, any other demand deposit or money market fund) instead of or in addition to a stable

value option. *See Pension Benefit Guar. Corp.*, 712 F.3d at 720. On that score, Mr. King does

not profess in his Report to have any expertise on actual fiduciary practice, as he has never been

a fiduciary and has "never provided advice to 401(k) plans or sponsors." King Tr. 53:2-9, 112:3-

10, at App. 3, 5.

Not surprisingly, Mr. King's investment advice is wildly out-of-step with existing large-

plan fiduciary practice. The undisputed evidence shows that reasonable plan officials can and

regularly do include the very types of fully liquid, safe capital preservation options in their

investment lineup that King condemns, including options that ***perform worse*** than the Credit

Union Option. Plaintiffs stress (again and again) that 70% of defined contribution plans offered

stable value funds during the relevant period. Opp. at 14, 17. But American explained in its

opening brief, that same survey shows that 62% of surveyed plans included a money market fund

in their investment lineups, either instead of or in addition to a stable value fund. Mot. at 24-25;

ECF 185-4 (MetLife 2015 Stable Value Study), at App. 844. Other surveys reflect the same

breakdown. *Id*. (Longstaff Report[7] ¶ 67 & Ex. 3), at App. 421-22, 435 (noting that from 2011 to

2016, between 57% and 65% of such plans offered a stable value option, while 66% and 77% of

---

[7] Defendants previously submitted the Longstaff Report in opposition to class certification, and
Plaintiffs challenged the use of his opinions for that purpose specifically. *See* ECF No. 122
(arguing, for example, that Longstaff offered "legal conclusions" on the ultimate class
certification issue). When this Court determined Plaintiffs could proceed as representatives, it
denied as moot Plaintiffs' challenges to the Report for use in its class certification opposition.
*See* ECF No. 167. The Report thus remains in the record, and Defendants have limited their use
of the Longstaff Report to only those sections that address issues relevant to Defendants' Motion
for Summary Judgment, i.e. Mr. Longstaff's description and assessment of different capital
preservation options. Plaintiffs do not object to this limited use of the Longstaff Report in their
Opposition.

such plans offered a money market option during the same period).  Plaintiffs (and Mr. King) simply ignore that consistent and longstanding fiduciary practice.

Likewise, courts routinely reject Mr. King's rigid position as a matter of law.  Since this litigation has been pending, at least eight different courts have rejected challenges to plans that use money market funds instead of or in addition to stable value funds.  *See* Mot. at 26 & n.20. Contra Plaintiff (Opp. at 20-21), those cases stand for more than the proposition that plans are not required to offer a stable value fund (though even that is a significant concession, given Plaintiffs' myopic focus on stable value funds and Mr. King's longstanding advocacy for the same).  Rather, these courts affirmatively endorse the use of money market funds, even when those funds produce "[m]icroscopically [l]ow" rates of return."  *Pledger v. Reliance Trust Co.*, 240 F. Supp. 3d 1314, 1333-34 (N.D. Ga. 2017); *see also White v. Chevron Corp.*, 2017 WL 2352137, at *9 (N.D. Cal. May 31, 2017) (making clear that "offering a money market fund"— instead of or in addition to a stable value fund—"more than satisfied the [Plan fiduciaries'] duty of prudence").[8]  Mr. King's opinion thus has no basis in either practice or precedent.

Indeed, when pressed, even Plaintiffs disclaim their own expert's opinion, recognizing that such an extreme position "could very well be susceptible to disposition by summary judgment."  Opp. at 16.  They thus agree that a reasonably "prudent fiduciary [c]ould include a demand deposit option in a 401(k) plan as a capital preservation option."  *Id.* (alterations omitted).  Likewise, they concede the "unremarkable proposition" that no *per se* rule requires plans to include stable value funds within their 401(k) lineup.  *Id*. at 20-21.  But if that is true, what was the problem with the Credit Union Option?  It cannot be that those other demand

---

[8] Remarkably, Plaintiffs attempt to distinguish these cases because some dismissed challenges at an even ***earlier*** stage in the litigation, Opp. at 20, but the burden that Plaintiffs must clear to proceed with this lawsuit is only more rigorous at the summary-judgment stage.

deposit options (or money market funds) outperformed the Credit Union Option.  Plaintiffs'

expert concedes that was not the case.  King Report ¶ 15.[9]  Nor can it be, as Plaintiffs tepidly

suggest (Opp. at 1, 3), 16, that the fund failed to outpace inflation.  The same is true of other

demand deposit options and money market funds as well.  King Report ¶ 8.  Hence if plans can

reasonably offer a "demand deposit option[s]"—as Plaintiffs insist they can—it follows that the

American Plan can prudently offer the Credit Union Option.  That alone resolves Plaintiffs'

challenge.

>    2.    *Plaintiffs Have Failed to Identify a Superior Comparable Alternative to the Credit Union Option*

But there is more: The reason so many 401(k) plans include capital preservation options

instead of or in addition to stable value funds is that these vehicles "cater to different investors."

*Davis*, 960 F.3d at 485.  And that, too, defeats Plaintiffs' challenge.  To proceed on their claim,

Plaintiffs must show that the Credit Union Option performed poorly relative to some

"meaningful benchmark," *id.* at 484 (quotation omitted), *i.e.*, "an equivalent investment vehicle,

*Cunningham v. Cornell Univ.*, 2019 WL 4735876, at *13 (S.D.N.Y. Sept. 27, 2019).  In more

than four years of litigation, the ***only*** such vehicle Plaintiffs have identified is a stable value

fund.[10]   Hence their claim depends on whether there "remains a disputed issue of material fact as

---

[9] Plaintiffs cite this Court's order denying Defendants' ***motion to dismiss*** the Complaint to suggest that money market funds have outperformed the Credit Union Option.  Opp. at 20 (citing ECF No. 54 at 24).  But as the record developed, both parties' experts have agreed that the Credit Union Option's returns "exceeded the returns of other demand deposit options and money market funds" during the relevant period.  King Report" ¶ 15; Longstaff Report ¶¶ 53(d),(e), at App. 413. This Court thus in no way needs to "reverse course" to accept that undisputed fact now.  *Cf.* Opp. at 20.

[10] Although Plaintiffs previously compared the Credit Union Option's returns to the promotional rate for one of the Credit Union's checking accounts, they make no reference to that account in the Opposition and have thus abandoned any such claim.  At times, they compare the Credit Union Option to rates offered by the Credit Union's individual savings accounts and IRAs, but as explained *supra*, neither account was available for inclusion in a 401(k) lineup and thus neither provides a valid basis for comparison.

to the appropriateness of Plaintiffs' comparison of the Credit Union Option to stable value." Opp. at 19.  There does not.

It is Plaintiffs' burden of proof to establish that the challenged Credit Union Option and their proffered alternative are comparable, *see Cunningham*, 2019 WL 4735876, at *13, yet Plaintiffs' only evidence—a report from Mr. King—does not dispute that "stable value funds and the Credit Union Option have different characteristics."  King Report ¶ 17.  To be sure, Mr. King nevertheless declares that the two investment options are "comparable" because they are both "capital preservation funds."  *Id.*  But apples and oranges are both fruits.  Demand deposit options, money market funds, long-term bonds, stable value funds, and any number of investment options may all fit under the "capital preservation" umbrella, but that does not mean that a prudent fiduciary would or should treat each option as interchangeable.

The relevant question—and one courts regularly resolve as a matter of law—is whether the funds have different compositions, such that they inherently present "different risks[] and different potential rewards."  *Davis*, 960 F.3d at 485 (distinguishing different mutual funds because one invested "around 30% of its portfolio" in "international securities," while other funds "had a lower percentage of international stocks"); *see also Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018) (holding two different target date funds not comparable because one had "a higher allocation of bonds" (alterations omitted)). That is indisputably the case here, as American explained at length in its opening brief.  Mot. at 19-24.  To briefly recap, stable value funds are a "unique asset class" that invest directly in "high quality bonds" and include a "wrap contract," i.e., a limited guarantee from an insurance company or bank.  King Report ¶ 4.  The Credit Union Option, by contrast, is a liquid demand deposit account that is fully guaranteed by the United States Government.  Longstaff Report ¶ 31, at App. 401.

12

Naturally enough, these two different investment vehicles differ on the metrics most relevant for capital preservation options: return, risk, and liquidity.  *Cf.* 29 C.F.R. § 404c-1(b)(1)(ii), (b)(2), (b)(3).

Plaintiffs cannot and do not dispute these differences.  Start with risk.  While federal credit unions have "never lost even a penny of insured savings,"[11] Mr. King acknowledges that stable value funds are not "risk free," and that there are instances where a participant in stable value funds will not get the "book value" of their investment.  King Report ¶¶ 22, 26; *see also* King Tr. 95:17-23, at App. 4.  True, Mr. King quibbles about the degree of additional risk stable value investors take on: he stresses, for instance, that ***some*** stable option plans contain a "book value corridor[]" that guarantees up to 10% or 20% of the fund's book value, even for events not otherwise covered by the insurance guarantee (such as layoffs, mergers, or bankruptcies).  King Report ¶ 5(f).  But that is hardly cause for celebration.  The flip side is that 80 to 90% of the funds' balances are ***not*** protected in such circumstances, leaving Plan participants exposed if the market value of the underlying fixed income portfolio drops by a sufficient margin.  Nor does it matter, as Plaintiffs suggest (Opp. at 19), that these risks did not materialize during the relevant period.  The fact that certain risks do not come home to roost cannot erase that they existed in the first place, nor does it mean a prudent investor should ignore these risks moving forward.  *See* Mot. at 22.

Likewise, Mr. King does not dispute that stable value funds are less liquid than demand deposit options like the Credit Union Option.  American previously explained why that was the case: whereas demand deposit funds are payable upon demand, many stable value funds—

---

[11] NCUA, Share Insurance Fund Overview, https://www.ncua.gov/support-services/share-insurance-fund (last visited July 29, 2020).

including the ones used by American—require at least 12 months' notice before a fiduciary can move a plan's funds to another investment option. Longstaff Report ¶ 44, at App. 409. Likewise, many stable value funds—again, including the ones used by American—typically contain an "equity-wash" provision, which restricts investments withdrawn from stable value funds from immediately being invested in in competing capital preservation options. *Id*. ¶ 45, at App. 409-10. Far from disputing that point, Mr. King agrees these latter provisions are the "industry standard" for stable value funds. King Report ¶ 27. Indeed, as Mr. King explains, liquidity restrictions are necessary to make a stable value fund work, as the funds invest in "long-term" bonds. *Id*.

In the end, Mr. King agrees that any prudent fiduciary faces "trade-offs" between risks, return, and liquidity when choosing a capital preservation menu. *Id*. ¶ 22. Where fiduciaries choose an option like the Credit Union Option, they are placing a "premium on liquidity and [the] strength of [a] guarantee" backed by the full faith and credit of the United States. *Id*. Stable value funds, by contrast, may generate higher returns, but they do so at the expense of other considerations. While Mr. King may have his own preference among those tradeoffs, he offers no expertise or evidence that a prudent fiduciary could not or would not make the same choice that the Plan fiduciaries did. *See supra* at 8. This Court should therefore reject Plaintiffs' condemnation of demand deposit options' returns relative to stable value funds, and their challenge to the Credit Union Option along with it.

## C.   **The Court Can Ignore Plaintiffs' Manufactured Factual Disputes.**

This Court can ignore the remainder of Plaintiffs' manufactured factual disputes, as none of them is material to resolving this case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

1. *Plaintiffs' Allegations About American's Fiduciary Process Are Both Irrelevant and Factually Unfounded*

Primarily, Plaintiffs claim there is a "factual dispute" about the "prudence of American Airlines' fiduciary *process*," such that there is "no need for the Court to determine whether the Credit Union Option substantively meets ERISA's fiduciary standard." Opp. at 18 (emphasis added). Plaintiffs are wrong for three independent reasons.

**First**, any "factual dispute" about American's fiduciary process is irrelevant. Plaintiffs have made clear that American could not, under any circumstances, prudently retain the Credit Union Option because of its purportedly poor performance. In response to questions posed by the Court, Plaintiffs stated expressly that they challenged a substantive outcome (the "retention" of the Credit Union Option) for substantive reasons (it produced "dramatically lower investment returns than other readily available capital preservation instruments."). ECF No. 168 at 4. Even today, Plaintiffs' expert affirms that any alleged procedural failure has no bearing on his analysis. King Report at 1 n.2 (arguing that "even if [American] had" considered removing the Credit Union Option, he would still call its decision not to do so "inappropriate"). Thus any dispute about American's "process" is immaterial to Plaintiffs' ultimate theory of liability, and this Court can cast Plaintiffs' arguments on this point aside. *See Anderson*, 477 U.S. at 248.

**Second**, Plaintiffs misconstrue the facts. Plaintiffs claim that "American Airlines has presented **zero** evidence that it considered" the risk or liquidity concerns associated with stable value funds, deeming that alleged failure the "**key** to Plaintiffs' claim that American Airlines failed to employ a prudent process." Opp. at 19 (second emphasis added). But that is simply untrue. Plaintiffs' own trial exhibit shows that American received a presentation in 2014 from its investment advisors outlining exactly the risk and liquidity concerns described above, including:

- The guarantee in a stable value fund's wrap contract" is "only as strong as the ability of the issuer to support it." Thus "[i]n the case of a default by a wrap

15

contract issuer, the contract would not be guaranteed," and participants who needed to cash out may receive a "market value less than their book value."

- Likewise, "wrap contracts do not generally cover outflows due to actions which are outside the normal operation of the plan, such as company layoffs beyond a certain corridor threshold, sale of a division, or plan sponsor insolvency." In those instances, too, "there is a risk for payments to be made at a market value below the book or participant statement value."

- Stable value funds carry "[l]iquidity [r]isk," i.e. stable value fuds "typically have a 12-month period" restricting the Plan's ability to remove funds and "[p]rovisions that prevent asset transfers to competitor funds for a stated time period (often 90 days)."

Ex. 2 (Plaintiffs' Trial Exhibit 45), at App. 23-24;[12] *see supra* at 13-14 (describing the same considerations).  Moreover, Plan fiduciaries received quarterly reports on the Credit Union Option throughout the relevant period.  *See, e.g.*, Ex. 3 (Joint Trial Exhibit 18), at App. 50.  The Plan's fiduciaries were thus well aware of the Credit Union Option's performance—and the associated risks and rewards of stable value funds—as they evaluated both investment options.

*Third*, and in all events, Plaintiffs have not shown that any failure to consider stable value funds was inconsistent with fiduciary practice.  That is, they submitted no evidence suggesting that it is accepted fiduciary practice to explicitly review and compare all capital preservation options to a stable value fund.  Nor could they.  Plan fiduciaries are not required to consider every conceivable alternative to their investments choices, from "gold bars" to "hedge funds."  *See Moitoso v. FMR LLC*, —F. Supp. 3d—, 2020 WL 1495938, at *14 (D. Mass Mar.

---

[12] Because Plaintiffs previously characterized their challenge as to American's selection and retention of the Credit Union Option, *see supra*, at 3, 15, Defendants had no occasion to introduce this evidence in support of their Motion for Summary Judgment.  But in their Opposition, Plaintiffs' falsely characterized the record by claiming (Opp. at 19) that there was "zero evidence" that Defendants had considered the risk and liquidity concerns associated with stable value funds or properly monitored the Credit Union Option.  Plaintiffs' statement is contradicted by the very exhibits they have designated for introduction in trial, which Defendants have included in an appendix for the Court's convenience.

27, 2020).  Nor are they under any "fiduciary duty to investigate alternative[] . . . funds" that would require an "apples-to-oranges comparison."  *Id.* (internal quotation marks omitted)).  For all the reasons explained, stable value funds and credit union options differ in critical ways (and in ways expressly considered by the Plan).  *See supra* at 13-16.  Plaintiffs' attempt to refashion their substantive challenge into a process-based one therefore goes nowhere.

2.    *Plaintiffs' Remaining Arguments Are Irrelevant and Ill-Conceived*

Plaintiffs' remaining complaints are nothing more than make-work.  First, Plaintiffs accuse American of attempting to "freight the record," complaining about an expert report from Mr. Walter Tourus that Defendants submitted for use in trial.  Opp. at 7-8.  But American has not relied, and does not rely, on the Tourus Report in support of its motion for summary judgment.  Plaintiffs' criticisms of that report—and their purported "factual dispute[s]" with it—are thus immaterial to the pending motion. *Id*. at n.5.

Second, Plaintiffs attempt to muckrake, casting aspersions on the "reason[s]" American chose to offer the Credit Union Option.  *See Id*. at 1-2, 5-6.  But Plaintiffs' insinuations are just that—they have never made any argument that American violated its duty of loyalty or engaged in self-dealing.  For good reason.  Plaintiffs cite a single email from an American Airlines executive, Kenneth Menezes, as evidence that American was "desperate" to retain the Credit Union Option.  *Id*. at 1.  But they do not allege that Mr. Menezes was ever a member of the fiduciary committees responsible for determining the Plan's capital preservation options, and their strained reading of Menezes' email says nothing about the motivations of the actual members of those committees.  Likewise, Plaintiffs note that (for a time) American[13] held a stake in American Beacon, an investment management group that earned a small amount of

---

[13] Technically, the stake was held by AMR Corporation, the former parent company of American Airlines, Inc.

compensation on services provided to the Credit Union.  *Id*. at 5-6.  But there is not ***one shred of evidence*** that any Plan fiduciary ever considered the American Beacon service relationship with the Credit Union in his or her decision to retain the Credit Union Option.  Nor does Plaintiffs' theory explain why American has retained the Credit Union to this day, despite divesting itself of any interest in American Beacon in 2015.  *Id*. at 2.  The obvious—and correct—explanation is that American retained the Credit Union Option because it was prudent to do so.

## II.   PLAINTIFFS CANNOT PROCEED WITH THEIR CLAIM FOR CO-FIDUCIARY LIABILITY AGAINST AMERICAN AIRLINES (COUNTS I AND II).

The Court should also dismiss Plaintiffs' bid for co-fiduciary liability against American.  First, Plaintiffs do not dispute that their co-fiduciary claim depends on their fiduciary breach claim against the Credit Union.  Mot. at 28.  Thus if Court grants judgment in the Credit Union's favor, it should do the same for American.  But, even if Plaintiffs could state a viable fiduciary breach claim against the Credit Union, their co-fiduciary liability claim against American would still fail because Plaintiffs have not alleged facts sufficient to meet the conditions of any of ERISA's three co-fiduciary liability provisions. *See* Mot. at 28-29.

American has explained why Plaintiffs cannot prevail under ERISA §§ 405(a)(1) and (3), which permits co-fiduciary liability only where the defendant has actual knowledge of another fiduciary's breach.  Mot. at 29 (citing *Donovan v. Cunningham*, 716 F.2d 1455, 1475 (5th Cir. 1983)).  Plaintiffs do not suggest they can meet that demanding standard.  *Cf. id.*  Instead, they boldly claim that *Donovan* is no longer good law, citing district court decisions they construe to displace it.  Opp. at 24.

Plaintiffs are incorrect.  Plaintiffs' citation of *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 284 F. Supp. 2d 511, 580 (S.D. Tex. 2003) is particularly inapt.  That court adopted a constructive knowledge standard for determining liability under ERISA ***section 403(a)***

18

not section 405(a)(1) or (3).  Indeed, the decision acknowledged that "the Fifth Circuit requires a more restrictive, actual knowledge standard for claims under § 405."  *Id.* at 591 (citing *Donovan,* 716 F.2d at 1475).  Plaintiffs also cite *Perez v. Bruister*, 54 F. Supp. 3d 629, 672 (S.D. Miss. 2014), but that decision did not expressly rest on section 405(a)(1) or (a)(3), and it nowhere discussed the appropriate standard of knowledge.  In affirming this unreasoned decision, a panel of the Fifth Circuit certainly did not (and could not have) *sub silentio* overruled its precedent.  *Perez v. Bruister* 823 F.3d 250 (5th Cir. 2016).  *Donovan* thus remains good law and controlling in this Court.

That leaves Plaintiffs to pin their hopes on ERISA § 405(a)(2).  As Plaintiffs' briefing reflects, Opp. at 23-24, that provision applies only to a defendant that has breached its own fiduciary duties.  *See* 29 U.S.C. § 1105(a)(2). Thus, because Plaintiffs have not adequately supported a viable fiduciary breach claim against American, *see supra* Part I, they have not provided a basis for co-fiduciary liability either.

## III.   PLAINTIFFS HAVE ABANDONED ANY CLAIM THAT AMERICAN ENGAGED IN A PROHIBITED TRANSACTION (COUNT III).

In its opening brief, Mot. at 30-32, Defendants explained why Plaintiffs could not hold Defendants liable for causing a prohibited party-in-interest transaction under ERISA § 406(a). Those transactions are exempt under ERISA § 408(b), which covers certain deposits held in federal banks or credit unions.  Plaintiffs nowhere address whether that exemption applies, much less rebut Defendants' arguments explaining why it does.  This Court should therefore grant summary judgment as to Count III.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court grant their Motion for Summary Judgment.

19

Respectfully submitted,

Dated:  July 30, 2020                                    */s/ Jeffrey I. Kohn*

Jeffrey I. Kohn* (N.Y. Bar # 1980838)
Karen Gillen (N.Y. Bar # 2963338)
O'MELVENY & MYERS LLP
7 Times Square
New York, New York 10036
Tel.: (212) 326-2000
Fax: (212) 326-2061
jkohn@omm.com
kgillen.@omm.com

Brian D. Boyle* (D.C. Bar # 419773)
Shannon M. Barrett* (D.C. Bar # 476866)
Meaghan VerGow* (D.C. Bar # 977165)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Tel.: (202) 383-5300
Fax: (202) 383-5300
bboyle@omm.com
sbarrett@omm.com
mvergow@omm.com

Dee J. Kelly, Jr. (S.B. # 11217250)
Lars L. Berg (S.B. # 00787072)
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Tel.: (817) 332-2500
Fax: (817) 878-9280
dee.kelly.2@kellyhart.com
lars.berg@kellyhart.com

*admitted *pro hac vice*

**ATTORNEYS FOR DEFENDANTS
AMERICAN AIRLINES, INC. AND THE
AMERICAN AIRLINES PENSION ASSET
ADMINISTRATION COMMITTEE**

20

**CERTIFICATE OF SERVICE**

On July 30, 2020, a true and correct copy of the foregoing document was served upon all persons who have requested notice and service of pleadings in this case via the Court's CM/ECF system.


_____*Jeffrey I. Kohn*_____

Jeffrey I. Kohn* (N.Y. Bar # 1980838)
O'MELVENY & MYERS LLP
7 Times Square
New York, New York 10036
Tel.: (212) 326-2000
Fax: (212) 326-2061
jkohn@omm.com